## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### APPEAL NO. 23-13855

JONATHAN TRENT MASSA,
*Plaintiff/Appellant,*

v.

TEAMSTERS LOCAL UNION 79 and UNITED PARCEL SERVICE, INC.,
*Defendants/Appellees.*

On Appeal from the United States District Court
For the Middle District of Florida, Tampa Division
District Court Docket No.: 8:22-cv-00796-KKM-JSS

## APPELLEE TEAMSTERS LOCAL UNION 79's MOTION TO DISMISS APPEAL OR FOR SUMMARY AFFIRMANCE AND 11TH CIR. R. 31-1(c) REQUEST TO POSTPONE DUE DATE FOR REMAINING BRIEFS

Thomas J. Pilacek
THOMAS J. PILACEK & ASSOCIATES
1306 Town Plaza Court
Winter Springs, FL 32708
(407-660-9595)
tpilacek@pilacek.com

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee TEAMSTERS LOCAL UNION 79, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files their Certificate of Interested Persons and Corporate Disclosure Statement:

1. International Brotherhood of Teamsters (IBT) – Parent organization/ affiliate of Defendant/ Appellee Teamsters Local Union 79

2. Kim Vaughan Lerner, LLP – Counsel to Defendant/ Appellee United Parcel Service, Inc.

3. Lerner, Brian L. – Counsel to Defendant/ Appellee United Parcel Service, Inc.

4. Liles, William R. - Counsel to Defendant/ Appellee United Parcel Service, Inc.

5.  Massa, Jonathan Trent – Plaintiff/ Appellant

6. Honorable Kathryn Kimball Mizelle - United States District Court Judge

7. Pilacek, Thomas J. – Counsel to Defendant/ Appellee Teamsters Local Union 79

8. Schmoyer Reinhard, LLP – Counsel to Defendant/Appellee United Parcel Service, Inc.

9.  Honorable Julie S. Sneed- United States District Court Magistrate Judge

10. Thomas J. Pilacek & Associates, LLC – Counsel to Defendant/ Appellee Teamsters Local Union 79

11. Teamsters Local Union 79 - Defendant/Appellee

12. The Usman Law Firm, P.A. - Counsel to Plaintiff/ Appellant

13. United Parcel Service, Inc. – Defendant/ Appellee

14. Usman, Derek P. – Counsel to Plaintiff/ Appellant

**APPELLEE TEAMSTERS LOCAL UNION 79's MOTION TO DISMISS
APPEAL, OR FOR SUMMARY AFFIRMANCE, AND REQUEST TO
POSTPONE DUE DATE FOR REMAINING BRIEFS**

Pursuant to FRAP 2 and 27 and 11th Cir. R. 27-1, 33-1(c), and 42-4, Defendant/Appellee TEAMSTERS LOCAL UNION 79 (hereinafter "Local 79") respectfully moves for entry of an order dismissing this appeal as frivolous, or alternatively for summary affirmance, and for postponement of the due date for subsequent briefs until the Court has had an opportunity to rule on this Motion. As demonstrated herein, Massa's argument that his claims are not time-barred is both factually baseless and was not properly preserved because it was not made to the District Court.

## PROCEDURAL HISTORY

Plaintiff/Appellant Jonathan Trent Massa (hereinafter "Massa") sued his former employer, Defendant/Appellee United Parcel Service, Inc. (hereinafter "UPS") and his former union, Defendant/Appellee Local 79, for wrongful discharge and retaliation in violation of Title VII of the Civil Rights Act (race) and the Americans With Disabilities Act (disability) in the U.S. District Court, Middle District of Florida, Tampa Division. After completion of discovery both UPS and Local 79 moved for summary judgment. On October 26, 2023, Hon. Kathryn Kimball Mizelle entered an Order which granted summary judgment in favor of both defendants on all claims (doc. 50, attached as Exhibit A)(hereinafter "Order"). Final judgment dismissing the case was entered the

following day (doc. 51); and Massa filed a timely appeal (11th Cir. Doc. 1). Massa's initial brief, to which this Motion is directed, was timely filed on February 7, 2024 (11th Cir. Doc. 13).

## FACTUAL BACKGROUND.

As recited in the Summary Judgment Order at pp. 1-4, Massa was employed by UPS as a part-time package handler under a collective bargaining agreement between UPS and Local 79 which governed his conditions of employment. During his employment Massa had filed a number of grievances protesting disciplinary actions and other conduct by UPS (some of which alleged workplace racial discrimination, the last of which had been filed in August, 2019, see Order, p. 12). In November 2019, Massa severely injured his knee outside of work. He applied for FMLA leave but was denied (because he had not worked enough hours to qualify); and he never returned to work after he was injured.

On January 2, 2020, UPS sent a letter to Massa which warned that he would be terminated unless he returned to work within 48 hours of receipt (Order, p. 2 and Exhibit B). On January 14, 2020, UPS sent a letter to Massa which stated that he was terminated on January 13, 2020 (for taking an unauthorized leave of absence) (Order, p. 2 and Exhibit C). Under the collective bargaining agreement, after Massa failed to grieve the termination within ten working days UPS had ten working days to implement its decision; and it did so effective February 5, 2020. UPS sent Massa a

final paycheck for unused vacation on February 13, 2020. UPS also sent Massa a COBRA election form because his health insurance had been discontinued, on or about January 31, 2020. (Order, pp. 2-3 and Exhibit D). Massa executed the COBRA election form on March 31, 2020 (id.).

Massa also executed an application for disability benefits on March 31, 2020 (Exhibit E). The physician certification states that the disability commenced in November, 2019; and it states an estimated return-to-work date of July 1, 2020 (id.). Massa stated in his deposition (doc. 34-2, attached as Exhibit F )(hereinafter "Massa dep.") that he was medically released to return to work in approximately "mid-April" of 2020 (Massa dep. 69:23 – 70:19).

Massa did not attempt to return to work after he was medically released, and he did not notify UPS that he had been medically released (Massa dep. 32:3-14 and 71:24-72:24). His explanation was that it would have been "pointless" to do so because he had been fired, and if he had returned to work UPS would only have told him he had been fired. (Massa dep. 72:10-18).

On October 13, 2020, Massa and union steward Joey Howard engaged in a text message conversation in which Howard conveyed UPS' offer to settle the pending grievances which Massa had filed in 2019, before his injury. The offer was "$250 for your open grievances and also asking for a resignation instead of being fired". Massa rejected the offer and stated he "didn't even know I was fired till I went to the doctor's

office" (Order, p. 3 and Exhibit G, text message conversation attached to Massa's deposition as exhibit 7).

Massa filed EEOC charges against UPS and Local 79 on June 1, 2021 (Order, p. 3). That is approximately 415 days after Massa executed his COBRA election form on March 31, 2020; it is approximately 400 days after mid-April, 2020 when Massa testified he was released from his medical restrictions; and it is 326 days after July 1, 2020 - the latest date Massa was released to return to work.

## LEGAL STANDARDS

Summary judgment was granted on two independent grounds: (1) all of Massa's claims were time-barred because Massa failed to file timely EEOC charges within 300 days from the date he had actual knowledge of his termination (Order, pp. 1, 6-10); and (2) even if they were not time-barred all claims failed on their individual merits because Massa did not establish a prima facie case of either discrimination, or retaliation, based on either race or disability (Order, pp. 1, 10-12).[1]

In order to prevail on appeal, Massa must demonstrate error on every stated ground on which the District Court based its rulings. Sapuppo v. Allstate Floridian Ins. Co., 739 F. 3d 678, 680 (11th Cir. 2014). *See also* Love v. Acting Sec'y, Dept. of Homeland Sec., 2023 U.S. App. Lexis 29216 at *4 (11th Cir. 2023)(granting summary

---

[1] Judge Mizelle did not find it necessary to consider other, potentially dispositive, grounds for summary judgment raised by UPS and Local 79 in light of her conclusions (Order, p. 5).

affirmance for failure to demonstrate error on each ground). In this Motion we respectfully direct the Court's attention to the time-bar ground only which, because Massa's arguments are both factually baseless and were not properly preserved, is dispositive of the entire appeal.

This Court may dismiss an appeal if "it shall appear to the Court at any time that an appeal is frivolous and entirely without merit". 11th Cir. R. 42-4. An appeal will be dismissed as frivolous only if it is "utterly devoid of merit". Loder v. Icemakers Inc., 2022 U.S. App. Lexis at *5 (11th Cir. 2022)(citing Parker v. Am. Traffic Sols., Inc., 835 F.3d 1363, 1371 (11th Cir. 2016). A complaint is frivolous when the factual allegations are "clearly baseless" or the legal theories are "indisputably meritless". Carroll v. Gross,, 984 F.2d 392, 393 (11th Cir. 1993).[2]

Summary disposition of an appeal is appropriate where "the position of one of the parties is clearly right as a matter of law so that there can be no substantial question as to the outcome of the case, or where, as is more frequently the case, the appeal is frivolous." Staten v. DR Horton, Inc., 2023 U.S. App. Lexis 13531 at *1-*2 (11th Cir. 2023)(citing Groendyke Transp., Inc. v. Davis, 406 F.2d 1158, 1162 (5th Cir. 1969).

---

[2] FRAP 38 provides that "[i]f a court of appeals determines that an appeal is frivolous it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee". Rule 38 sanctions are appropriately imposed against appellants who raise "clearly frivolous claims in the face of established law and clear facts". Farese v. Scherer, 342 F.3d 1223, 1232 (11th Cir. 2003). A claim is clearly frivolous under Rule 38 if it is "utterly devoid of merit". Bonfiglio v. Nugent, 986 F. 2d 1391, 1393 (11th Cir. 1993).

Local 79 understands and acknowledges that these standards set a high bar and are reserved for completely specious appeals. For the reasons that follow we respectfully suggest that this is one of them.

## <u>MASSA'S ARGUMENT THAT HIS CLAIMS ARE NOT TIME-BARRED IS FACTUALLY BASELESS, AND IT WAS NOT MADE TO THE DISTRICT COURT AT SUMMARY JUDGMENT</u>

The statement of issues and the arguments made in Sections I and V of Massa's Initial Brief[3] which are directed to the time-bar ground fail on their face to demonstrate error for two independently dispositive reasons: (1) Massa's argument that he did not have "actual knowledge" of his termination prior to October 13, 2020 is conclusively foreclosed by Massa's deposition admissions that he had actual knowledge of his termination by the time he was medically released to return to work (not later than July 1, 2020), well outside the 300-day charge-filing period and long before October 13, 2020 (Section A., <u>infra</u>); and (2) Massa did not argue in the lower court that he did not have actual knowledge of his termination before October 13, 2020, and he cannot raise that argument for the first time on appeal (Section B., <u>infra</u>).

Further, Massa also failed to preserve many of the individual "timeliness" sub-arguments he makes in Sections I and V of his initial brief because he did not make them to the lower court, and/or they are otherwise frivolous (Section C., <u>infra</u>). The appeal is therefore utterly devoid of merit and should be dismissed, or should be

---

[3] References to Massa's Initial Brief are designated "Br."

summarily affirmed.[4]

### A. Massa's Admissions That He Knew He Had Been Terminated Prior to August 5, 2020 Foreclose His Argument That He Did Not Have Actual Knowledge of His Termination Until October 13, 2020.

Preliminarily, Massa does not dispute: (a) that he was required to file EEOC charges within 300 days after he received unequivocal notice of his termination – the last discriminatory or retaliatory act of which he complains; (b) that Massa filed his EEOC charges against UPS and Local 79 on June 1, 2021; or (c) that in order for his charges to be timely Massa must not have known that he had been terminated prior to August 5. 2020 (Order, pp. 6-7). Judge Mizelle concluded that Massa had actual knowledge of his termination well before August 5, 2020, based on his undisputed receipt of his final paycheck, his undisputed receipt of the COBRA election form, and his admission during the text message conversation on October 13, 2020, in which he did not deny that he knew he had been terminated and asserted that he knew he had been terminated when he saw his doctor and found out his insurance had been discontinued (in January, 2020)(Order, pp. 7-10).

---

[4] Massa's admissions also render his appeal on the second, "merits", ground equally frivolous. For example, contrary to his arguments in his initial brief Massa admitted in his deposition that he could not perform his job duties with UPS until long after he had been terminated (Massa dep. 70:2-19) and he was therefore not "qualified" for his position under the discrimination laws and could not state a prima facie case of race or disability discrimination, as Judge Mizelle concluded (Order, p. 10); and he admitted that he did not request any form of accommodation after he was injured (Massa dep. 72:10-18). Those and other frivolous "merits" issues will be addressed, if necessary, in Local 79's Answer Brief if the appeal is not dismissed or summary affirmance is not granted on the time-bar ground pursuant to this Motion.

In this appeal Massa argues that he did not have "actual knowledge" of his termination until October 13, 2020 when he received UPS's offer to settle his outstanding grievances, because his alleged non-receipt of the termination notice (which clearly and unambiguously states the termination decision, its date, and its reason, but on which Judge Mizelle did not base her conclusion of actual knowledge, see Order, p. 7), and the alleged ambiguity of Massa's text admission, his final paycheck, and the COBRA election form, are individually legally insufficient to establish a conclusion of actual knowledge (Br. Sections I A., D., E., and V). However, it is unnecessary for the Court to consider any of those arguments because in his deposition Massa admitted having actual knowledge that he had been terminated at (and before) the time he was medically released to return to work well before August 5, 2020, which renders his "actual knowledge" argument to this Court completely baseless.

Massa admits in his initial brief that he had been released to return to work from his injury not later than July 1, 2020 (Br. 21 and 26, n.1). However, Massa testified in his deposition that he did not provide his physician's return-to-work release to UPS, and that he did not attempt to return to work after he had been medically released, because he knew he had already been fired (Massa dep. at 31: 9  - 33:7  and 71:24 - 72:24). Massa testified that he received a return-to-work release from his physician (Massa dep. 31: 9-13), and that he already knew that he had been fired at the time he

received it (Massa dep. 31:24-32:2). Massa further testified:

"Q. Mr. Massa, assuming for the moment you received the return to work authorization approximately June or earlier of 2020 –

A. Yes.

Q. – you did not provide the return to work authorization from your physician to UPS?

A. I was fired. I was told to not come to work. I was fired.

Q. The answer is you did not do that, correct?

A. I was – that's not really the answer, though, because I was – why would I do that when I'm told that I'm fired? I did not go to work." (Massa dep. 32:3 – 14).

Massa later reiterated his testimony that he did not notify UPS that he had been medically released to return to work (Massa dep. 71:24 – 72:6), this time adding that he also never requested a light duty assignment which he could perform while he remained medically restricted "because I was fired" and that it would have been "pointless" because "they would have just told me that I was fired" (Massa dep. 72:10-18). Massa also admitted that he understood the October 13, 2020 settlement offer to mean "you could have $250, get all the grievances gone, or you could just stay fired." (Massa dep. 72:19-24).

Those admissions – which Massa did not disclose to this Court in his initial brief – directly contradict and are conclusively fatal to Massa's arguments in Sections I and

V that he did not have actual knowledge that he had been terminated until he received the text message from Howard on October 13, 2020 (the so-called "$250 termination ultimatum", see Br. 7). Any employee who does not know that he had been fired after he could not work and had not worked for seven months would notify his employer and attempt to return to work when he was medically released to return. Yet, Massa admits that he *deliberately* did neither; and his *only* excuse was that such actions would have been "pointless" *because* he had been fired and would only have been told he had been fired if he had attempted to return to work, or had requested light duty while he was still medically restricted.

Massa's admissions alone are sufficient to trigger the charge-filing period well before August 5, 2020; and they therefore render all of his individual sub-arguments, and this appeal, "completely baseless and indisputably meritless". Regardless of whether or not the evidence were insufficient to establish that Massa had actual knowledge of his termination by the time he executed the COBRA election form on March 31, 2020 (as he argues), his admissions conclusively establish that he had actual knowledge, and the charge-filing period thereby commenced, before July 1, 2020 - long before October 13, 2020 and well outside the 300-day charge-filing period.[5]

---

[5] Nor could Massa's untimely charges be saved by equitable tolling of the charge-filing period (an issue on which Massa has the burden of proof but does not argue in his initial brief). It is well settled in this Circuit that the time to file discrimination charges begins to run when the facts which would support a charge of discrimination were apparent or should have been apparent to a person with a reasonably prudent regard for his rights. Equitable tolling does not extend the earlier-commenced charge-filing period unless the facts show that

Accordingly, Massa's factual assertions and his legal arguments which depend on them are baseless; and this appeal is frivolous.

### B. Massa Failed to Preserve His "Actual Knowledge" Arguments Because He Did Not Make Them In the Lower Court.

Not only is Massa's "actual knowledge" argument baseless, but in addition it was never made to the lower court (Order, p. 9 para. 2). It is well settled in this Circuit that an argument which was not made to the lower court, particularly one grounded in fact, cannot be raised for the first time on appeal. See, e.g., Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331-1332 (11th Cir. 2004); FTC v. Abbvie Prods. LLC, 713 F.3d 54, 65 (11th Cir. 2013); Valle v. Ceres Env'l Servs., Inc., 2022 U.S. App. Lexis 14207 at *25-*26 (11th Cir. 2022); Mitchell v. DHR, 2023 U.S. App. Lexis 11234 at *3 (11th Cir. 2023). Because Massa did not argue to the District Court that he lacked actual knowledge of his termination prior to October 13, 2020, that argument is not properly considered on appeal; and dismissal or summary affirmance is warranted for that reason as well.

Throughout his amended complaint Massa had alleged that he was terminated on October 13, 2020, when he received and rejected UPS's settlement offer (doc. 12,

---

the employee had "no reason to believe that he was the victim of unlawful discrimination". See, e.g., Muscogee County Bd. of Education, 688 F. 2d 1383, 1387-88 (11th Cir. 1982); Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 660-662 (11th Cir. 1993); Bagley v. City of Tampa, 2008 U.S. Dist. Lexis 62701 at *5 - *8 (M.D. Fla. 2008)(discussing cases). By his own admissions Massa undisputedly knew that he had been terminated (in alleged violation of the ADA and/or Title VII) well before August 5, 2020.

appx. tab 12, paras. 9, 32, 51-52, 63, 76, 89, 105, 115, 122, 135-136). In response to UPS's and Local 79's time-bar arguments at summary judgment Massa argued *only* that his termination did not become final until October 13, 2020 when he rejected the offer (Order, pp. 7-8).  He did *not* argue that he did not have "actual knowledge" of his termination prior to October 13, 2020. An "actual knowledge" argument presents completely different factual and legal issues from "finality", the *only* issue Massa argued at summary judgment. Hence, Massa has failed to preserve the arguments he makes in Sections I and V of his initial brief; and dismissal or summary affirmance is warranted for that independent reason.[6]

### C. Massa's Individual Sub-Arguments on Appeal Have Not Been Preserved and/or are Frivolous.

Because Massa's appeal is utterly devoid of merit for the above reasons alone, it should be unnecessary for this Court to address his individual sub-arguments directed to the "actual knowledge" issue. Notwithstanding, even if the Court were to find it appropriate to consider any of Massa's sub-arguments, nevertheless dismissal or summary affirmance is warranted because they, too, have not been preserved and/or are otherwise baseless.

---

[6] Massa has abandoned his "finality" argument on appeal. It is well settled in this Circuit that any argument not raised in Appellant's brief, or which is "inadequately" briefed by way of only passing or tangential reference, is deemed abandoned on appeal. Access Now, supra, 385 F.3d at 1340; Kellner v. NCL (Bah.), Lte., 763 Fed. Appx. 662, 665-666 (11th Cir. 2018)(discussing cases). Massa's "finality" argument receives only a passing reference in Massa's initial brief with no citation to contrary or distinguishing cases (Br. 6, 19); and it is therefore abandoned.

Initially, although in his initial brief Massa claims that his final paycheck, the COBRA election form, and his knowledge that his health insurance had been discontinued were individually insufficient to provide unequivocal notice of his termination (Br. 11; 16-19), once again Massa did not raise that challenge in response to UPS's or Local 79's summary judgment motions; and it, too, cannot be raised for the first time in this appeal. And, as set forth above the argument cannot affect the outcome based on Massa's deposition admissions; and it is therefore frivolous.

Second, even if Massa's "finality" argument were not abandoned, it is legally frivolous. It is undisputed that Massa did not file any grievances after he was injured in November, 2019 (see Massa dep., pp. 88:22 – 89:3). The grievances which UPS offered to settle in October, 2020 were filed before Massa's injury, they were unrelated to the reason for his subsequent termination, and their disposition would not have affected his termination. As Judge Mizelle aptly noted, Massa's argument that his termination did not become final until he rejected UPS's settlement offer is conclusively foreclosed by well-established law which holds that grievance proceedings do not extend the time for filing charges, which starts when the alleged discrimination occurred (Order, pp. 8-9). Delaware State College v. Ricks, 449 U.S. 250, 261 (1980)(rejecting argument that grievance proceeding tolls the statute of limitations for discriminatory discharge actions until completion of grievance proceeding). See also AMTRAK v, Morgan, 536 U.S. 229, 234 (2002)(citing Electrical

Workers v. Robbins & Myers, Inc., 429 U.S. 229, 234 (1976)(rejecting claim that charge was timely because the alleged unlawful employment practice was "nonfinal" until conclusion of the grievance/arbitration procedure). Massa does not cite to any contrary or distinguishing cases in his initial brief. Accordingly, even if not abandoned Massa's "finality" argument is objectively frivolous under clearly established law.[7]

Third, each of Massa's remaining arguments are patently frivolous. His argument that he did not receive UPS's return-to-work notice or UPS's termination notice because he was too incapacitated to pay attention to them and treated them like "junk mail" (Br. 5, 10, 13) is irrelevant because Judge Mizelle based her "actual knowledge" conclusion on other grounds which were not disputed, and she specifically refrained from deciding whether or not Massa received the notices (Order, p. 7). Further, Massa also did not make his "incapacitated" argument in the lower court and thereby failed to preserve it.

Similarly, Massa's argument that UPS breached the bargaining agreement when it sent the return-to-work notice and termination notice by certified mail (Br. 9-11) is also irrelevant. An employer's failure to adhere to appropriate contractual procedures when it terminates an employee does not mean that the employee was not terminated. As set forth previously, under established law complaints alleging that a termination

---

[7] Massa's "finality" argument is not only legally frivolous, it is also logically nonsensical. The fact that grievances protesting actions which allegedly violated the bargaining agreement remained unresolved does not mean that the protested actions (which start the charge-filing period) had not yet occurred.

**Page 14 of 16**

violated the bargaining agreement do not affect the time limit for filing discrimination charges (Order, pp. 8-9).

Finally, Massa's argument that his termination was not effective because the discipline notices were generated by a computer (Br. 19-20) is patently ludicrous; and it, too, was never made in the District Court.

## CONCLUSION

In his initial brief Massa attempts, in effect, to impermissibly invent a new defense to the time-bar determination for the first time on appeal, and he impermissibly bases his new defense on an (undisclosed) admittedly false factual premise. The appeal is frivolous because it is utterly devoid of factual or legal merit; and it should therefore be dismissed or, alternatively, the judgment should be summarily affirmed.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing has been electronically filed with the Clerk of U.S. Court of Appeals, Eleventh Circuit, using the CM/ECF Appellate System and served via email to Derek P. Usman, Esq., Usman Law Firm, P.A., 20701 Bruce B. Downs Blvd., Suite 207, Tampa, FL 33647, at derek@usmanfirm.com, and Shannon B. Schmoyer, Esq., Schmoyer Reinhard LLP, 8000 IH 10 West, Suite 1600, San Antonio, TX 78230, at sschmoyer@sr-llp.com on this 19th day of February, 2024.

THOMAS J. PILACEK & ASSOCIATES
Tuskawilla Office Park

**Page 15 of 16**

1306 Town Plaza Court
Winter Springs, FL 32708
Telephone: 407-660-9595
Facsimile: 407-660-8343
Email: tpilacek@pilacek.com
    amalpartida@pilacek.com
By: */s/ Thomas J. Pilacek, Esq.*
    Thomas J. Pilacek
    Florida Bar No. 143576

*Counsel for Defendant/ Appellee*
*Teamsters Local Union 79*

## Certificate of Compliance with Type-Volume Limitation

I hereby certify that, in compliance with the *Federal Rules of Appellate Procedure,* this motion has been prepared using 14-point Times New Roman and contains 3,931 countable words. See *Fed. R. App. P.* 27(d)(2) and *Fed. R. App. P.* 32(a)(5) and 32(a)(6).

/s/ *Thomas J. Pilacek*
Thomas J. Pilacek, Esq.

# EXHIBIT A

# To Motion to Dismiss or For Summary Affirmance

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JONATHAN TRENT MASSA,

     Plaintiff,

v.                          Case No: 8:22-cv-00796-KKM-JSS

TEAMSTERS LOCAL UNION 79, and
UNITED PARCEL SERVICE, INC.

     Defendants.

_____

## ORDER

Jonathan Trent Massa sues his former employer, United Parcel Service ("UPS"), and his former union, Teamsters Local Union 79 (the Union), for wrongful discharge and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 (ADA). *See* Am. Compl. (Doc. 12). Both Defendants move for summary judgment on all Massa's claims. *See* Union MSJ (Doc. 32); UPS MSJ (Doc. 34). Because Massa's claims are time-barred and would fail on the merits, the motions for summary judgment are granted.

## I. UNDISPUTED FACTS

Massa worked as a part-time package loader for UPS. Statement of Facts (Doc. 33) at 1. During his employment, he was a member of the Union, and a collective bargaining

agreement (CBA) between UPS and the Union governed his employment. *Id.*; CBA (Doc. 34-9). UPS addressed dozens of attendance-related disciplinary letters to Massa beginning in 2017. *See generally* Disciplinary Letters (Doc. 34-3). Most of these letters are Notices of Intent to Discharge for lack of attendance from the latter half of 2019. *Id.* In response, Massa filed dozens of grievances with the Union challenging the disciplinary letters and other conduct by UPS. *See generally* Massa Grievances (Doc. 34-8).

In November 2019, Massa suffered a serious knee injury outside of work. Statement of Facts at 1. He applied for leave under the Family and Medical Leave Act of 1993 (FMLA), *codified at* 29 U.S.C. § 2601 *et seq.*, but the application was denied. Statement of Facts at 2. Massa did not return to work after sustaining this injury. *Id.*

UPS continued to address Notices of Intent to discharge to Massa, all of which Massa denies receiving. *See, e.g.*, Resp. to UPS MSJ (Doc. 44) at 5. UPS addressed a letter to Massa on January 2, 2020, warning that he would be terminated unless he reported to work within forty-eight hours of receipt. Disciplinary Letters at 81. A discharge letter followed on January 14, 2020, informing Massa that he had been terminated on January 13, 2020. *Id.* at 87. Under the CBA, Massa could appeal his discharge within ten working days. CBA at 226. Once he failed to do so, UPS had ten working days to administer the discipline. *Id.* Massa's Employee History Profile indicates that UPS officially terminated him on February 5, 2020. Emp. Hist. Profile (Doc. 34-4) at 2. UPS sent a final paycheck

to Massa for his unused vacation time on February 13, 2020. Pay Hist. (Doc. 34-11) at 57–58.

Around this time, UPS discontinued Massa's employee health coverage. Massa Dep. (Doc. 34-2) at 34. In March 2020, Massa submitted a Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), *codified at* 29 U.S.C. § 1161 *et seq.*, election notice opting to keep his insurance through self-payments. Statement of Facts at 2; COBRA Form (Doc. 34-16) at 9.

Massa seeks to introduce evidence of a text message conversation on October 13, 2020, between himself and union steward Joey Howard. He argues that the texts provide evidence that UPS did not fire him until October 13, 2020. UPS argues that the conversation is inadmissible. UPS MSJ at 12-13. For the purposes of these summary judgment motions, I assume without deciding that the messages are admissible. Howard told Massa that "[UPS] would like to make you a [sic] offer of $250 for your open grievances and also asking for a resignation instead of being fired." Text Messages (Doc. 42-1) at 2. Massa declined the offer and protested that he "[d]idn't even know I was fired till I went to the doctors [sic] office." *Id.* at 3.

Massa filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) against UPS and the Union on June 1, 2021. Statement of Facts at 2. Now he brings this action against UPS and the Union, alleging race and disability

discrimination claims as well as retaliation claims. *See generally* Am. Compl. Defendants

motion for summary judgment. UPS MSJ; Union MSJ.

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and

the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact

is material if it might affect the outcome of the suit under governing law. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the

basis for its motion and identifying those parts of the record that demonstrate an absence

of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608

(11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present

evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there

is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party

is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient

showing on an essential element of [his] case with respect to which [he] has the burden of

proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court reviews the record evidence as identified by the parties and draws all

legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d

1256, 1262 (11th Cir. 2020); *Reese v. Hebert*, 527 F.3d 1253, 1268 (11th Cir. 2008). Here,

to the extent that the record is disputed or capable of multiple inferences, the Court draws them in favor of the non-movant.

## III.   ANALYSIS

The Union and UPS each move for summary judgment. Union MSJ; UPS MSJ. In two instances, their motions raise arguments that overlap and apply to both the Title VII claims and the ADA claims. First, both Defendants aver that Massa's claims are time-barred because they were not raised within 300 days of any adverse employment action. Union MSJ at 16-20; UPS MSJ at 8-16. Second, both aver that Massa has failed to establish a prima facie case of any form of discrimination. Union MSJ at 20-26; UPS MSJ at 16-21.

Other arguments in the motions are unique to the moving party. The Union argues that Massa's claims against it fail under the standards applicable to unions. Union MSJ at 13-16. UPS argues that Massa cannot establish that its reason for discharging him was pretext for discrimination. UPS MSJ at 22-23. UPS also argues that Massa has only pleaded wrongful discharge claims and cannot raise other allegations of discrimination. *Id.* at 23-24. Finally, UPS argues that it cannot be held liable for any discrimination on the part of the Union. *Id.* at 24.

Summary judgment is appropriate. Massa did not file his charges of discrimination against Defendants within the required timeframe. Moreover, his professed inability to

work rendered him unqualified for his position after November 2019. His ADA retaliation claim would also fail because he did not engage in protected activity under the statute. Finally, his Title VII retaliation claim would fail for the lack of a causal connection between his alleged complaints of racial harassment and his termination. Because summary judgment is warranted on these grounds, I do not address the other arguments raised by UPS and the Union.

### A. The Time Bar

First, all of Massa's claims are time-barred. In Florida, plaintiffs bringing Title VII claims must file a charge of discrimination within 300 days of the last discriminatory act. 42 U.S.C. § 2000e-5(e)(1); *see also E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002) (per curiam). The clock "does not begin to run until a plaintiff receives notice of termination" if the discriminatory act is a firing. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 846 (11th Cir. 2000). Moreover, the communication of termination must be "unequivocal." *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1202 (11th Cir. 2003). Once the 300 days pass, the claims are time-barred. *Joe's Stone Crabs, Inc.*, 296 F.3d at 1271. The same rules apply to ADA claims. 42 U.S.C. § 12117.

Massa filed his charge against UPS and the Union on June 1, 2021. Statement of Facts at 2. Therefore, the last discriminatory act must have occurred no earlier than August

5, 2020. Because the discriminatory act at issue is Massa's termination, the act "occurred" when Massa received notice of his termination. *See Stewart*, 232 F.3d at 849.

Massa was on notice of his termination by March 2020. As summarized above, Massa claims he never received any of the letters warning of his impending termination, Resp. to UPS MSJ at 5, though all are addressed to the home where he has lived for the past twenty years. *Compare* Disciplinary Letters at 81, 87 *with* Massa Dep. at 6. Because this dispute is both genuine and material, I do not resolve the issue of notice of termination based on the January 2020 letters. But Massa does not dispute that other, unequivocal forms of notice reached him well before August 2020. He received a final paycheck from UPS paying out his unused vacation time on February 13, 2020. Pay Hist. at 57–58. And during a trip to the doctor's office "before February of 2020," he learned that his employer-provided health insurance was cancelled. Massa Dep. at 34. At the end of March 2020, he submitted signed COBRA forms electing to keep his health insurance via self-payment. COBRA Form at 9. Those forms indicated that his loss of coverage occurred on January 5, 2020. *Id.* When UPS offered to settle Massa's grievances for $250, Massa referred to this event, saying that he "[d]idn't even know I was fired till I went to the doctors [sic] office." Text Messages at 3. Consequently, Massa received notice of the last allegedly discriminatory act well before the August 5, 2020 cutoff date.

Massa's response to the motion posits that he was fired much later, on October 13,

2020. Resp. to UPS MSJ at 3-8; Resp. to Union MSJ at 7-13. He cites several portions of the CBA between UPS and the Union that outline protections for workers, such as the leave policy for employees covered by the FMLA, CBA at 56–57, the leave policy for workers participating in union activities, *id.* at 51, and the general provision that "[t]he Employer shall not discharge nor suspend any employee without just cause," *id.* at 225. He contends that his termination violated these policies, and therefore his discharge could not have taken effect on February 5. Instead, he proposes that he remained a UPS employee until October 13, when Howard texted Massa that "[UPS] would like to make you a [sic] offer of $250 for your open grievances and also asking for a resignation instead of being fired." Text Messages at 2.[1] He cites no other documentation in support of this October 13 date and gives no explanation as to how the settlement offer would have legally effectuated his termination.

Massa is confusing two separate issues. One is whether his discharge complied with the terms of the CBA. The other is whether he was discharged at all. If an employer violates a CBA through a wrongful discharge, then the fired employee may pursue a remedy through the CBA's grievance procedures or, in some cases, a breach-of-contract suit. *See*

---

[1] He also notes that the Union scheduled a hearing with UPS in March 2021 to determine whether Massa's termination was proper. Resp. to UPS MSJ at 8. However, he rightly does not argue that this hearing was the date of termination; a "grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 (1980) (emphases omitted).

*Vaca v. Sipes*, 386 U.S. 171, 184–85 (1967). But the wrongful discharge is still just that: a discharge. *Id.*; *cf. Delaware State Coll. v. Ricks*, 449 U.S. 250, 260–61 (1980) (rejecting the argument that an employment decision is not final until the grievance process concludes). When Massa was terminated in February 2020, UPS's official records reflected that reality, his unused vacation time was paid out, his health coverage ended through UPS, and Massa filed COBRA forms to maintain health coverage via self-pay. By contrast, when Massa rejected UPS's offer in October 2020, nothing changed—because he was already fired. Massa does not put forth any evidence to contradict these facts or otherwise show he was employed until the October 2020 text message conversation.

Further, Massa did not first receive notice of his firing in October 2020. He does not argue otherwise in his responses to the motions; he merely asserts that UPS's attempt to terminate him was invalid because it violated the CBA. *See generally* Resp. to UPS MSJ at 3-8; Resp. to Union MSJ at 7-13. But the only notices that Massa disputes receiving are UPS's letters. Resp. to UPS MSJ at 5-6; Resp. to Union MSJ at 9-10. Assuming none of these reached him, Massa does not contest that he received notice of his termination when his health coverage ended, when his unused vacation time was paid out, or when he received the COBRA forms that he later used to continue his insurance. These events unequivocally communicated the termination. Massa admitted as much during the text message conversation with Howard in October 2020, when Howard extended UPS's offer to settle

the open grievances. Text Messages at 3. Thus, there is no genuine dispute of material fact that Massa received adequate notice well before August 5, 2020. His claims are time-barred.

## B. The Merits

Even if Massa's intentional discrimination claims were not time-barred, they would fail on the merits. One similarity between Title VII and the ADA is that both require plaintiffs alleging discrimination to be "qualified" to do the job. *Lewis v. City of Union City*, 934 F.3d 1169, 1179, 1185 (11th Cir. 2019). Perhaps the most basic qualification is "job presence"—the ability to attend work. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000). Massa, however, acknowledges that he was not able to return to his old job duties until June 2020 at the earliest, citing a doctor's note. Resp. to UPS MSJ at 16; *see also* Doctor's Note (Doc. 44-3). And although he argues in his responses that a reasonable accommodation might have been possible in the ADA context, he did not allege a reasonable-accommodation claim. *See generally* Am. Compl. He cannot now assert one in response to a motion for summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1313 (11th Cir. 2004) (per curiam). Moreover, the Eleventh Circuit has held "that an accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003). Even if Massa had brought a reasonable-accommodation

claim, then, it would likely have failed because his disability rendered him unable to show up to work "in the present or in the immediate future." *Id.*

Massa's ADA retaliation claims fare no better. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Both of Massa's ADA retaliation claims rely on the notion that UPS discharged Massa for inquiring into and requesting disability leave. Am. Compl. ¶¶ 74, 100. But by itself, requesting disability leave does not "oppose[] any act or practice made unlawful by" the ADA. 42 U.S.C. § 12203(a); *see also Johnson v. J.P. Morgan Chase Bank, N.A.*, 293 F. Supp. 3d 600, 609 n.8 (W.D. La. 2018). And there is no evidence that, in context, Massa's request for leave was made in opposition to an unlawful practice. Ergo, Massa's ADA retaliation claims fail on the merits.

Neither can his Title VII retaliation claims succeed. To make "a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quotations omitted). According to the operative complaint, "Massa filed in excess of 100 racial discrimination grievances with his union, and also complained

to human resources and his superiors concerning race discrimination." Am. Compl. ¶¶ 111, 128; *see also id.* ¶¶ 25–26. But a three-to-four-month gap between the protected expression and the adverse employment action, absent other evidence, belies the causal relation element. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). And Massa offers no evidence at the summary judgment stage of any complaints of racial discrimination that he presented within a similar timeframe. The last grievance that appears to mention race is dated August 15, 2019. Massa Grievances at 8 (Doc. 44-5). That length of time—by itself—is too attenuated to establish causation. And while Massa argues that "there were not any intervening events to sever any causal inference" that the complaints led to his termination, there was in fact a significant intervening event: his injury and subsequent absenteeism in November 2019. Accordingly, I conclude that there is no genuine dispute of material fact as to the causal relation element.

## IV.   CONCLUSION

For the above reasons, Defendants are entitled to summary judgment on Massa's claims. Accordingly, the following is **ORDERED**:

1. Teamsters Local Union 79's Motion for Summary Judgment (Doc. 32) is **GRANTED**.

2. United Parcel Service's Motion for Summary Judgment (Doc. 34) is **GRANTED**.

3.     The Clerk is directed to enter **JUDGMENT** in favor of Defendants Teamsters Local Union 79 and United Parcel Service, Inc.

4.     The Clerk is directed to terminate any pending motions and deadlines, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on October 26, 2023.

Kathryn Kimball Mizelle
United States District Judge

# EXHIBIT B

# To Motion to Dismiss or For Summary Affirmance

UPS - Florida District
8901 E Atlantic Ave
Orlando, FL  32824

**UPS**

**RECEIVED**

JAN **0 8** 2020
20-200
**TEAMSTERS LOCAL #79**

January 2, 2020

NOTICE

4551488
Jonathan Massa
8205 Nature Cove Way
Tampa, FL  33647

Re: 48 Hour Termination Notice

Dear Jonathan Massa,

You have forty-eight (48) hours to report to work.

Failure to report to work within forty-eight (48) hours of receipt of this letter will be considered unauthorized leave of absence and your employment at UPS will be terminated.

United Parcel Service

*Tom Teimer / CB*

Tom Teimer
Manager Bayside 3363

CERTIFIED MAIL 7019-1120-0001-3072-3593

cc:    Teamsters Union #79 CERTIFIED MAIL 7019-1120-0001-3072-3609
       Division Manager
       Human Resources

Employee: _____
Manager: _____
Steward: _____
Date: _____

MASSA000489

# EXHIBIT C

## To Motion to Dismiss or For Summary Affirmance

UPS - Florida District
8901 E Atlantic Ave
Orlando, FL 32824

RECEIVED

JAN 2 4 2020
20-930
TEAMSTERS LOCAL #79

January 14, 2020

DISCHARGE LETTER

4551488
Jonathan Massa
8205 Nature Cove Way
Tampa, FL 33647

Re: Discharge for Unauthorized Leave of Absence

Dear Jonathan Massa,

This is official notification under Article 16, 48 &52 of the Labor Agreement that your employment with UPS is terminated effective 01/13/2020 for just cause, specifically an unauthorized leave of absence.

United Parcel Service

Tom Teimer /CB

Tom Teimer
Manager Bayside 3363

CERTIFIED MAIL 7019-1120-0001-3072-3272

cc:   Teamsters Union #79 CERTIFIED MAIL 7019-1120-0001-3072-3296
      Division Manager
      Human Resources

Employee: _____
Manager: _____
Steward: _____
Date: _____

MASSA000495

# EXHIBIT D

# To Motion to Dismiss or For Summary Affirmance

**TEAMCARE**®

A CENTRAL STATES HEALTH PLAN

EMPLOYEE TRUSTEES
CHARLES A. WHOBREY
GEORGE J. WESTLEY
MARVIN KROPP
GARY DUNHAM

EMPLOYER TRUSTEES
GARY F. CALDWELL
CHRISTOPHER J. LANGAN
ROBERT WHITAKER

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

January 31, 2020

CBR-3421856
JONATHAN T MASSA
8205 NATURE COVE WAY
TAMPA, FL 33647

**COBRA CONTINUATION
COVERAGE ELECTION NOTICE**

Dear TeamCare Member and Family:

**This notice has important information about your right to continue your health care coverage with TeamCare - A Central States Health Plan (the Plan), as well as other health coverage options that may be available to you, including coverage through the Health Insurance Marketplace at HealthCare.gov or call 800-318-2596.  You may be able to get coverage through the Health Insurance Marketplace that costs less than COBRA continuation coverage.**  Please read the information in this notice very carefully before you make your decision.  If you choose to elect COBRA continuation coverage, you should use the election form provided later in this notice.

If you do not elect COBRA continuation coverage, your coverage under the Plan will end on 01/05/2020. Each person ("qualified beneficiary") listed below is entitled to elect COBRA continuation coverage, which will continue group health care coverage under the Plan for up to 24 months (in the case of the end of employment or a reduction in hours pursuant to Section 3.16(b) of the Plan) or up to 36 months (in the case of any other qualifying event):

JONATHAN T MASSA

If elected COBRA continuation coverage will begin on 01/05/2020 and can last until 01/01/2022.  Optional plan levels for COBRA continuation coverage may include Full Coverage and Core Coverage. Full Coverage is the plan of benefits you had while reported active by your employer without loss of time benefits. Core Coverage is the same plan as Full Coverage but excludes dental, vision, life insurance and eligibility for retiree health coverage.  Please remember, if you elect Core Coverage you will not be allowed to switch back to Full Coverage for the remainder of the COBRA continuation coverage period. In addition, you are not allowed to upgrade a period of employer provided Plan S Coverage unless that period is immediately preceded by either:

a)   a period of employer provided Full Plan Coverage or
b)   a period of COBRA coverage in which you elected and maintained the higher plan.

The optional plan levels available to you and their respective weekly rates are indicated below:

| Plan Type | Full Coverage | Core Coverage |
|-----------|---------------|---------------|
| U3 | $287.92 | $242.50 |

You do not have to send any payment with the election form (provided that payment is received within 45 days of the election form).  Important additional information about payment for COBRA continuation coverage is included in this letter.  You will be notified of any rate increases as they occur.

JTMASSA000145

8647 West Higgins Road, Chicago IL 60631-2803    |    MyTeamCare.org

If you or your eligible dependents are entitled to Medicare benefits before the date COBRA continuation coverage is elected that coverage will be primary to your COBRA continuation coverage except in cases where the reason for entitlement to Medicare benefits is end stage renal disease. If the reason for entitlement to Medicare benefits is end stage renal disease Medicare will be secondary to your COBRA continuation coverage until the end of the first 30 months of Medicare benefits. If you or your eligible dependents become entitled to Medicare benefits after the date COBRA continuation coverage is elected you must notify the Plan of the entitlement to Medicare benefits. You must notify the Plan even if the Medicare entitlement is only for Part A benefits. COBRA continuation coverage will end for the person becoming entitled to Medicare benefits.

You must also immediately notify the Plan if you or your eligible dependents become eligible for group health plan coverage under another plan. Group health plan coverage is health insurance coverage that is obtained through one's employment or, if covered as a dependent under another plan, the subscriber's employment. COBRA continuation coverage will end for the person becoming eligible for group health plan coverage under another plan. Your notice to the Plan should include the following:

1. Your name and member ID number
2. Your address and telephone number
3. The name and birth date of the person who became entitled to Medicare benefits or became eligible for other group health plan coverage (if not yourself)
4. The effective date Medicare or other group health coverage began
5. If other coverage is through Medicare, please include a copy of the Medicare card and indicate if Medicare eligibility was due to end stage renal disease
6. If other coverage is through another group health plan, the insurer's name, the insurer's phone number, and the group policy number

Notification should be mailed to: Self-Payments Department, TeamCare, Dept. 10291, Palatine IL 60055-0291 or faxed to: 847-518-9768, Attn. Self-Payments Department.

If you have any questions about this notice or your rights to COBRA continuation coverage, call us at 800-TEAMCARE (832-6227).

JTMASSA000146

CBR 07A 20031 001447 / 806416300 / P2-8

## IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS
## PAGE 1 OF 4

**What is continuation coverage?**

Federal law requires that most group health plans (including this Plan) give employees and their families the opportunity to continue their health care coverage when there is a "qualifying event" that would result in a loss of coverage under the Plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee (or retired employee) covered under the group health plan, the covered employee's spouse, and the dependent children of the covered employee.

Continuation coverage is the same coverage that the Plan gives to other members or beneficiaries under the Plan who are not receiving continuation coverage. Each qualified beneficiary who elects continuation coverage will have the same rights under the Plan as other members or beneficiaries covered under the Plan, including open enrollment and special enrollment rights.

**How long will continuation coverage last?**

In the case of a loss of coverage due to end of employment or reduction in hours of employment, coverage generally may be continued only for up to a total of 24 months. In the case of losses of coverage due to an employee's death, divorce or legal separation, the employee's becoming entitled to Medicare benefits or a dependent child ceasing to be a dependent under the terms of the Plan, coverage may be continued for up to a total of 36 months. When the qualifying event is the end of employment or reduction in the employee's hours of employment, and the employee became entitled to Medicare benefits less than 24 months before the qualifying event, COBRA continuation coverage for qualified beneficiaries other than the employee lasts until 36 months after the date of Medicare entitlement. This notice shows the maximum period of continuation coverage available to the qualified beneficiaries.

Continuation coverage may end before the date noted above in certain circumstances, like failure to pay premiums, fraud, or the individual becomes covered under another group health plan.

**Are there other coverage options besides COBRA Continuation Coverage?**

Yes. Instead of enrolling in COBRA continuation coverage, there may be other more affordable coverage options for you and your family through the Health Insurance Marketplace, Medicaid, or other group health plan coverage options (such as a spouse's plan) through what is called a "special enrollment period." Some of these options may cost less than COBRA continuation coverage.

You should compare your other coverage options with COBRA continuation coverage and choose the coverage that is best for you. For example, if you move to other coverage you may pay more out of pocket than you would under COBRA because the new coverage may impose a new deductible.

When you lose job-based health coverage, it's important that you choose carefully between COBRA continuation coverage and other coverage options, because once you've made your choice, it can be difficult or impossible to switch to another coverage option.

**How can you extend the length of COBRA continuation coverage?**

If you elect continuation coverage, an extension of the maximum period of coverage may be available if a qualified beneficiary is disabled or a second qualifying event occurs. You must notify the Plan of a disability or a second qualifying event in order to extend the period of continuation coverage. Failure to provide notice of a disability or second qualifying event may affect the right to extend the period of continuation coverage.

Disability
An extension of coverage to 29 months for qualifying events caused by the end of employment or a reduction in hours, pursuant to Section 3.16(b) of the Plan, may be available if any of the qualified beneficiaries is determined by the Social Security Administration (SSA) to be disabled. The disability has to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the original 24-month period of continuation coverage. To receive the disability extension of coverage you must notify the Plan within 60 days of the date of the disability determination by the SSA and before the end of the initial 24-month period of continuation coverage. You must send a copy of the disability award from the SSA to:

JTMASSA000147

## IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS
## PAGE 2 OF 4

Indicative Records Department
TeamCare – A Central States Health Plan
PO Box 5112
Des Plaines IL 60017-5112

Each qualified beneficiary who has elected continuation coverage will be entitled to the disability extension if one of them qualifies. If the qualified beneficiary is determined by SSA to no longer be disabled, you must notify the Plan of that fact within 30 days after SSA's determination.

For more information about extending the length of COBRA continuation coverage visit: http://www.dol.gov/ebsa/publications/cobraemployee.html.

### How can you elect COBRA continuation coverage?

To elect continuation coverage, you must complete the election form and furnish it according to the directions on the form. Each qualified beneficiary has a separate right to elect continuation coverage. For example, the employee's spouse may elect continuation coverage even if the employee does not. Continuation coverage may be elected for only one, several, or for all dependent children who are qualified beneficiaries. A parent may elect to continue coverage on behalf of any dependent children. The employee or the employee's spouse can elect continuation coverage on behalf of all of the qualified beneficiaries.

### How much does COBRA continuation coverage cost?

Generally, each qualified beneficiary may be required to pay the entire cost of continuation coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent (or, in the case of an extension of continuation coverage due to a disability, 150 percent) of the cost to the group health plan (including both employer and employee contributions) for coverage of a similarly situated plan member or beneficiary who is not receiving continuation coverage. The required payment for each continuation coverage period for each option is described in this notice.

Other coverage options may cost less. If you choose to elect continuation coverage, you don't have to send any payment with the Election Form. Additional information about payment will be provided to you after the election form is received by the Plan. Important information about paying your premium can be found at the end of this notice.

**You may be able to get coverage through the Health Insurance Marketplace that costs less than COBRA continuation coverage.** You can learn more about the Marketplace below.

### What is the Health Insurance Marketplace?

The Marketplace offers "one-stop shopping" to find and compare private health insurance options. In the Marketplace, you could be eligible for a new kind of tax credit that lowers your monthly premiums and cost-sharing reductions (amounts that lower your out-of-pocket costs for deductibles, coinsurance, and copayments) right away, and you can see what your premium, deductibles, and out-of-pocket costs will be before you make a decision to enroll. Through the Marketplace you'll also learn if you qualify for free or low-cost coverage from Medicaid or the Children's Health Insurance Program (CHIP). You can access the Marketplace for your state at HealthCare.gov.

Coverage through the Health Insurance Marketplace may cost less than COBRA continuation coverage. Being offered COBRA continuation coverage won't limit your eligibility for coverage or for a tax credit through the Marketplace.

### When can I enroll in Marketplace coverage?

You always have 60 days from the time you lose your job-based coverage to enroll in the Marketplace. That is because losing your job-based health coverage is a "special enrollment" event. **After 60 days your special enrollment period will end and you may not be able to enroll, so you should take action right away.** In addition, during what is called an "open enrollment" period, anyone can enroll in Marketplace coverage.

JTMASSA000148

## IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS
### PAGE 3 OF 4

To find out more about enrolling in the Marketplace, such as when the next open enrollment period will be and what you need to know about qualifying events and special enrollment periods, visit www.HealthCare.gov.

**If I sign up for COBRA continuation coverage, can I switch to coverage in the Marketplace?  What about if I choose Marketplace coverage and want to switch back to COBRA continuation coverage?**

If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during a Marketplace open enrollment period.  You can also end your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period."  But be careful though - if you terminate your COBRA continuation coverage early without another qualifying event, you'll have to wait to enroll in Marketplace coverage until the next open enrollment period, and could end up without any health coverage in the interim.

Once you've exhausted your COBRA continuation coverage and the coverage expires, you'll be eligible to enroll in Marketplace coverage through a special enrollment period, even if Marketplace open enrollment has ended.

If you sign up for Marketplace coverage instead of COBRA continuation coverage, you cannot switch to COBRA continuation coverage under any circumstances.

**Can I enroll in another group health plan?**

You may be eligible to enroll in coverage under another group health plan (like a spouse's plan), if you request enrollment within 30 days of the loss of coverage.

If you or your dependent chooses to elect COBRA continuation coverage instead of enrolling in another group health plan for which you're eligible, you'll have another opportunity to enroll in the other group health plan within 30 days of losing your COBRA continuation coverage.

**What factors should I consider when choosing coverage options?**

When considering your options for health coverage, you may want to think about:

**Premiums**: Your previous plan can charge up to 102% of total plan premiums for COBRA coverage.  Other options, like coverage on a spouse's plan or through the Marketplace, may be less expensive.
**Provider Networks**: If you're currently getting care or treatment for a condition, a change in your health coverage may affect your access to a particular health care provider.  You may want to check to see if your current health care providers participate in a network as you consider options for health coverage.
**Drug Formularies**: If you're currently taking medication, a change in your health coverage may affect your costs for medication – and in some cases, your medication may not be covered by another plan.  You may want to check to see if your current medications are listed in drug formularies for other health coverage.
**Severance payments**:  If you lost your job and got a severance package from your former employer, your former employer may have offered to pay some or all of your COBRA payments for a period of time.  In this scenario, you may want to contact the Department of Labor at 866-444-3272 to discuss your options.
**Service Areas**: Some plans limit their benefits to specific service or coverage areas – so if you move to another area of the country, you may not be able to use your benefits.  You may want to see if your plan has a service or coverage area, or other similar limitations.
**Other Cost-Sharing**: In addition to premiums or contributions for health coverage, you probably pay copayments, deductibles, coinsurance, or other amounts as you use your benefits.  You may want to check to see what the cost-sharing requirements are for other health coverage options.  For example, one option may have much lower monthly premiums, but a much higher deductible and higher copayments.

**When and how must payment for COBRA continuation coverage be made?**

First payment for continuation coverage

If you elect continuation coverage, you do not have to send any payment with the election form.  However, you must make your first payment for continuation coverage not later than 45 days after the date of your election (this is the date the election notice is post marked, if mailed).  If you do not make your first payment

JTMASSA000153

## IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS
### PAGE 4 OF 4

for continuation coverage within 45 days of your election, you will lose all continuation coverage rights under the Plan.  You are responsible for making sure that the amount of your first payment is correct.  You may contact TeamCare at 800-TEAMCARE (832-6227) to confirm the correct amount of your first payment.

Periodic payments for continuation coverage

After you make your first payment for continuation coverage, you will be required to make periodic payments for each subsequent coverage period.  The amount due for each coverage period is shown in this notice.  The periodic payments can be made on either a weekly or monthly basis.  Under the Plan, each of these periodic payments for continuation coverage is due on the first day of the coverage period for which coverage will be in effect.  If you pay a periodic payment on or before the first day of the coverage period to which it applies, your coverage under the Plan will continue for that coverage period without any break.

Grace periods for periodic payments

Although periodic payments are due on the dates mentioned above, you will be given a grace period of 30 days from the first day of the coverage period to make each periodic payment.  Your continuation coverage will be provided for each coverage period as long as payment for that coverage period is made before the end of the grace period for that payment and the coverage periods are sequential.  However, if you pay a periodic payment later than the first day of the coverage period to which it applies, but before the end of grace period for that coverage period, your coverage under the Plan will be suspended as of the first day of the coverage period and then retroactively reinstated (going back to the first day of the coverage period) when the periodic payment is received.  This means that any claim you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated.

If you fail to make a periodic payment before the end of the grace period for that coverage period, you will lose all rights to continuation coverage under the Plan.  Your first payment and all periodic payments for continuation coverage should be sent to:

> Self-Payments Department
> TeamCare – A Central States Health Plan
> Dept. 10291
> Palatine IL 60055-0291

**For More Information**

This Notice does not fully describe continuation coverage or other rights under the Plan.  More information about continuation coverage and your rights under the Plan is available in your Summary Plan Description or from the Plan Administrator.

If you have any questions concerning the information in this notice, your rights to coverage, or if you want a copy of your Summary Plan Description, you should contact TeamCare at 800-TEAMCARE (832-6227).

For more information about your rights under the Employee Retirement Income Security Act (ERISA), including COBRA, the Patient Protection and Affordable Care Act, and other laws affecting group health plans, visit the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) website at www.dol.gov/ebsa or call their toll-free number at 866-444-3272.  For more information about health insurance options available through the Health Insurance Marketplace, and to locate an assister in your area who you can talk to about the different options, visit HealthCare.gov.

**Keep your Plan informed of address changes**

In order to protect your and your family's rights, you should keep the Plan administrator informed of any changes in your address and the addresses of family members.  You should also keep a copy, for your records, of any notices you send to the Plan administrator.

## COBRA CONTINUATION COVERAGE ELECTION/PAYMENT FORM
## PAGE 1 OF 2

**INSTRUCTIONS**: To elect COBRA continuation coverage, complete this election form and return it to us. Under Federal law, you must have sixty days after the date of this notice to decide whether you want to elect COBRA continuation coverage under the Plan. This election form must be completed and returned by mail or actually received by the Plan. **If mailed, it must be post-marked no later than 03/31/2020.** If you do not submit a completed election form by the due date shown above, you will lose your right to elect COBRA continuation coverage. If you elect COBRA continuation coverage before the due date, you may change your mind as long as you do not submit a payment for coverage. However, if you change your mind after first rejecting COBRA continuation coverage, you must notify the Plan in writing that you wish to elect COBRA continuation coverage. Please note that the election due date remains the same for all these situations.

**Both Sections I and II of this form must be completed in order to initiate your COBRA continuation coverage**. To make an election, please select the appropriate action below and mail this form to the address indicated at the bottom of this form. If you wish to elect and remit your first payment, please select both actions and mail this form to the address indicated at the bottom of this form. **Please note that your initial payment must: 1) be received within 45 days of your election; and 2) be in the amount that would provide coverage from the loss of coverage date through the current week.** Both of these requirements must be met in order to ensure further eligibility for COBRA continuation coverage. Also note that subsequent payments are due on the first day of the coverage period and will not be accepted beyond the thirty-day grace period.

### SECTION I - PLAN SELECTION

NAME:  **JONATHAN T MASSA**
ACCOUNT NO: **SP806416300**
EMPLOYER:  **UNITED PARCEL SERVICE**            EMPLOYER NO:  **8139100-6202-00079B**
LOSS OF COVERAGE DATE:  **01/05/2020**          NOTICE DATE:  **01/31/2020**

☒  I elect to continue my health coverage by making self-payments to TeamCare.

Plan selected (must check one):    ☐ Full Coverage      ☒ Core Coverage

☐  Enclosed is payment for the period of **01/05/2020** through _____ (_____ weeks)

Weekly Rate $ _____ X No. of Weeks _____ = Total Amount Due $ _____

_____          3/31/20
Signature                                 Date

Make your check or money order payable to:  TEAMCARE

Mail this form to:      SELF-PAYMENTS DEPARTMENT
                        TEAMCARE – A CENTRAL STATES HEALTH PLAN
                        DEPT 10291
                        PALATINE IL 60055-0291
Or fax to:              847-518-9768

JTMASSA000155

## COBRA CONTINUATION COVERAGE ELECTION/PAYMENT FORM
## PAGE 2 OF 2

**SECTION II - MEDICARE COVERAGE AVAILABILITY**

NAME:  **JONATHAN T MASSA**
ACCOUNT NO: **SP806416300**
EMPLOYER:  **UNITED PARCEL SERVICE**          EMPLOYER NO:  **8139100-6202-00079B**
LOSS OF COVERAGE DATE:  **01/05/2020**          NOTICE DATE:  **01/31/2020**

1.  Is the subscriber JONATHAN T MASSA enrolled in Part(s) A and/or B of Medicare?

   Part A:  ☐ YES   ☒ NO   If yes, effective date of coverage: _____

   Part B:  ☐ YES   ☒ NO   If yes, effective date of coverage: _____

   (If yes, please attach a copy of the Medicare card to this form.)

2.  Is the subscriber's spouse enrolled in Part(s) A and/or B of Medicare?

   Part A:  ☐ YES   ☒ NO   If yes, effective date of coverage: _____

   Part B:  ☐ YES   ☒ NO   If yes, effective date of coverage: _____

   (If yes, please attach a copy of the Medicare card to this form.)

3.  Please list the names of your dependent children who are enrolled in Part(s) A and/or B of Medicare.  If you do not have children enrolled in Medicare, do not list their names here.

   CHILD 1 NAME: _____

   Part A:  ☐ YES   ☐ NO   If yes, effective date of coverage: _____

   Part B:  ☐ YES   ☐ NO   If yes, effective date of coverage: _____

   (Please attach a copy of the Medicare card to this form.)

   CHILD 2 NAME: _____

   Part A:  ☐ YES   ☐ NO   If yes, effective date of coverage: _____

   Part B:  ☐ YES   ☐ NO   If yes, effective date of coverage: _____

   (Please attach a copy of the Medicare card to this form.)

N/A

JTMASSA000156

# EXHIBIT E

# To Motion to Dismiss or For Summary Affirmance

# TEAMCARE
A CENTRAL STATES HEALTH PLAN

EXHIBIT
E

**ATTN UPS EMPLOYEES:** In addition to completing and returning this form to TeamCare, UPS employees must also call Aetna at 866-825-0186 to initiate your leave with UPS.

## SHORT-TERM DISABILITY CLAIM FORM - INITIAL REPORT OF DISABILITY

### FORM MUST BE COMPLETED IN FULL BEFORE PAYMENT IS CONSIDERED

**Remit To: TeamCare, PO Box 5107 Des Plaines IL 60017-5107 or Fax Form To: 847-518-9757**

#### SECTION 1 – PARTICIPANT'S INFORMATION   PLEASE PRINT

Participant's Identification Number: 8 0 6 4 1 6 3 0 0

Participant's Full Name: JONATHAN TRENT MASSA

Date of Birth: 08/30/91

Participant's Complete Address: 8205 NATURE COVE WAY TAMPA FL 33647

Employer: UPS

If accident related, please answer the following questions:

Date of Accident: 11/25/19

Where did the accident occur? check one ☐ Home ☐ Work ☐ Auto ☒ Other

How did the accident occur? AT LA FITNESS

Is your disability in any way work related? ☐ Yes ☒ No

If yes, please explain: _____

***If you have been denied by Workers' Compensation, attach a copy of the denial.

Authorization: I hereby authorize any doctor, hospital, or insurance company to furnish and disclose all known facts.

Signature of Participant

Participant's Phone Number: 813-451-6550

Date: 3/31/20

#### SECTION 2 – PHYSICIAN'S STATEMENT   PLEASE PRINT

Patient's Name: JONATHAN TRENT MASSA

Date Disability Began: 11/26/19

**DO NOT SUBMIT FORM BEFORE THIS DATE**

Diagnosis: Right patellar tendon rupture

All dates of treatment for this disability: 11-26-19, 12-2-19, 12-10-19, 12-18-19, 12-20-19, 1-21-20, 2-11-20, 3-20-20

Surgery date and procedure performed: 12-10-19 Right patellar tendon repair

Was patient hospitalized? ☐ Yes ☒ No

Date: _____

What is the treatment plan? Surgery, physical therapy

For a pregnancy, please give the estimated delivery date: _____

Is condition due to patient's employment? ☐ Yes ☒ No

Briefly explain: _____

**ACTUAL OR ESTIMATED RETURN TO WORK DATE REQUIRED**

Actual return to work date: _____ OR Estimated return to work date: JULY 1, 2020

Physician's Signature:

Print Physician's Name: Dr. George Companioni

Physician's Phone Number: (813) 977-4767

Date Form Completed: 4-1-20

#### SECTION 3 – EMPLOYER'S STATEMENT   PLEASE PRINT

What was the employee's last day paid or compensated (i.e., vacation)?

Last day worked: _____

What date did the employee actually return to work? _____ **(Do not use a future date)**

Was the employee on layoff? ☐ Yes ☐ No

Date of layoff: _____ Date recalled: _____

Has a claim been filed for Workers' Compensation related to this disability?

☐ Yes ☐ No

Employer's Signature:

Print Employer's Name and Position:

Employer's Phone Number:

Date Form Completed:

```
        **********************
        *** FAX TX REPORT ***
        **********************

        TRANSMISSION OK

    JOB NO.                    1805
    DESTINATION ADDRESS        18475189757
    SUBADDRESS
    DESTINATION ID
    ST. TIME                   06/02 08:45
    TX/RX TIME                 00' 47
    PGS.                       1
    RESULT                     OK
```

# TEAMCARE®
## A CENTRAL STATES HEALTH PLAN

**ATTN: UPS EMPLOYEES:** In addition to completing and returning this form to TeamCare, UPS employees must also call Aetna at 866-825-0186 to initiate your leave with UPS.

## SHORT-TERM DISABILITY CLAIM FORM - INITIAL REPORT OF DISABILITY

FORM MUST BE COMPLETED IN FULL BEFORE PAYMENT IS CONSIDERED

Remit To: TeamCare, PO Box 5107 Des Plaines IL 60017-5107 or Fax Form To: 847-518-9757

### SECTION 1 - PARTICIPANT'S INFORMATION (PLEASE PRINT)

Participant's Identification Number: **B 0 6 4 1 6 3 0 0**

Participant's Full Name: **JONATHAN TRENT MASSA**

Date of Birth: **08/30/91**

Participant's Complete Address: **8205 NATURE COVE WAY TAMPA FL 33647**

Employer: **UPS**

Date of Accident: **11/26/19**

Where did the accident occur? check one ☐ Home ☐ Work ☐ Auto ☒ Other

How did the accident occur? **AT LA FITNESS**

Is your disability in any way work related? ☐ Yes ☒ No

If yes, please explain: _____

**If you have been denied by Workers' Compensation, attach a copy of the denial.

Authorization: I hereby authorize any doctor, hospital, or insurance company to furnish and disclose all known facts.

Signature of Participant: [signature]

Participant's Phone Number: **813-451-6550**

Date: **3/31/20**

### SECTION 2 - PHYSICIAN'S STATEMENT (TO BE COMPLETED BY PHYSICIAN)

Patient's Name: **JONATHAN TRENT MASSA**

Date Disability Began **11/26/19**

Diagnosis: **R 15 h t Patellar Tendon rupture**

All dates of treatment for this disability: **11-26-19, 12-2-19, 12-9-19, 12-15-19, 12-24-19, 1-21-20, 2-11-20**

Surgery date and procedure performed: **12-10-19 Right patellar tendon repair**

Was patient hospitalized? ☐ Yes ☒ No   Date: _____

What is the treatment plan? **Surgery, physical therapy**

For a pregnancy, please give the estimated delivery date: _____

Is condition due to patient's employment? ☐ Yes ☒ No

Briefly explain: _____

### ACTUAL OR ESTIMATED RETURN TO WORK DATE REQUIRED

Actual return to work date: _____  OR  Estimated return to work date: **July 1, 2020**

Physician's Signature: [signature]

Print Physician's Name: **Dr. George Companioni**

Physician's Phone Number: **(813) 877-4767**

Date Form Completed: **4-1-20**

### SECTION 3 - EMPLOYER'S STATEMENT (TO BE COMPLETED BY EMPLOYER)

# EXHIBIT F

# To Motion to Dismiss or For Summary Affirmance

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3
    JONATHAN TRENT MASSA,
 4
             Plaintiff,
 5  v.                        Case No.: 8:22-cv-796-KKM-JSS

 6  TEAMSTERS LOCAL UNION 79
    and UNITED PARCEL SERVICE,
 7  INC.

 8           Defendants.
    _____/
 9

10
                    DEPOSITION OF
11             JONATHAN TRENT MASSA

12        Taken on behalf of the Defendants

13

14

15
                 DATE TAKEN:    January 30, 2023
16               TIME:          9:29 a.m. - 12:27 p.m.
                 PLACE:         Huseby Global Litigation
17                              401 East Jackson Street
                                Suite 2340
18                              Tampa, Florida 33602

19

20

21

22

23
                 Stenographically Reported by:
24
                    Lisa Gropper, RPR, FPR-C
25
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                    **Page 2**

```
 1    APPEARANCES

 2
      ON BEHALF OF THE PLAINTIFF:
 3
          DEREK P. USMAN, ESQ.
 4        USMAN LAW FIRM, P.A.
          505 E. Jackson Street
 5        Suite 305
          Tampa, Florida 33602
 6        derek@usmanfirm.com

 7
      ON BEHALF OF THE DEFENDANT TEAMSTERS LOCAL UNION 79:
 8
          THOMAS J. PILACEK, ESQ.
 9        THOMAS J. PILACEK & ASSOCIATES
          Tuskawilla Office Park
10        1318 Town Plaza Court
          Winter Springs, Florida 32708
11        tpilacek@pilacek.com

12
      ON BEHALF OF THE DEFENDANT UNITED PARCEL SERVICE, INC.:
13
          WILLIAM R. LILES, ESQ.
14        SCHMOYER REINHARD LLP
          8000 IH 10 West
15        Suite 1600
          San Antonio, Texas 78230
16        wliles@sr-llp.com

17

18                            -  -  -

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2    Witness                 Direct    Cross    Redirect

 3    Jonathan Trent Massa

 4    (By Mr. Pilacek)          5                  114

 5    (By Mr. Liles)                     66

 6    (By Mr. Usman)                    109

 7

 8                         - - -

 9                        EXHIBITS

10
      Defendant's         Description              Page
11
          1        Employment Applications          9
12
          2        Amended Complaint and Demand    17
13                 for Jury Trial

14        3        Hartford report                 40

15        4        Plaintiff's Jonathan Trent      42
                   Massa, Response to Defendant's
16                 First Set of Interrogatories

17        5        Packet of documents starting    46
                   with the November 1, 2019
18                 Intent to Discharge

19        6        Five Grievances                 47

20        7        Text messages between Marc      51
                   "Joey" Howard and Jonathan
21                 Trent Massa dated October 13,
                   2020
22
          8        Text messages between Marc      52
23                 "Joey" Howard and Jonathan
                   Trent Massa dated March 22,
24                 2021

25
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                Page 4

```
 1                         EXHIBITS (Cont'd)

 2
       Defendant's            Description                Page
 3
           9          Text messages between Marc          52
 4                    "Joey" Howard and Jonathan
                      Trent Massa dated March 23,
 5                    2021

 6         10         Text messages between Marc          53
                      "Joey" Howard and Jonathan
 7                    Trent Massa dated March 25,
                      2021
 8
           11         Notice dated January 2, 2020,       94
 9                    Bates number D-JM-000789

10         12         Discharge Letter dated              94
                      January 14, 2020, Bates number
11                    D-JM-000791

12         13         COBRA Continuation Coverage         96
                      Election/Payment Form
13

14                            - - -

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE STENOGRAPHER:  Sir, would you raise your

 2         right hand for me, please.

 3              (Witness complies.)

 4              THE STENOGRAPHER:  Do you swear or affirm the

 5         testimony you're about to give will be the truth,

 6         the whole truth, and nothing but the truth?

 7              THE WITNESS:  I do.

 8    DIRECT EXAMINATION

 9    BY MR. PILACEK:

10         Q    Good morning, sir.

11         A    Good morning.

12         Q    Would you please tell us your name.

13         A    Jonathan Trent Massa.

14         Q    And you are the plaintiff in this lawsuit that

15    brought you here today?

16         A    I am.

17         Q    Would you please tell us your residence

18    address.

19         A    8205 Nature Cove Way, Tampa, Florida 33647.

20         Q    And how long have you lived at that address?

21         A    Twenty years.

22         Q    And is that a single-family residence,

23    apartment, multi-family, what?

24         A    Single-family.

25         Q    And who else lives with you, if anyone, at
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                      Page 6

1   that address?

2        A    Mother, father, brother.

3        **Q    Are you the owner of the residence or do you**

4   **rent?**

5        A    I rent.

6        **Q    And approximately how much per month do you**

7   **pay in rent?**

8        A    It's -- I don't -- it's -- essentially I work

9   for my mother, so the only reason that I'm able to live

10  there is because I'm working for her.

11       **Q    Okay.  You are not married, correct?**

12       A    No, I'm not.

13       **Q    What is your date of birth?**

14       A    8/30/1991.  August 30, 1991.

15       **Q    And you indicated that you work for your**

16  **mother.  How long have you worked for your mother?**

17       A    Since essentially I found out that I was fired

18  from UPS.

19       **Q    Did you work for your mother at any time**

20  **before that?**

21       A    When I was younger, not for -- since maybe

22  when I was 12 to 15 years old.  It's been a long time.

23       **Q    All right.  And what does your mother do that**

24  **you perform work for her?**

25       A    She owns a landscape/lawn care business.

```
 1      Q    And what is that called?

 2      A    Green Team Green Scapes.

 3      Q    Is that incorporated?

 4      A    I believe so.

 5      Q    Does she own any other businesses --

 6      A    Just --

 7      Q    -- that you're aware of?

 8      A    Just that one.

 9      Q    Have you heard of a business named Poi, P-O-I,

10   Dog, Inc.?

11      A    Well, that's basically Green Team Green

12   Scapes.

13      Q    Oh.  So Green Team Green Scapes is a

14   fictitious name?

15      A    I -- I believe -- they're the same thing

16   essentially.  Green Team Green Scape, it's the same

17   company.

18      Q    And what type of work do you do for the Green

19   Team?

20      A    Management.  So essentially whatever she needs

21   me to do.  If I have to go talk to somebody, if I have

22   to -- anything that she needs me to do.  I'm basically

23   her assistant.

24      Q    Would you give us your educational background,

25   please.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                    Page 8

```
 1        A    I just graduated from USF in 2018, 2017.  I

 2   have a bachelor's in marketing and business.

 3        Q    And did you graduate before, during or after

 4   your employment with UPS --

 5        A    During.

 6        Q    -- that we're talking about?

 7        A    During.

 8        Q    When did you first apply for employment with

 9   United Parcel Service?

10        A    2015, I believe.  Two -- twenty -- I believe

11   2015.

12        Q    And was that for a seasonal position?

13        A    Yes, and then it turned into a full-time -- or

14   a part-time position.

15        Q    You submitted employment applications for both

16   the seasonal position and the part-time position?

17        A    No.  I'm pretty sure it was just for part-time

18   and then they promoted me after.

19             I mean it was just for seasonal, and they

20   promoted me after seasonal to part-time.

21        Q    I'm going to show you some documents that have

22   been supplied during discovery in this matter by UPS to

23   us --

24        A    Okay.

25        Q    -- as well as to your attorney.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 9

```
 1              MR. PILACEK:  Marking it Exhibit 1.
 2              (Defendant's Exhibit 1 marked for
 3    identification.)
 4    BY MR. PILACEK:
 5         Q    I will tell you that this appears to be two
 6    separate employment applications, and I'll go through
 7    that with you.
 8         A    Okay.
 9         Q    The first page, which is Bates stamped at the
10    bottom 004, indicates that you can begin work on
11    January 11, 2016.  Do you see that there?
12         A    I do see it.
13         Q    And you had been previously employed by UPS
14    on -- since October of '15.  Do you see that also?
15         A    I do see that, yes.
16         Q    Okay.  Does that help you refresh your memory
17    whether you submitted a separate employment application
18    for the part-time position?
19         A    I guess it does, yes.
20         Q    All right.  Was the information that you gave
21    as contained on this employment application for 2016
22    true and correct --
23         A    Yes.
24         Q    -- to the best of your memory?
25         A    Yes, it is.
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                 Page 10

```
 1      Q    All right.  Going to the second page, which is
 2   Bates stamped 005 --
 3      A    Okay.
 4      Q    -- it indicates that you were going to
 5   Hillsborough Community College seeking a bachelor's
 6   degree which you say was in progress in business
 7   administration.
 8      A    Yup.
 9      Q    Do you see that there?
10      A    I do.
11      Q    Did you graduate from Hillsborough Community
12   College or USF?
13      A    Both.
14      Q    Both.  Did you obtain separate degrees?
15      A    I did.
16      Q    So which one did you obtain first?
17      A    The AA from HCC.
18      Q    An AA.  And when did you obtain that,
19   approximately?
20      A    2015, right before I went to USF.  You can't
21   get to USF without an AA if you're going to a community
22   college.
23      Q    Okay.  And how long did you study at USF
24   before you obtained your --
25      A    Less than three years.
```

1      Q      Were you a full-time student?

2      A      I was.

3      Q      So as I understand you, and correct me if I

4   don't, based on this information that you're providing

5   today and on these employment applications, you were a

6   full-time student at USF shortly after you obtained a

7   part-time job at United Parcel Service and you worked

8   part-time for UPS during that period of time that you

9   were a full-time student; is that accurate?

10     A      Correct, yes.

11     Q      Okay.  Stay on the same page with me, please.

12     A      Okay.

13     Q      Further down the page it indicates that you

14   were employed by Green Team Green Scapes from May of

15   2008 to May of twenty -- I can't read that.  It's too

16   small.  '15 it looks like.

17     A      Yes.

18     Q      So you worked for your mother between 2008 and

19   the date you applied for part-time --

20     A      Yes.

21     Q      -- employment with UPS?

22     A      Part-time, yes.

23     Q      And then for a period of time you left

24   employment with your mother to work at BJ's Wholesale

25   Club?

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                    Page 12

```
 1        A    Yes.  That was right when I started at USF.

 2        Q    Okay.  And so you worked at BJ's between May

 3   of 2015 and September of 2015?

 4        A    Yup.

 5        Q    And after September of 2015, did you work for

 6   anybody until the time that you obtained the part-time

 7   job with UPS?

 8        A    I did not.

 9        Q    Was there a gap in your employment?

10        A    I don't believe so.

11        Q    All right.  So your best memory is that you

12   went directly from BJ's to the seasonal position --

13        A    At UPS.

14        Q    -- with UPS --

15        A    Yes.

16        Q    -- and from there you went to the part-time

17   position --

18        A    Correct.

19        Q    -- a few months later, correct?

20             (Interruption by the stenographer due to

21   cross-talking.)

22   BY MR. PILACEK:

23        Q    So your best memory is that you went from BJ's

24   to the seasonal position with UPS?

25        A    Correct.
```

```
 1        Q     And from the seasonal position you obtained

 2    the part-time position with UPS?

 3        A     Correct.

 4        Q     With no gaps between BJ's and your employment

 5    at UPS?

 6        A     Correct.

 7        Q     If you will flip to the page that is Bates

 8    stamped 006, which would be the third page of the

 9    document --

10        A     Okay.

11        Q     -- there is an identification of ethnicity

12    that is voluntary for you to provide.  Do you see that

13    there?

14        A     I do.

15        Q     And you provided your ethnicity voluntarily,

16    correct?

17        A     Of course, yes.

18        Q     And the ethnicity you provided was, quote,

19    white --

20        A     Yes.

21        Q     -- unquote, correct?

22        A     Yes.

23        Q     You did not provide your ethnicity as, quote,

24    Asian American/Pacific Islander --

25        A     Well, because I'm --
```

```
 1       Q    -- correct?

 2       A    Am I allowed to do both?

 3            It's like I was pretty much told from when I

 4   was younger to do white.  I am a mixed.  So I've just

 5   been told I am definitely Asian and Pacific Islander but

 6   I am more white.  I've been always told to do white.

 7       Q    All right.  And who of your parents is

 8   white --

 9       A    Mother.

10       Q    -- which one?

11            Pardon?

12       A    My mother.

13       Q    Your mother is white?

14       A    Yes.

15       Q    And you have a father as well?

16       A    Yes, I do.

17       Q    And that's Bruce Massa, correct?

18       A    Yes, yes.

19       Q    And he's one of the people that live at the

20   residence?

21       A    Correct.

22       Q    And is he white?

23       A    He is not.

24       Q    He is not.  What is he?

25       A    He would be Pacific Islander/Asian American.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 15

```
 1        Q    Okay.  That's fine.

 2             And if would go to the page that is Bates

 3    stamped 012 at the bottom, do you recognize this as

 4    being your employment application for the seasonal

 5    position with UPS?

 6        A    I do.

 7        Q    And again the information provided on that

 8    application was true and correct?

 9        A    It is and was.

10        Q    Okay.  Once again on that form you checked

11    white as your ethnicity as opposed to Asian

12    American/Pacific Islander, correct?

13        A    Correct.

14        Q    Okay.  That's --

15        A    That's it?

16        Q    -- all for that document.

17             Now, when you obtained the seasonal job at

18    UPS, what did you do?

19        A    Package handler.

20        Q    What were your days and hours of work?

21        A    Monday through Friday -- it was different

22    every day.  From like 4 to whenever you finish or

23    when -- the start time was different every day.

24        Q    It was typically the afternoon?

25        A    No, it was the morning.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                        Page 16

```
 1       Q     Morning?

 2       A     Yeah.  So from like 3 to 9, 4 to 9, something

 3  like usually around that.

 4       Q     And were you on the pre-load operation?

 5       A     I was.

 6       Q     And approximately how many hours per day?

 7       A     It was different.  Maybe about four to five.

 8  It would be different every day.  And then with seasonal

 9  you get like 10.  It was always different.

10       Q     When you obtained the part-time position with

11  UPS in 2016, what was your position?

12       A     Pre -- the same thing, package handler.

13       Q     On the pre-load?

14       A     Yup.

15       Q     And were your days and hours the same?

16       A     Yeah.

17       Q     So you would be scheduled to work five days

18  per week?

19       A     Yeah, Monday through Friday.

20       Q     And do you recall your most recent rate of

21  pay?

22       A     Thirteen dollars, I believe.

23       Q     We're not going to hold you to an exact

24  number.

25       A     Yeah.  It was around there.
```

1      Q    I'm going to switch topics, jump tracks.  I'm

2   going to show you a copy of the Amended Complaint in

3   this matter that has been filed by your attorney.  If

4   you'd just please share that with Mr. Usman.

5           MR. PILACEK:  Mark it Exhibit 2.

6           (Defendant's Exhibit 2 marked for

7   identification.)

8   BY MR. PILACEK:.

9      Q    Have you read that?

10     A    I have.

11     Q    Attached as Exhibit A to this document - it's

12  pretty lengthy - it's Page 28, approximately - is a copy

13  of a charge that you filed with the Equal Employment

14  Opportunities Commission; is that correct?

15     A    It is.

16     Q    And it appears that you signed that document

17  on or about May 28, 2021 --

18     A    Correct.

19     Q    -- is that correct?

20     A    Yes, it is.

21     Q    All right.  And if you would go two pages

22  further, Exhibit B to the Amended Complaint is a Charge

23  of Discrimination against Teamsters Local 79 that

24  appears that you also signed on May 28, 2021; is that

25  correct?

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 18

```
 1        A    Correct.

 2        Q    All right.  If you'd go back to Exhibit A,

 3   please, if you take a look at the "Particulars" box, the

 4   third paragraph states, "I have been constructively

 5   discharged from my employment at UPS as of May 28, 2021.

 6   I was constructively discharged by being forced to

 7   resign due to a medical disability for my knee surgery

 8   and for my race and ethnic characteristics."

 9             Did you submit a resignation to UPS?

10        A    I didn't.

11        Q    You did not.  Then what did you mean --

12        A    They --

13        Q    -- by being forced to resign?

14        A    I got a text message from --

15             MR. USMAN:  Objection.  Just legal contention.

16             MR. PILACEK:  No.  I want to find out what he

17        meant when he filed the charge.

18             MR. USMAN:  You can answer.

19        A    I got a text message from Thor, who is the

20   head of the union, correct?  He essentially -- well,

21   whatever -- wherever he stands, I got a text.  Joey --

22   he told Joey -- they met with each other.  Joey text

23   messaged me telling me instead of being fired, would you

24   like to resign and get all of your grievances dropped

25   for $250.
```

```
 1              So I essentially -- they gave me two choices.
 2    You can resign, get the $250, or you can be fired.
 3              Would you like to see those text messages?
 4    BY MR. PILACEK:
 5         Q    Mr. Massa, we will get into that in great
 6    detail --
 7         A    I cannot wait.
 8         Q    -- during your deposition.
 9         A    I cannot wait.
10         Q    And the question then is, what do you mean
11    that you were constructively discharged --
12         A    I had --
13         Q    -- by being forced to resign?
14         A    I did not know I was fired.  I was never aware
15    that I was fired.  I was never aware that I was
16    terminated.  Essentially I get this text message out of
17    the blue.  They're telling me, instead of being fired,
18    you could help us out and you could resign for us so it
19    looks better on us, and then I would never be able to do
20    what I'm doing now in court --
21         Q    When --
22         A    -- essentially is what happened.
23         Q    When were you forced to resign?
24         A    Then.  That text message from then.
25              Essentially after that I did not trust the
```

```
 1   union; I did not trust UPS, and that is when I went

 2   about what I'm doing now.

 3           They essentially -- with that, they tried to

 4   trick me into resigning so I would not be able to do

 5   what I'm doing now and I would not be able to sit here

 6   and be able to talk to you currently.

 7       Q    What was the date that that occurred?

 8       A    Would you like me to get the text message out

 9   currently?  I could --

10       Q    All I want is a date.

11       A    Oh, you're going to get a date.

12           Do you want me to read the text messages as

13   well?

14       Q    No, sir.  I would like the date.

15       A    October 13, 2020.

16       Q    Very good.  So you believe and you allege you

17   were forced to resign as of October 13, 2020, accurate?

18       A    A hundred percent.

19       Q    Okay.  You can put that aside for the moment.

20           So you knew as of October 13, 2020 that your

21   employment with UPS had ended via constructive

22   termination, correct?

23       A    Yes.

24       Q    Okay.  And at that point in time, had you made

25   any effort to find another job?
```

 1       A    I did not.  Why would I be making an effort to

 2    make a job when I did not know that I was fired?  Why

 3    would I be trying to get another job when I have no clue

 4    that I'm fired or terminated?  Why would I be doing

 5    that?  Huh?

 6       **Q    After you knew that you were constructively**

 7    **discharged on October 13, 2020, what efforts did you**

 8    **make to find another job?**

 9       A    I had to work for my mother.  I've explained

10    this to you already.  Why would I make a -- why would I

11    go and try and find another job when I did not know that

12    I was fired to begin with?  I'm paying the union.

13    They're taking money out of my check every week to

14    protect me and they did not protect me.  Why would I try

15    and find another job?

16       **Q    All right.**

17       A    Does that make sense to you?  Why would I try

18    and do that?

19       **Q    You have a bachelor's degree in business**

20    **administration?**

21       A    I do.

22       **Q    And yet you made no effort to market yourself**

23    **to find --**

24       A    Why would I --

25       **Q    -- employment?**

```
1        A    -- do that when I -- when I'm paying the union

2   to protect me?  They do not protect me.  They do not do

3   a single thing to help me out.  UPS is not telling me

4   that I am fired.  The entire time that I'm dealing with

5   my surgery, physical therapy, everything that I have to

6   do, I'm assuming that I'm still hired.  Why would I be

7   actively trying to get another job when I am hurt?  Why

8   would I be actively trying to get another job when I'm

9   having to go to physical therapy four to five times a

10  week?  Why would I be trying to do that when I do not

11  know that I'm fired?

12       Q    Mr. Massa, we understand that you had a knee

13  injury --

14       A    I don't think you do though.  I don't think

15  you understand.

16       Q    -- in November of 2019 --

17            MR. USMAN:  Just let him ask the question.

18            THE WITNESS:  No.  This is --

19  BY MR. PILACEK:

20       Q    -- is that correct?

21            THE WITNESS:  This is just getting ridiculous

22       already.  We're just --

23  BY MR. PILACEK:

24       Q    Yes, it's getting ridiculous, Mr. Massa.  The

25  process is I ask questions; you answer them --
```

 1      A    All right.  So will --

 2      Q    -- truthfully and completely.

 3      A    -- you answer my questions when I'm asking

 4  you?

 5           Why won't you look at me when I'm asking these

 6  simple questions?  You don't even want to look at me

 7  because you know that you're in the wrong.  It's -- you

 8  won't even look at me before.  You're looking at the

 9  ground.  You know that I'm -- you're wrong.  It's -- and

10  that's why you're getting angry.  You wouldn't be

11  getting angry if you were not wrong.  Am I correct?

12      Q    Mr. Massa, I am not looking at you --

13      A    No, you refuse to, like -- you refuse to look

14  at me.

15      Q    Mr. Massa, this is not an opportunity for you

16  to start an argument.

17      A    It's -- I'm not looking for --

18      Q    That's exactly what you're insisting on doing.

19      A    That's not really at all.

20      Q    I insist that you answer the questions.

21      A    That's exactly what I'm doing.

22      Q    All right.

23      A    You ask a question and I'm going to ask one as

24  well.  It's --

25      Q    It is not your opportunity to ask questions --

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.

Jonathan Trent Massa on 01/30/2023                                    Page 24

```
1        A    Fine.

2        Q    -- Mr. Massa.

3        A    Okay.

4        Q    We understand that you injured your knee in

5    November of 2019; is that correct?

6        A    Yes.

7        Q    What was the exact date?

8        A    The week of -- Thanksgiving week.

9        Q    Would that be on or about November 19, 2019?

10       A    Yes.  The week of Thanksgiving it happened.

11       Q    All right.  And when you initially suffered

12   the injury, was that at work or off work?

13       A    Off work.

14       Q    And how did the injury occur?

15       A    Playing basketball.

16       Q    And when you hurt your knee, did you seek

17   medical assistance?

18       A    Of course I sought -- yes, of course I did.

19       Q    And did you initially go to a Centra Care --

20       A    Immediately.

21       Q    -- type clinic?

22       A    As soon as I left the basketball court.

23       Q    All right.  And were you taken out of work by

24   the medical provider?

25       A    Was I taken out of work by the medical
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                   Page 25

```
 1   provider?

 2        Q    Yeah.  Did they issue something saying hey,

 3   you can't work for a while?

 4        A    I'm sure they did because my kneecap was in my

 5   thigh.

 6        Q    And do you know how long the work restriction

 7   was by that medical provider?

 8        A    It was at least six months.

 9        Q    The initial medical provider restricted you

10   for four to six months?

11        A    At least six months.

12        Q    If the documents made available to us indicate

13   that the initial restriction was four to five days, do

14   you have any response to that?

15        A    That's definitely not true.  I couldn't

16   even -- I -- four to five days and I was supposed to be

17   back at work?

18        Q    Did you have a subsequent medical restriction

19   by a different medical provider?

20        A    No.

21        Q    No?  It was the same one all the time?

22        A    It was the same one.

23        Q    All right.  And what was the name of the

24   doctor?

25        A    I'd have to get -- I'm not sure of his name.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                    Page 26

 1   I'd have to get it.

 2        Q    And when you hurt your knee, did you notify

 3   the company that you did and that you'd have to be off

 4   work?

 5        A    Immediately.  And I sent them pictures of my

 6   knee.

 7        Q    You sent out pictures?

 8        A    I sent them picture of my knee and I told them

 9   that I was hurt.  They told me to immediately get on

10   FMLA, and that is what I did.

11        Q    Who is they?

12        A    Liz and Joey and Alan.

13        Q    Liz is Liz who?

14        A    Liz Harrill, I believe.  She is the -- the --

15   the head -- she is -- she's in charge of everyone at the

16   building.

17        Q    She's a UPS employee --

18        A    Yes.

19        Q    -- correct?

20        A    Yes.

21        Q    And she is not a union steward, correct?

22        A    No, she is not.

23        Q    All right.  And who was the second one, Alan?

24        A    Alan and Joey.  That were two union stewards.

25        Q    Alan Lucciola?

```
 1        A    I don't think that's his last name.

 2        Q    What do you think it is?

 3        A    I'm not sure, but I don't think -- that

 4   doesn't sound familiar.  The two guys, Alan and Joey,

 5   that are on the -- that were on the union, and I don't

 6   think they work at the -- I'm pretty sure they both

 7   don't work there anymore.

 8        Q    And --

 9        A    I don't think that's a coincidence either.

10        Q    Is the Joey you mentioned known as Marc Joey

11   Howard?

12        A    Yes, Joey Howard.

13        Q    All right.  And so all of them told you to get

14   on FMLA?

15        A    They told me to get on FMLA, yes.

16        Q    Did you see anything wrong with that?

17        A    I didn't.

18        Q    Okay.  And did you apply for FMLA?

19        A    I did.

20        Q    And what happened?

21        A    I got denied.

22        Q    Why were you denied?

23        A    I believe I didn't work enough hours.  They

24   said I was denied.

25        Q    Do you know how many hours you had actually
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                        Page 28

```
 1   worked?

 2       A    I don't.

 3       Q    Would it be less than 450 hours in the 12

 4   months preceding your injury?

 5       A    It might have been.

 6       Q    Even though you were scheduled to work five

 7   hours a day, five days per week?

 8       A    Yup.

 9       Q    So why didn't you work more hours?

10       A    Constant discrimination every single day,

11   harassment when I would walk into the building.  It

12   started from the first day that I got the job.  I was

13   hired with an African American and another white person.

14   We both started -- all three of us started the same day.

15   We got hired the same time.  Essentially what happened

16   was the black kid, the other white kid, they got to go

17   in on start time.  They had me come in 45 minutes to an

18   hour late every single day to save money.  That's when

19   it started.  And then after that essentially they would

20   pretty much make me do the worst jobs.  They would pick

21   on me.  They would -- I would have to file grievances

22   every single day.

23            Essentially what they would try and do is they

24   would try and get to the point where I would essentially

25   pretty much -- like how we just got into an argument,
```

1   they would want us to get into an argument like that so

2   they would be able to discipline me.  So like how you

3   just got -- how you just got -- pretty much just lost

4   your mind, and then pretty much they would do the same

5   thing on the job to me the entire time trying to get me

6   to lose my mind so then I would be able to be

7   disciplined.

8          It happened every single day, and it started

9   from the first day I worked there.

10      Q    Mr. Massa, did you have an absenteeism

11  problem?

12      A    No, I don't.  I just explained why.

13      Q    I see.  You did not work, in fact, five days

14  per week five hours per day --

15      A    But I worked --

16      Q    -- correct?

17      A    There's some -- there's some weeks that I

18  worked five days though, so that's not correct.

19      Q    Some weeks?

20      A    Yes, but that's not correct what you just said

21  though.

22      Q    Did you receive discipline for bad attendance?

23      A    I did.

24      Q    Did you receive quite a few disciplines for

25  bad attendance?

```
 1        A    I did.

 2             Did they receive quite a few grievances for

 3   harassment and everything else they did?

 4        Q    So the days you didn't show up, why didn't

 5   you?

 6        A    I just explained it to you.  Would you like me

 7   to say that over again?

 8        Q    I haven't heard an answer to that question

 9   yet, so --

10        A    Harass -- I just --

11        Q    -- I'd like to hear it.

12        A    They would harass me, discriminate against me

13   every single day.

14        Q    So you just didn't show up to work?

15        A    Well, because of that, yes.

16        Q    Oh, I see.  Okay.

17        A    So I'm going to go to work and voluntarily be

18   harassed and discriminated against when I know that I

19   could keep the job and not have to do that?

20        Q    I understand.

21             Getting back to where we were, after your

22   injury, when were you capable of returning to work if

23   you wanted to?

24        A    It was like six months after.

25        Q    Approximately June of 2020?
```

 1      A    Yes.

 2      Q    Maybe earlier?

 3      A    Yes.  I was ready to go back to work.  I did

 4   not know I was fired.

 5      Q    When were you ready to go back to work?

 6      A    I just told you within six months after I

 7   was -- after the doctor told me I was able to go back to

 8   work.

 9      Q    Okay.  Did you get a return to work release

10   from the physician?

11      A    I had one, yes.

12      Q    You did?

13      A    Yes.

14      Q    Okay.  And what was the release date?

15      A    I would have to get it, but I for sure got

16   one.

17      Q    Well, we have requested that document --

18      A    Okay.

19      Q    -- in this lawsuit and have still not received

20   it.

21      A    Okay.

22      Q    Is that document available to you?

23      A    I'm sure it would be.

24           What would that have to do with -- all right.

25   So I'm fired.  What would that have to do with anything?

1   By the time that I got that, I was fired and terminated.

2   What would that have to do with anything?

3        Q    Mr. Massa, assuming for the moment you

4   received the return to work authorization approximately

5   June or earlier of 2020 --

6        A    Yes.

7        Q    -- you did not provide the return to work

8   authorization from your physician to UPS?

9        A    I was fired.  I was told to not come to work.

10  I was fired.

11       Q    The answer is you did not do that, correct?

12       A    I was -- that's not really the answer though,

13  because I was -- why would I do that when I'm told that

14  I'm fired?  I did not go to work.

15       Q    When were you told you were fired?

16       A    Essentially when I called Alan and he never

17  called me back.

18       Q    So you were fired in February of 2020?

19       A    I wasn't -- that was when I found out -- I

20  found out that I was -- essentially I was fired two days

21  after I got injured in November of 2019, correct?

22       Q    I'm asking you when you found out you were

23  fired --

24       A    I found out I was --

25       Q    -- and you said it was when you talked to

1   Alan?

2       A    I found out I was fired when I went to the

3   doctor's office.  I'm finishing; they tell me your

4   insurance is no longer working.

5       Q    When did you go to the doctor's office and

6   find that out?

7       A    Before the -- before February of 2020.

8       Q    After February of 2020, what effort did you

9   make to return to work, if any?

10      A    I talked to Alan on the phone.  He called me

11  after I told him this.  I talked to him on the phone for

12  30 minutes.  I told him exactly every single detail that

13  he could have ever possibly needed about what was going

14  on.  He tells me, All right, I'm going to figure it out;

15  I'm going to call you back.

16          On the phone, he never told me I was fired.

17  He never told me anything that was going on.  He pretty

18  much just listened to me for 30 minutes while I just

19  talked.  Then he told me he was going to call me back.

20  I never got another phone call, text message, email,

21  anything, from him ever again, ever.

22      Q    This is after you knew you were fired?

23      A    I did not know I was fired.  All I knew was

24  that my insurance was canceled.  That is all that I

25  knew, so I assumed that I was fired.

1      Q    When you found out your insurance was canceled

2  and made the assumption that you were fired, did you

3  attempt to file a grievance?

4      A    I talked to Alan and Joey.  By then they told

5  me to -- by then they told me to do that.  I did not

6  trust the union or UPS, and that is why we started to do

7  this.

8      Q    The question was, did you attempt to file a

9  grievance?

10     A    No.

11     Q    Now, during your employment with UPS, you were

12 aware that there was a collective bargaining agreement

13 between the union and the company, correct?

14     A    Yes.

15     Q    It was a big, old, thick book, correct?

16     A    Yes.

17     Q    You had a copy of it, right?

18     A    I'm sure I did.

19     Q    And you had read it from time to time, or at

20 least part of it I would assume, correct?

21     A    I -- maybe.  Yes.

22     Q    And you were aware there was something in that

23 contract called a grievance procedure, correct?

24     A    Yes.

25     Q    And the grievance procedure is something for

1  you to use if you believe the company has violated

2  your --

3      A    Okay.  And --

4      Q    -- rights, correct?

5      A    That is correct.  All right.  And I agree with

6  that a hundred percent, but I filed maybe a hundred to

7  150 grievances prior to that.  In the entire time that I

8  was working, not one of them got answered.  So you're

9  telling me that it's to protect me, but in the four

10  years that I'd been working there I filed a hundred to

11  150, and not one of them had been answered.  So you're

12  telling me that I'm supposed to just assume that me

13  filing another grievance is just going to skip the

14  hundred and other 50 ones before any other thing that I

15  would have been able to do.

16      Q    You are aware that the contract provides that

17  if you believe the company has violated your rights you

18  have to file a grievance, correct?

19      A    Correct.  But then why did they not get to my

20  hundred and a hundred other fifty grievances prior?  Can

21  you --

22      Q    And --

23      A    Why?

24      Q    If you will listen to the question and answer

25  the question, I would appreciate it.

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 36

1              The contract also provides a time limit for

2     you to file a grievance, correct?

3        A    Okay.

4        Q    And you have received something called Intent

5     to Discharge by the company, correct?

6        A    I don't know what that is.

7        Q    You don't?

8        A    No.

9        Q    It's a notice saying that we intend to fire

10    you for this reason.

11       A    Why would they be sending me that?

12       Q    I'm asking you whether you are aware that

13    there is such a thing called an Intent to Discharge.

14       A    Well, now, yes, yes, I'm aware.

15       Q    All right.  And you are also aware that, when

16    you receive one of those, that you have a time limit in

17    order --

18       A    Well, of course.

19       Q    -- to file a grievance, correct?

20       A    Yes, of course.

21            (Interruption by the stenographer due to

22    cross-talking.)

23    BY MR. PILACEK:

24       Q    And you are also aware that if you do not file

25    a grievance, then the company may take the disciplinary

 1   action against you?

 2        A    Of course.

 3        Q    And you are aware, are you not, that the union

 4   contract also provides for certain causes for

 5   termination which the company may implement immediately

 6   and those for which it must issue an Intent to

 7   Discharge, correct?

 8        A    Correct.

 9        Q    And you are aware that the reason for the

10   Intent to Discharge is that the contract contains

11   something that we call an innocent until proven guilty

12   provision in Article 7 which basically says that, except

13   in certain cases for which we can fire you immediately,

14   we have to wait until a timely grievance is decided by a

15   panel, right?

16        A    Correct.

17        Q    Are you aware of that?

18        A    Yes.

19        Q    So by filing a grievance when you get an

20   Intent to Discharge, you are aware that stops the

21   company from firing you?

22        A    But I didn't -- I never received an attempt to

23   discharge.  Can you explain to me --

24             All right.

25        Q    That's fine.

 1       A    It's the first week.  They sent me -- the week

 2    that I was injured, they send me an attempt to

 3    discharge, right?  I supposedly got it.  I don't make a

 4    big deal about being fired at all.  I wait til three or

 5    four months later to make a big deal about being fired

 6    but I'm not going to make a big deal about being fired

 7    when I get an attempt to discharge?  Why would I do

 8    that?

 9            I never received that.  Like this -- I never

10    received a 48-hour termination letter.  I would have

11    not -- I would have made a way bigger deal that first

12    week when I sent everybody pictures of my knee and I

13    told them that I was injured rather than four months

14    later when I'm at the doctor's office and they told me

15    that my insurance is canceled.  It would have been a way

16    bigger -- I would have made a much bigger deal the first

17    week.  Why would I have not made a big deal the first

18    week when they sent the 48-hour termination letter?

19       Q    You're saying you did not receive --

20       A    I did not.

21       Q    -- a 48-hour --

22       A    I did not --

23            (Interruption by the stenographer due to

24    cross-talking.)

25

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 39

```
 1   BY MR. PILACEK:

 2        Q    You --

 3        A    I --

 4             (Interruption by the stenographer due to

 5   cross-talking.)

 6   BY MR. PILACEK:

 7        Q    I get to ask you a question that you have to

 8   answer, Mr. Massa.

 9        A    Okay.

10        Q    You are saying that you did not receive a

11   48-hour return to work notice?

12        A    One hundred percent correct, and I'm willing

13   to go on a lie detector test.  You can get my mother to

14   go on a lie detector test as well.  I never received one

15   or I would have made a humongous deal about it the first

16   week considering I told everybody my situation.

17        Q    We're jumping tracks.  Did you --

18             Sorry, withdrawn.

19             You indicated before that your FMLA leave

20   request was denied, correct?

21        A    Correct.

22        Q    And I'm going to show you documents that we

23   have received from UPS during discovery.  I'm marking it

24   as Exhibit 3.

25             MR. LILES:  Just the one page?
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 40

1              MR. PILACEK:  Yup.

2              (Defendant's Exhibit 3 marked for

3     identification.)

4     BY MR. PILACEK:

5         **Q     Now, this indicates that the total hours that**

6     **you worked in the year before your first day of absence**

7     **due to your injury was 144 hours.**

8         A     Correct.

9         **Q     Do you disagree with that?**

10        A     No.

11        **Q     Okay.  At some point in time, did you file a**

12    **claim for disability benefits?**

13        A     When they told me to get on short-term

14    disability, yes.

15        **Q     And when was that?**

16        A     After I was denied from FMLA, and then after

17    the 97 days that I had to wait from contacting Desiree

18    in my HR in order to get her -- she had to sign off like

19    the last day I worked and like the first day I worked.

20    She just had to sign it.  It took them 97 days to get

21    that back to me.  I called them from at least 10

22    different phone numbers; I text-messaged from five

23    different phone numbers, and I emailed from -- it was

24    too many different emails.  It took them 97 days to get

25    back that little piece of paper to me.

1         And then essentially when she emailed me back,

2   she -- it wasn't like I'm sorry for taking 97 days.  It

3   was just what I needed.  And then it was dated like

4   three months that did -- they did it for like three

5   months prior and it -- they sent it to me three months

6   after they had did it.

7         Do you know why they did that?

8     Q    Desiree is an employee of UPS --

9     A    I don't believe --

10    Q    -- correct?

11    A    -- so anymore.  She was the HR.

12    Q    Yes.  She was in HR --

13    A    Yes.

14    Q    -- of the company, correct?

15    A    Yes.

16    Q    Had nothing to do with employment by the union

17  or a position with the union, correct?

18    A    Correct.

19    Q    And the union doesn't fill out disability

20  claim forms, does it?

21    A    I don't believe so.

22    Q    Did you ultimately start receiving disability

23  benefits?

24    A    No.

25    Q    You never did?

1       A    No.

2            MR. LILES:  Can you read back that last

3       question and answer.

4            (Read back by the stenographer.)

5            MR. PILACEK:  Would you mark this as the next

6       in order please.

7            (Defendant's Exhibit 4 marked for

8    identification.)

9    BY MR. PILACEK:

10      Q    Would you take a look at the third page of

11   that document.

12      A    Yup.

13      Q    Interrogatory No. 2 asks you to please

14   identify all of your sources of income and the total

15   amount of income you received from each source for each

16   of the calendar years 2019, 2020, 2021 and --

17      A    Yes.

18      Q    -- 2022, and you said, "Insurance payments for

19   my knee injury."

20      A    Correct.

21      Q    And so insurance paid for your knee injury?

22      A    Yes.

23      Q    If you take a look at interrogatory No. 3,

24   "Did you receive disability payments as the result of

25   your knee injury on November 20, 2019?  If so, please

 1   specify each benefit provider," and it asks you to state

 2   certain information besides that --

 3       A    Yeah.

 4       Q    -- including the date the payments commenced

 5   and the period of time during which you were paid.

 6       A    Yes.

 7       Q    And your answer was, "Disability payments

 8   listed above."

 9       A    All right.

10       Q    Did you not now just tell me you never

11   received disability payments?

12       A    I was thinking that you were talking about

13   No. 4.

14       Q    That asked for Unemployment Compensation

15   benefits?

16       A    That's what I just thought you were talking

17   about, yes.  I mean, I obviously got insurance payments

18   for my knee.  I thought you were talking about No. 4.

19       Q    Interrogatory No. 4 asked, "Did you apply for

20   Unemployment Compensation benefits?"

21       A    Yes.

22       Q    And your response was, "No.  I didn't think I

23   was eligible."

24       A    I wasn't.

25       Q    And why did you not think you were eligible?

1       A    Because I didn't think I worked enough hours.

2            After not getting -- I got denied for FMLA,

3   why would I get Unemployment Compensation?

4       Q    So anyhow, going back to where we left off,

5   you confused the question that was asked in

6   interrogatory No. 3 with the question about unemployment

7   that was asked in interrogatory No. 4?

8       A    Yes.  Yes.

9       Q    Okay.  Now, you indicated that you went back

10  to work for your mother?

11      A    Yes.

12      Q    When?

13      A    As soon as I found out I was fired.

14      Q    When was that?

15      A    When I went to the doctor's office and they

16  told me that my insurance was canceled and I talked to

17  Alan for 30 minutes and he did not tell me -- he did not

18  call me back again.

19      Q    Well, you went to your doctor's office before

20  you talked to Alan, correct?

21      A    Yes.  That's how I --

22      Q    And if you talked to Alan in February of 2020,

23  and we'll get your memory on that date shortly, you were

24  aware before you talked to Alan that you had been fired

25  because your insurance had been canceled, correct?

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                         Page 45

```
1       A    Correct.

2       Q    Okay.  Now, is it at that point when you

3   talked to your doctor that you go back to work for your

4   mother?

5       A    I -- I could work for my mother without having

6   to do -- it's not -- I don't have to do physical labor.

7   I could sit on a chair doing work for her, whereas UPS I

8   would have to be doing physical labor.  It's a

9   completely different thing.

10      Q    So the answer to my question is that it was --

11  as soon as you find out from the doctor --

12      A    Yes, correct.

13      Q    Okay.  That's fine.

14           And does your mother pay you a salary?

15      A    It's -- I get no money.  It's essentially I

16  have a place to live.  I have a car.  I have a phone,

17  insurance.  I have food.  I have everything that I need

18  and I work for her.

19      Q    So they provide you with what you need to

20  maintain?

21      A    Yes, or I would have been homeless because UPS

22  essentially -- I didn't have enough money to afford my

23  insurance, my -- every -- my payments, everything that I

24  had to do for surgery.  I would have been homeless if it

25  was not for her because of UPS and the union.
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                Page 46

```
 1      Q    All right.  So the answer is you get no money.

 2   You get it in terms -- what you're compensated by your

 3   mother is food, shelter, a cell phone --

 4      A    A -- yes.

 5      Q    -- a car?

 6      A    Necessities.

 7      Q    All right.  So she's the one that pays for all

 8   of those?

 9      A    Yes.

10      Q    Did you work for your mother at any time when

11   you were employed by UPS?

12      A    I did not.

13      Q    Did not.  Even on the days when you were

14   scheduled to work but chose not to go to work?

15      A    Correct.

16           MR. PILACEK:  I'm going to take five minutes

17      if you don't mind.

18           (Recess taken.)

19           MR. PILACEK:  Would you please mark this as

20      next in line.

21           (Defendant's Exhibit 5 marked for

22   identification.)

23   BY MR. PILACEK:

24      Q    Mr. Massa, would you please browse through

25   that package of documents which are Bates stamped Massa
```

```
 1   470 through 495.

 2      A    Yup.

 3      Q    Do you recall receiving any of those?

 4      A    No, not a single one.

 5      Q    Never?

 6      A    Nope.

 7      Q    Not a single one?

 8      A    Not a single one.

 9      Q    Now, the first page is dated November 1, 2019.

10   Do you see that there?

11      A    I certainly do.

12      Q    And it says "Intent to Discharge," correct?

13      A    That is what it says.

14      Q    And you say you never received it?

15      A    Nope, I did not.

16      Q    Okay.

17           MR. PILACEK:  Would you please mark this as

18      Defendant's 6.

19           (Defendant's Exhibit 6 marked for

20      identification.)

21   BY MR. PILACEK:

22      Q    Mr. Massa, what I've handed you is some

23   documents that have been provided by the union during

24   discovery.

25      A    Right.
```

```
 1      Q    They have various Bates numbers --

 2      A    Yes.

 3      Q    -- at the bottom.  If you take a look at the

 4  first page --

 5      A    Yes.

 6      Q    -- is that your signature at the bottom?

 7      A    It is.

 8      Q    And it says, "On 11/7/19 I received a

 9  discharge for missing work on 11/1/19"?

10      A    Yup.

11      Q    And the letter is dated November 1, '19?

12      A    Yup.

13      Q    That's the first page of Defendant's Exhibit

14  5, isn't it?

15      A    This says -- I never received this in the mail

16  though.  This was from the union.  They told me to do

17  this.

18           There's a big difference between getting one

19  in the mail and them telling me.  So pretty much the

20  union -- they actually kind of had my back there and

21  they told me when this happened and I would have to file

22  a grievance on them.  So every time that I get -- I

23  would get one, I would file a grievance on it, but I

24  never got one in the mail.

25      Q    Okay.  The way UPS issued discipline is that
```

```
 1    if you were at work --

 2        A    Yeah.

 3        Q    -- they would call you into the supervisor's

 4    office together with a union steward and then you'd be

 5    handed the discipline, correct?

 6        A    No, you would not be handed this.  You were

 7    never, ever handed one of these.

 8        Q    Okay.  That's fine.

 9        A    You have to sign for this in the mail.  It is

10    certified mail.  You have to sign.  It is completely

11    different what they hand you in the -- when you get --

12    when you -- when that happens and they bring you in to

13    get disciplined, they do not ever hand you this.  So I

14    don't know what you are talking about because they never

15    ever hand you a termination letter in -- when you're

16    with a supervisor at work.

17        Q    Then how would you know to file --

18        A    I just explained it to you.

19             (Interruption by the stenographer due to

20    cross-talking.)

21        A    They told me when I got it.

22             Do you want me to say it for a third time?  I

23    just --

24        Q    Who?

25        A    Alan and Joey would tell me -- when I would
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                              Page 50

```
 1    get into work, they would tell me when I would have one.

 2    How else would I know the dates on these?  They told me.

 3    How else would I know to write these every day?  They

 4    would tell me.  They actually had my back there.  I

 5    never received one in the mail though like you are

 6    saying.

 7         Q    I never asked --

 8         A    If you're saying --

 9         Q    -- if you received it in the mail or not.

10         A    That's the only --

11         Q    I asked if you ever received it.

12         A    That's the only way you receive it though,

13    sir.

14         Q    Did you receive --

15         A    You only receive it in the mail though, sir.

16    You don't receive -- they don't hand it to you hand to

17    hand.  You only receive this by certified mail.

18         Q    Mr. Massa --

19         A    And the answer is no that I've already

20    answered four times.  No, no --

21         Q    Never received --

22         A    -- no, no, no.

23         Q    -- a discharge letter for missing off work --

24         A    No.

25         Q    -- on November 1, 2019?
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                            Page 51

 1      A    No.

 2      Q    Okay.  So when the grievance says, "On

 3   November 7, '19 I received a discharge for missing

 4   work," that's wrong?

 5      A    I just explained it to you.  They told me,

 6   yes, I received it.  They told me that I received it.  I

 7   never signed for one in the mail, but they had told me

 8   that they had sent one and that I needed to file a

 9   grievance.

10      Q    So getting back to Defendant's Exhibit No. 5,

11   you never actually received any of these documents?

12      A    No, I never received them.

13      Q    And the only way you grieved the discipline

14   that is set forth in these documents is if you were told

15   by the union that the company had issued them?

16      A    100 percent.

17      Q    Okay.

18           MR. PILACEK:  Would you please mark this as

19      next in line.

20           (Defendant's Exhibit 7 marked for

21      identification.)

22           MR. LILES:  Those don't have Bates labels, do

23      those?

24           MR. PILACEK:  No.

25

```
 1   BY MR. PILACEK:

 2       Q    Do you recognize those pages as screenshots of

 3   text messages --

 4       A    Yes.

 5       Q    -- between you and Marc Joey Howard on

 6   October 13, 2020?

 7       A    Yes.

 8            MR. PILACEK:  The next one would be 8.

 9            (Defendant's Exhibit 8 marked for

10   identification.)

11   BY MR. PILACEK:

12       Q    Have you browsed through that?

13       A    I -- I know these almost by heart, sir.  I can

14   almost recite these by heart.

15       Q    Do you recognize the pages of this document --

16       A    Yes.

17       Q    -- to be true and accurate screenshots --

18       A    Yes.

19       Q    -- of text messages between you and Marc Joey

20   Howard on March 22, 2021?

21       A    Yup.

22            (Defendant's Exhibit 9 marked for

23   identification.)

24   BY MR. PILACEK:

25       Q    Mr. Massa, do you recognize those pages as
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 53

1    true and accurate screenshots of text messages between

2    you and Marc Joey Howard on March 23, 2021?

3         A    I do.

4              (Defendant's Exhibit 10 marked for

5    identification.)

6    BY MR. PILACEK:

7         Q    Do you recognize those pages as true and

8    accurate screenshots of texts between you and Marc Joey

9    Howard on March 25, 2021?

10        A    I do.

11        Q    With regard to Exhibit 10, the one we just

12   looked at, you understood that you were invited to --

13        A    I did --

14        Q    -- attend a meeting --

15        A    -- and by then --

16        Q    Excuse me.

17             -- to attend a meeting with Fred Dore, the

18   labor manager, Thor Johnson, the --

19        A    Yes.

20        Q    -- union business agent and present

21   documentation showing you did not receive Intents to

22   Discharge and/or provide excuses for why you did not

23   show up to work to that point, correct?

24        A    Correct.  By --

25        Q    And you did not attend that meeting, correct?

 1        A    Correct.

 2        **Q    You said that you wanted your lawyer to handle**

 3   **it, right?**

 4        A    By then I did not trust them at all.  I did

 5   not trust a single word they said at all, because I

 6   could tell they were trying to trick me and work with

 7   the union.  By then I did not trust a single thing that

 8   they were saying to me.

 9        **Q    All right.**

10        A    I'm not going to listen to them at all at that

11   point.

12        **Q    Well, when did you stop trusting?**

13        A    Pretty much when they told me I could either

14   be fired of get paid $250 to resign.

15        **Q    October 13 --**

16        A    Yeah, pretty -- pretty much.

17        **Q    -- 2021, correct?**

18        A    Yeah.

19        **Q    If you'd go back to Exhibit 7 then.**

20        A    Yup.

21        **Q    On the third page, which includes counting the**

22   **cover page --**

23        A    Yup.

24        **Q    -- Mr. Howard tells you, "Labor manager is**

25   **here just making the offer.  They state they sent you**

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023
Page 55

```
 1   termination letter in the mail and 48-hour and you

 2   didn't respond allegedly," and you responded, "I'll just

 3   wait for my lawyer to get this, figure it out," correct?

 4        A    Correct.  Like I said, I do not trust a single

 5   word they're telling me at this point.

 6        Q    Okay.

 7        A    Considering he won't answer a single question

 8   I ask him, just going by the book, only answer what Thor

 9   tells them to say.

10        Q    And if you'd turn to the second to the last

11   page.

12        A    Yup.

13        Q    You say, "Why was I getting 48-hour

14   terminations when I sent pics to Liz, you and Alan?"

15        A    Yeah, that's pretty -- that's pretty obvious

16   why I would say that, because he had just said that they

17   had sent me 48-hour termination letters; that's how I

18   knew about them.  So that's pretty -- pretty easy.

19        Q    Okay.  That's fine.  So you stand by your

20   testimony that you never received a 48-hour termination

21   letter?

22        A    I do.

23        Q    Okay.  That's fine.

24             Now, why do you think that the union, who you

25   say at some time had your back, suddenly turned on you?
```

1      A    Are you serious?

**2      Q    Yeah.  I'm asking.  What do you think is the**

**3   reason?**

4      A    They did not want to -- it's pretty much --

5   they did not want to have to do the work that it was

6   going to take to keep me hired.  They wanted -- it was

7   easier for them to work with the UPS, work together and

8   get me fired, obviously by them telling me the $250 -- I

9   get $250, I could resign, or I could be fired.

**10     Q    And assuming for the moment that, as the texts**

**11   state, this was an offer made by the labor manager, do**

**12   you think the union was the one that convinced UPS to**

**13   make it?**

14     A    I didn't say that, but at this point I don't

15   trust anybody dealing -- I don't trust anybody at this

16   point.

**17     Q    Okay.**

18     A    Why would I?  Why would I trust them at this

19   point?  Why would I?  Just -- why?

**20     Q    And so you think that the reason why the union**

**21   turned on you was that it was too lazy to do the work to**

**22   keep you employed?**

23     A    A hundred percent.  Why did they not get to my

24   150 other grievances the four years prior?  A hundred

25   percent.  They -- they were tired of -- so pretty much

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                               Page 57

 1   they were tired of having to take me to the office, get

 2   disciplined, and then having to deal with me and the

 3   grievance process every single day.

 4           Because that's pretty much what would happen.

 5   Every single day I was having to go into the office with

 6   one of them to talk to someone to discipline me, and

 7   they would -- it would take more time for them out of

 8   their day.

 9      Q    **But, Mr. Massa, you were never at the**

10   **office --**

11      A    But then how would --

12      Q    **-- at work after November 20 of 2019, were**

13   **you?**

14      A    I wasn't.

15      Q    **So then why would they be tired of trying to**

16   **keep you employed after that date?**

17      A    I just explained it.  They didn't want to do

18   any more work.

19           They didn't even tell me it was fired.  It's

20   very obvious.  What you're asking right now I don't

21   understand.  Why wouldn't they tell me I was fired?

22   They tried to sweep it under the desk so they could

23   trick me.  They -- it's very obvious in the text

24   messages they tried to work together to trick me so I

25   wouldn't be in a position to be able to do what I'm

 1   doing currently.  If I were to go and take the $250 and

 2   resign or I would say no, I don't want that, I'm fired,

 3   I would not be able to be sitting here with you right

 4   now, correct?

 5        Q     The union did not accept the company's offer

 6   for you, did it?

 7        A     They asked though.  They asked me.  They said

 8   you could be fired or you could take $250 and resign.

 9   What are you talking about?

10        Q     Mr. Massa, would you please answer the

11   question that's being asked.  The union did not accept

12   the company's offer?

13        A     They did, because they -- obviously they did

14   because they were the ones that told me I was fired.

15   Alan and Joey, they knew I was fired.  They accepted

16   that I was fired.

17        Q     The union did not accept the company's

18   settlement offer --

19        A     They did.

20        Q     -- correct?

21        A     They did though essentially.  Why did they

22   tell me one day that I could either be fired or I could

23   take a resignation for $250 and then six or so months

24   later they just randomly tell me oh, you can come back

25   to work whenever you want?  Why would they do that?

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                              Page 59

```
 1       Q    Mr. Massa, the grievances that were pending
 2  for which the monetary payment was offered were not
 3  resolved, correct?
 4       A    But they would have been if I would have
 5  accepted the $250 like they were trying to get them --
 6  they would have been though if I would have said, Yes,
 7  let me resign and let me take this $250.  They would
 8  have been.  So essentially they did, correct?
 9       Q    Mr. Massa, they left that decision up to
10  you --
11       A    But why would --
12       Q    -- to accept or reject, did they not?
13       A    They -- are you -- are you serious?  It was
14  not an accept or reject.  It was either be fired or
15  accept the resignation.  What is the difference between
16  those?  Are you -- this is -- are you serious?  They're
17  trying to give me $250 to clear all of my -- all of my
18  grievances and I'm not able to do this with you right
19  now or I could be fired.  Does that make sense to you?
20            MR. USMAN:  Don't yell, Trent.
21            THE WITNESS:  No.  He's trying to make me like
22       I'm stupid.  These questions are ridiculous.  These
23       are -- they're ridiculous.  There is like...
24       A    What does the $250 -- why do you think they
25  offered me money?  And the fact they offered me $250 for
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 60

1    150 grievances is absolutely insane.

2            You don't know what to say now, huh?  Yeah,

3    because that's pretty much what it meant.  They were

4    trying to get at all their -- 150 grievances all for

5    $250, sweep it under the rug so it's easier for you guys

6    and I can't do this now.

7        Q    If you would take a look at Defendant's

8    Exhibit 7, the first page.

9        A    I'm looking at it.

10       Q    All right.  Again, these are text messages

11   between you and Marc Joey Howard dated October 13, 2020.

12       A    Yes.

13       Q    All right.  Now, the first message you receive

14   from Marc Joey Howard is, "The company would like to

15   make you an offer of $250 for your open grievances and

16   also asking for a resignation instead of being fired per

17   labor manager Fred Fore," I guess, "to clear the log."

18   You respond, "That's a big no," correct?

19       A    Correct.

20       Q    The next message from Mr. Howard is,

21   "Understand.  What would you like your resolution to be?

22   Or I could let Thor handle it, whichever you prefer,"

23   right?

24       A    Correct.

25       Q    You never told him what you wanted the

 1   resolution to be, did you?

 2        A    At this point I don't trust you a single --

 3   why would I tell you -- why would I tell you that when

 4   you don't even tell me that I'm fired and then all of a

 5   sudden you give me this ultimatum where I could either

 6   be fired or I could accept your $250 to get all my 150

 7   grievances out of the way?  Why would I tell you

 8   anything after that?

 9        **Q    Mr. Massa, the question was, you never did**

10   **tell Joey Howard --**

11        A    Because --

12        **Q    -- what you wanted to be your resolution?**

13        A    The first thing, I wanted them to at least

14   tell me that I was fired.  They couldn't even do that

15   part.  It's just -- the first text message pretty much

16   explains that whole ordeal.  Why would I trust them at

17   all at this point?  Just why?  Would you trust them?  I

18   don't --

19        **Q    Mr. Massa --**

20        A    -- think you would.

21        **Q    -- please answer the questions.**

22        A    I'm answering them, but you're trying to --

23   you're trying to play games and go in circles.  This

24   is -- I'm answering them exactly how you want.  You're

25   trying to trick me like the UPS and the union are.

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 62

```
 1   It's --

 2        Q    You never did tell Marc Joey Howard what

 3   resolution you wanted, did you?

 4        A    At this time --

 5        Q    Did you?

 6        A    No, I didn't.

 7        Q    Okay.  See, it was that easy.

 8        A    It was.  It really was.

 9        Q    We're jumping tracks.

10             Did you file a tax return for 2019?

11        A    Yes.

12        Q    Okay.  May we have that, please.

13             THE WITNESS:  I have it, right?

14             MR. USMAN:  It's -- I have his W-2.  I'll see

15   if we can get the actual return.

16   BY MR. PILACEK:

17        Q    Did you file a tax return for 2020?

18        A    No.

19        Q    2021?

20        A    No.

21        Q    2022?

22        A    No.

23        Q    Or this year?

24        A    No.  Because I don't make any money.

25        Q    Okay.  You never filed a grievance which
```

```
 1    alleged disability discrimination by UPS, did you?
 2        A    I didn't think I had to.  I didn't think I was
 3    fired.
 4        Q    The answer is no?
 5        A    Yes.  But the answer is I didn't think I have
 6    to.  But yes.
 7        Q    The answer is you did not file a grievance
 8    alleging disability --
 9        A    Yes.
10        Q    -- discrimination --
11        A    Yes.
12        Q    -- by UPS?
13             Yes?
14        A    Yes.
15        Q    Okay.  And you never made a request to UPS to
16    return you to work after you were released by your
17    doctor and ready to go back to work?
18        A    I was ready to go back to work.  They told me
19    I was fired.
20        Q    You did not --
21        A    I was ready --
22        Q    -- tell UPS I'm ready to come back to work --
23        A    They told me I was fired.  I was ready.  I
24    obviously --
25             All right.  So I don't assume that I'm -- I
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                          Page 64

 1   don't assume that I'm fired.  Why would I ever do that?

 2        Q    Mr. Massa, if you're not fired but you can't

 3   work --

 4             Right?

 5        A    Right.

 6        Q    -- then don't you have to tell your company

 7   when you can work again?

 8        A    But according to them I was fired.  Was I not?

 9        Q    Mr. Massa --

10        A    I knew -- you could work --

11        Q    If you believed that you were wrongfully fired

12   and you wanted to go back to work when you could, why

13   did you not just tell UPS I'm ready to return --

14        A    They text --

15        Q    -- to work --

16        A    They sent me --

17        Q    -- it's your mess?

18        A    Are you serious?

19        Q    Yeah.

20        A    You just read the text messages of them

21   telling me to come back to work multiple times and I

22   told them I did not trust them.  Is there any -- do I

23   need to tell you this again?  Do I need to say it a

24   different way?  What are you trying to get out of this?

25   Are you going to ask me it a different way this time?

```
 1   Like are you going to word it a different -- you're
 2   asking me the same question over and over again.  I
 3   don't know how I'm going to give you a different answer.
 4        Q    After you spoke with Alan, the shop steward,
 5   in approximately February of 2020, you never asked the
 6   union for help in getting back to work after you were
 7   ready to go back to work --
 8        A    Are you serious?
 9        Q    -- correct?
10        A    I was waiting for him to contact me again.  He
11   never contacted me again --
12        Q    So the answer --
13        A    -- after I talked to him for 30 minutes.
14        Q    -- to my question is no?
15        A    I was -- that's -- no.  You're trying to word
16   it where it's no, but that's not really the answer to it
17   though.  It's -- it's not -- I was -- it's not.
18        Q    You never asked the union for help --
19        A    I asked them --
20        Q    -- in attempting to get you back to work --
21        A    I asked them --
22        Q    -- after you were ready to --
23        A    I did though.
24        Q    -- return to work?
25        A    It's in the text message.  You -- you see it
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 66

```
 1    in the text messages where I'm asking Joey five
 2    different things and he's not responding to them.  You
 3    see it in the text messages.  I asked him five different
 4    questions he just completely ignores and he goes to tell
 5    me what Fred Thor told him to say.
 6         Q    I see.
 7         A    There's -- why would I not ask for help to get
 8    back to work?  Are you -- it's in the text messages.
 9         Q    So when did you ask the union for help in
10    getting back to work after you were released to return
11    to work?
12         A    By -- in --
13         Q    When?
14         A    After Alan talked to me.
15         Q    February of 2020?
16         A    Yes.
17              MR. PILACEK:  No further questions.
18              MR. LILES:  Let's take a five or ten-minute
19         break.
20              (Recess taken.)
21    CROSS-EXAMINATION
22    BY MR. LILES:
23         Q    All right.  Mr. Massa, we took a quick break.
24    Are you ready to continue?
25         A    Yup.
```

```
 1        Q     My name is William Liles.  I'm an attorney for

 2   UPS.  I've got some follow-up questions for you.

 3        A     All right.

 4        Q     I apologize in advance if I ask you something

 5   that was asked earlier.

 6        A     It's all good.  I get it.

 7        Q     So one of the things that's kind of been

 8   happening, that if you can just try as good as you can,

 9   if you could wait until I finish my question and then

10   you give me your answer.

11        A     I gotcha.

12        Q     It just --

13        A     No, I know.  I gotcha.

14        Q     Yeah.  If we were sitting around the living

15   room, it would be different, but with this process the

16   court reporter really needs to get the question, get

17   your answer, and then I'll do my very best to try to

18   wait until you finish your answer before I give you a

19   question.

20              Kind of similarly, this is my one opportunity

21   to ask you questions in person about the claim that

22   you're making in this lawsuit, and it's not really the

23   time for you to be asking questions back.

24        A     All right.

25        Q     Like it's just not the way the process works.
```

1        A     All right.

2        Q     And so you ask me questions, I'm not going to

3   answer them.

4        A     I know.  I could tell by him.  He just

5   completely ignored every --

6        Q     Okay.  So let's just --

7        A     I could tell, yeah.

8        Q     That's not --

9        A     No, I get it.  I get it.

10       Q     This isn't the forum.

11       A     I get it.

12       Q     So we've never met before today?

13       A     No.

14       Q     Never spoken before today?

15       A     No.

16       Q     Have you been involved in any other lawsuits

17   previously?

18       A     Nope.

19       Q     Other than talking to your lawyer, did you do

20   anything else to prepare for your deposition today?

21       A     No.

22       Q     Did you talk to anybody, any current or former

23   employees of UPS, about your deposition today?

24       A     Nope.

25       Q     Okay.  Some of the stuff I'm just going to go

```
 1   back and kind of clean up and make sure that I've got
 2   answers to directly.
 3           Other than the work that you're doing for your
 4   mom as part of the landscaping, you haven't applied to
 5   any other work in any way since November of 2019?
 6       A    Correct.
 7       Q    Okay.  Since November of 2019, have you
 8   applied for Social Security Disability?
 9       A    No.
10       Q    When you were working for UPS, what was your
11   direct supervisor and their one-up's names?
12       A    George -- George was my direct supervisor.
13   His like one-up was Liz.
14       Q    Do you know George's last name?
15       A    I do not.
16           Or George and Dave.  It was two of them, so
17   George and Dave.  They would like rotate.
18       Q    Do you know Dave's last name?
19       A    I don't know Dave's last name either.
20       Q    Does Dave Senyak sound familiar?
21       A    No, I -- I don't know their -- I'm not sure
22   what their names -- last names would be.
23       Q    We talked about it some earlier, but you would
24   agree with me that your job for UPS required certain
25   physical elements to it?
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                    Page 70

```
 1      A    The entire time, yes, a hundred percent.

 2      Q    And there was a time period after you injured

 3  your knee where you were unable to perform that --

 4  physically --

 5      A    Correct.

 6      Q    -- perform that work, right?

 7      A    Correct.

 8      Q    And your testimony is that that time period

 9  where those restrictions were in place was roughly the

10  date of the accident in November 2019 through I think

11  you said earlier less than six months --

12      A    Correct.

13      Q    -- is that right?

14      A    Yes.

15      Q    Okay.  And so November 2019, six months

16  forward would be roughly middle of April 2020 --

17      A    Correct.

18      Q    -- is that right?

19      A    Yes, correct.

20      Q    And did you tell anybody at UPS on or around

21  April of 2020 that you were released from your work

22  restrictions and able physically to return to work?

23      A    By then I did not trust --

24           No.  No.

25      Q    No, you didn't tell anybody?
```

1      A    They knew that, but I did not tell them.   I

2   never -- I never told them that I did not want to be at

3   work.  I was willing to go to work injured.  I did not

4   know that I was fired.  I was never -- I did not ever

5   want to not be at work.  I would have gone to work and

6   done the mail where they -- they've given the girls or

7   people that are injured jobs where they can just -- they

8   sit in a chair and they do the light stuff and the mail.

9   I was willing to do that very early on.

10      **Q    Did you talk to anybody at UPS about**

11   **performing --**

12      A    Well, I didn't because --

13      **Q    -- whether light duty --**

14      A    -- essentially --

15           (Interruption by the stenographer due to

16   cross-talking.)

17      A    Essentially after my injury, they were no help

18   to me at all.  UPS or the union, they pretty much left

19   me in the dark and I had to fend for myself essentially.

20   So from there, I don't -- I don't see why me telling

21   them I'm ready to go back to work would matter when the

22   entire time I did not want to not be at work.

23   BY MR. LILES:

24      **Q    And I just want to clarify my question.  I'm**

25   **not asking you whether it mattered or not.  My question**

1  to you is, did you ever tell or otherwise communicate to

2  UPS that your doctor had released you from your work

3  restrictions and you were physically able to return to

4  work?

5      A    No, because at that time I did not trust UPS

6  or the union because they were no help to me at all.

7      Q    Okay.

8      A    It was -- I was ready to return -- I was --

9  never wanted to not go to work.

10     Q    Okay.  And again just yes or no to clarify,

11 you didn't ever request a different job position or some

12 other accommodation of something that you felt like you

13 could physically do?

14     A    No, because I was fired.

15     Q    Okay.

16     A    So me doing that would have been absolutely

17 pointless because they would have just told me that I

18 was fired.

19         So I don't see where you're going with that,

20 because they were -- essentially I'm fired.  Me telling

21 them I'm ready to go back to work does not matter

22 because I'm fired as -- for them telling me you could

23 have $250, get all the grievances gone, or you could

24 just stay fired.

25     Q    Since November of 2019, have you applied for

```
 1   any other jobs --

 2        A    No --

 3        Q    -- for UPS --

 4        A    -- I have not.

 5        Q    -- regardless of location?

 6        A    No, I have not.

 7        Q    If you could look at Exhibit 2, which is your

 8   First Amended Complaint.

 9        A    All right.  I'm looking.

10        Q    I would like you to look at Page 6 of 27.

11        A    All right.

12        Q    On paragraph 31 it says, "In discriminatory

13   fashion, UPS failed Massa when he took a driving to test

14   for a promotion to become a delivery driver."  Do you

15   see that?

16        A    Yes, I do.

17        Q    When did that driver test occur?

18        A    Before the injury, either 20 -- early 2019,

19   late 2018, between then.

20        Q    Did you file a grievance relating to the

21   failure on the driving test?

22        A    They pretty much told me that that was

23   pointless, the union.  I talked to the union about that.

24   They said there was nothing they could do.

25        Q    Who at the union told you --
```

 1      A    Joey and Alan.

 2           (Interruption by the stenographer due to

 3   cross-talking.)

 4   BY MR. LILES:

 5      Q    Who at the union told you that it was

 6   pointless?

 7      A    Joey and Alan.

 8      Q    Paragraph 30, just above that, it says --

 9           Am I saying that right, Massa?

10      A    Yeah, correct.

11      Q    "Massa's white coworkers were also given

12   preferential treatment in the form of promotions such as

13   delivery driver positions."

14      A    Yes, correct.

15      Q    When do you allege that that occurred?

16      A    When I was -- during late 2018 to early 2019.

17      Q    And which coworkers do you believe were given

18   preferential treatment?

19      A    I'm not sure of their names, but there's a

20   bunch of them.

21           I studied for that test like I was preparing

22   for a final at USF.  So I know how to -- I knew how to

23   study.  I was -- I had a pretty good GPA.  I knew how to

24   prepare for something like that.  I went over -- I did

25   too much for that.  There were Saturdays where I would

1   spend the entire day in the yard doing -- just driving

2   around the truck.  I did more work than anybody for that

3   and they failed me.  There's -- I couldn't have done any

4   more work to prepare for that driving test and they

5   failed me.  It was on purpose.

6       Q    Just to clarify, you don't know the identity

7   of any of the coworkers that you alleged were given

8   preferential treatment?

9       A    I'm not sure of their names, no.  There's

10  like -- there are 10, 15, 20, 30 new drivers in that

11  period of time.

12      Q    For the preceding paragraph, Paragraph 29, it

13  says, "Massa was adversely singled-out to work different

14  hours than his white coworkers."

15      A    Yeah.  Like I said, the -- that started the

16  first day that I was at work at UPS.  The first day that

17  I was on the job, I was hired with an African American,

18  another white person.  Those two got to come to work on

19  start time and I pretty much got to get like two and a

20  half hours of work because they made me come in 45

21  minutes to an hour late every day.  This is at just the

22  start, the start of me working at UPS.

23      Q    What do you allege that your start time should

24  have been when you started?

25      A    The same start time as everybody else.

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                               Page 76

```
 1      Q    And what time is that?

 2      A    It's different every day, like I said.

 3      Q    Did you ask anybody why you were being asked

 4  to --

 5      A    I did.

 6      Q    -- come in 45 minutes --

 7      A    Including -- including --

 8           (Interruption by the stenographer due to

 9  cross-talking.)

10  BY MR. LILES:

11      Q    If you could wait until I finish my question

12  please.

13           Did you ask anyone about why you were being

14  asked to come in 45 minutes to an hour later --

15      A    I did.

16      Q    -- than everybody else on those shifts?

17      A    I did.

18      Q    Who did you ask?

19      A    Joey, Alan, the union stewards.

20      Q    And what was Joey and Alan's responses --

21      A    To?

22      Q    -- when you asked them why you were being

23  asked to come in later than the other workers?

24      A    Pretty much that it was bull and then S, that

25  I should not have been do -- had to do that, pretty much
```

 1    is what they told me.  It was ridiculous.  This is bull

 2    S.  This should not be happening, especially on your

 3    first day.

 4        Q    Did Joey or Alan or anybody at the union or

 5    through the grievance process correct any of the issues

 6    with your start time?

 7        A    I don't believe it was them.  I think they

 8    just eventually had me start the regular start time.  I

 9    don't think they -- I don't think the union had anything

10    to do with it.

11        Q    And --

12        A    They had me deal with it on my own.  So they

13    pretty much were like you have to deal with it on your

14    own.

15        Q    And when did that change where you were no

16    longer being asked to come in later than your other

17    coworkers?

18        A    A couple of months.  It went on for a while.

19        Q    Okay.  And so when you first started in --

20             2015?

21        A    Yeah.

22        Q    -- for a couple of months you were asked to

23    come in 45 minutes to --

24        A    It was always a different -- so I would always

25    have to come in after the start time.  I would always

```
 1   have to -- it would always be after the start time, a
 2   certain amount of time after the start time every day.
 3   They would not let me clock in on start time.
 4         Q    Again, if I could just finish my question for
 5   the court reporter.
 6              So your allegations are that from your first
 7   day in 2015 through a couple of months that you were
 8   asked to come in some amount of time later than your
 9   coworkers and then that issue was resolved one way or
10   the other after a couple of months?
11         A    Correct.
12         Q    After that issue was resolved, were there any
13   other instances where you believe that you were
14   adversely singled out to work different hours from your
15   other coworkers?
16         A    No, not -- that was done after that, the first
17   couple of months.
18         Q    And so that would have been done at a minimum
19   by early 2016?
20         A    Yeah.  Correct.
21         Q    Going back to the driver test, is there
22   anything that happened other than the fact that you put
23   in a lot of time studying that you believe that failure
24   on UPS's part was due in some way to your race?
25         A    I didn't do anything to be -- to fail the
```

```
 1   test.  I did nothing wrong to fail the test and I was

 2   failed.  So yes, I'm going to say that was because of

 3   race.

 4           I'm telling you I could not -- I saw what

 5   other people were doing for the test and I was doing

 6   more than them.  I -- I knew what -- I knew what I had

 7   to do in order to pass something and get a good grade on

 8   something.  I knew how to pass tests.  I went overboard

 9   on what I was doing to prepare for that test.

10       Q    Did you see anybody else actually taking the

11   test --

12       A    Yes, every day.

13       Q    -- or are you just referring to their

14   preparation?

15       A    I saw other people taking the test.  I saw

16   other people preparing for the test.  I saw -- yes.

17       Q    Okay.  Other than your belief that you didn't

18   do anything to fail and that you were doing as good or

19   better than your other coworkers, is there anything else

20   within the driving test that you believe is evidence of

21   racial discrimination in your failure of the test?

22           MR. USMAN:  Objection.  Legal contention.

23           But you can answer.

24       A    No.

25
```

 1   BY MR. LILES:

 2       Q    Paragraph 28 of this Amended Complaint says,

 3   "Due to his race, UPS provoked Massa and then would

 4   discipline him when he objected to the mistreatment."

 5       A    Hundred percent.  So they would try and --

 6   they would just -- they would make me do stuff that

 7   other people would not have to do, and then when I would

 8   stand on my two feet and say something about it, they

 9   would do exactly like he would do and yell at me, and

10   then I would have to -- it would pretty much get into

11   a -- we would get into a yelling match so then I would

12   be able to be disciplined, and it's just like they would

13   do whatever they possibly could to provoke me on every

14   single day so I would be able to get disciplined.  It

15   happened -- it was every single day I went to work.

16       Q    Your testimony is that every single day that

17   you went to work from 2015 through November 2019 that

18   you were provoked --

19       A    Yes.

20       Q    -- and then disciplined because of your

21   reaction to --

22       A    Not -- I wasn't disciplined every day, but I

23   was provoked.  They would try and provoke me every

24   single day.  They would give me a job that someone else

25   would not want to do every single day.  They would make

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                              Page 81

 1  me do other people's jobs every single day.

 2      Q    And --

 3      A    Yes.

 4      Q    **Why is it your belief that that was due to**

 5  **your race?**

 6      A    Why --

 7           Well, the first day that it happened, I

 8  started with a black and another white person.  I'm not

 9  black.  I kind of don't look that white.  Why would all

10  of this happening right when I first started work -- why

11  would it continue to happen after that happened and I

12  made a big deal about coming to work 45 minutes, an hour

13  later?

14      Q    **Did anybody at UPS say anything to you --**

15      A    Yes.

16      Q    **-- during this time period when you allege**

17  **that you were provoked related specifically to your**

18  **race?**

19      A    Yes, and I said it in the hundred to 150

20  grievances that I filed.  There is times where I have

21  put detailed instances of this happening, and then --

22  that four -- and the entire time that I was there not a

23  single grievance was dealt with, not a single one, and

24  then for some reason they decided that -- they said

25  that -- the other grievance they couldn't answer during

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                     Page 82

1   Covid because it was Covid, but then why the other four

2   years did my other 150 grievances not get answered

3   either?  But that was you guys' excuse for 2020, we

4   couldn't get to these grievances because it was Covid,

5   but you guys didn't answer my hundred to 150 grievances

6   from before Covid.  So I just kind of thought that was

7   kind of strange.

8       **Q     Can you give me some examples of some times**

9   **where you believed that you were provoked due to your**

10  **race and then disciplined based on your reaction?**

11      A     Yes, I certainly can.  You just have to get my

12  hundred to 150 grievances, and they are detailed

13  instances of what happened, detailed.  It is -- it is

14  like to the T exactly what happened detailed.  So just

15  please if you can get the hundred to 150 grievances that

16  I filed, they will be in there in detail of instances of

17  this happening.

18      **Q     Mr. Massa, the record of the grievances speak**

19  **for themselves.  My question to you is if you can give**

20  **me some examples as we sit here today of times when you**

21  **believe that you were provoked due to your race and then**

22  **disciplined based on your reaction.**

23      A     It's in my grievances, like I said.

24      **Q     Is it your testimony that you can't give me**

25  **any instances of --**

```
 1      A    It's not that.  I just -- it's been a while.

 2   It's in my -- it will be better if you have the

 3   grievances.  That's been a long time of every single --

 4   you want me to come up with every single time that I was

 5   provoked every single day?  It's -- there's a hundred to

 6   150 grievances that it is front page, back page of me

 7   explaining exactly what happened.

 8           MR. LILES:  I'm going to object to the

 9      nonresponsive portion of that answer.

10   BY MR. LILES:

11      Q    Mr. Massa, I'm not asking you to direct me to

12   the grievances that were filed.  I'm asking, as we sit

13   here today, can you identify one, two, three times when

14   you believe that you were provoked and then disciplined

15   based on your reaction due to your race?

16      A    It's the first -- the first day of work, and

17   then other times when I filed grievances.  That's

18   happened more than two or three times.  It has been

19   times like this.  I don't remember the exact specifics,

20   but it is detailed in every single grievance what

21   happened.  There's been more than two or three times for

22   race.

23      Q    Mr. Massa, again, I'm not asking you to tell

24   me every single time it happened.

25      A    I hear you, and I just told you the first --
```

```
1              MR. USMAN:  Objection.  Asked and answered.

2      A     Like what else do I -- how else am I going to

3   answer this question?

4              MR. LILES:  I didn't ask a question.  What are

5         you objecting to, Derek?

6              MR. USMAN:  He's -- he wants like a

7         specific --

8              THE WITNESS:  I just -- the first --

9              MR. USMAN:  Do you remember a specific --

10             (Interruption by the stenographer due to

11  cross-talking.)

12     A     The first day on the job.  My first day.  I'm

13  with a black and a white guy.  They made me come to work

14  45 to an hour later.

15             MR. USMAN:  What about after that; any

16        specific time?

17     A     There's -- they would pick me --

18             MR. LILES:  I object to the sidebar and the

19        coaching.

20     A     It's the same exact thing.  So I'd be at work.

21  They would make a black person or a white person -- they

22  would do -- they would have the easier job and I would

23  have to do the harder job.  That happened all the time.

24  Or you could just go to the hundred to 150 grievances

25  and it would be very detailed for you.
```

 1   BY MR. LILES:

 2        Q    Okay.  Mr. Massa, excluding the first day on

 3   the job, excluding the first few months where there was

 4   an issue of your start time, can you give me any

 5   examples, even one, in 2018 or 2019 when you believed

 6   that you were provoked due to your race and that you

 7   were disciplined because of your reaction?

 8        A    Liz telling me that she knew more than I did.

 9   Pretty much caused us to get into a yelling spat.  That

10   happened more than once.  And it's -- that's like a

11   three-page grievance that I wrote.  And it was because

12   of race, because she didn't do the other things -- she

13   didn't discipline the other two workers that were

14   working with me and it was just me.

15             THE WITNESS:  I don't know -- what is the

16        point of this?  Why can't he get the grievances

17        like where it's detailed and it's like -- it

18        happened the day of and I wrote it?  Why is he

19        trying to get this from six years ago?  Why can't

20        he -- why can't he go and get the 150 grievances

21        that it tells you exactly what happened?  I don't

22        understand why he's trying to do this right now.

23        It's -- it -- it'll be way fresher on the

24        grievances than my memory from six, seven years

25        ago.

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                    Page 86

```
 1              MR. USMAN:  They lost them.

 2              THE WITNESS:  A hundred percent.

 3      A    So like why are you asking these questions

 4   when I -- it -- I detailed every single time that this

 5   has happened in a grievance?  Why are you trying to get

 6   this -- I don't understand.  Why am I having to come

 7   with this off the top of my head when you can literally

 8   get it in a grievance when I've -- it's detailed?

 9              MR. LILES:  I'm going to object to both the

10         sidebar by counsel and the nonresponsive portion of

11         the answer by the witness.

12   BY MR. LILES:

13      Q    Mr. Massa, this my opportunity to ask you

14   questions --

15      A    And I'm answering them.

16      Q    -- about your personal knowledge about the

17   claims that you have alleged in this case.

18      A    And I'm answering them.

19      Q    Okay.  We have your grievances.

20      A    But then why are you -- all right.  So you

21   have my grievances.  Then why are you asking me --

22      Q    Mr. Massa, this is not your opportunity to ask

23   questions.

24      A    But --

25      Q    This is my opportunity --
```

```
 1        A     But make --

 2        Q     -- to ask you questions --

 3        A     Essentially what you're saying though is you

 4   have the answer to the question that you're asking me

 5   right now, because you have the grievance.  You know

 6   exactly what I said to be -- for it to be racial, and

 7   you're still trying to do this.  You -- why can't you

 8   get the other hundred to 150 grievances that I had?

 9              MR. USMAN:  Well, maybe you can --

10              MR. LILES:  I'm going to object to the

11        nonresponsive portion of the question [sic].

12              Again, Derek, please don't coach the witness.

13   BY MR. LILES:

14        Q     Mr. Massa, I am asking you about your personal

15   knowledge of the claims that you're making and --

16        A     And I just -- I just answered that.

17        Q     Okay.  You gave me an example.  That's what I

18   was asking for.

19        A     That's why I don't understand why when

20   there's -- you have literally the detailed -- it's

21   detailed --

22        Q     Because that is my prerogative as the attorney

23   representing --

24        A     I know.  I --

25        Q     -- UPS to ask you these questions --
```

```
 1        A    I get you --

 2             (Interruption by the stenographer due to

 3   cross-talking.)

 4        A    I understand that, but when you have it, it's

 5   just -- it would be -- it would be --

 6   BY MR. LILES:

 7        Q    That's not --

 8        A    You would --

 9        Q    -- the way it works though, Mr. Massa.

10        A    You'll get a much better answer though from

11   that.  I just don't understand.

12             (Interruption by the stenographer due to

13   cross-talking.)

14   BY MR. LILES:

15        Q    That's not the way the process works, Mr.

16   Massa.  I ask you the questions.

17        A    All right.

18        Q    You give me your best answer.  I'll ask my

19   next question.

20        A    All right.

21        Q    That's the way it works.

22             Mr. Massa, following your knee injury in

23   November of 2019, are there any allegations or any

24   instances that you can point to where you believe that

25   you were racially discriminated by UPS?
```

 1       A    After I was injured?

 2       Q    Correct.

 3       A    No.

 4            MR. USMAN:  Objection.  Legal contention.

 5       A    But how I would even -- they didn't help me at

 6  all.  How would --

 7            That doesn't even make any sense.  They didn't

 8  even help me out at all, the UPS or the union.

 9  BY MR. LILES:

10       Q    Can you turn to Exhibit --

11            Where is the EEOC charge?

12            It should be one of the later exhibits in

13  Exhibit 2.  It's about halfway down the page on the

14  first page of Exhibit A where it says, "Discrimination

15  based on," and then a bunch of boxes checked.

16            Do you see that section?

17       A    What page is it?

18       Q    The first page of Exhibit A.  It's the one

19  right after 27 of 27.

20            That's that document, but you need to turn

21  to -- I guess it's Page 28.

22       A    This one?

23            MR. USMAN:  Yeah.

24  BY MR. LILES:

25       Q    Yeah.

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 90

```
 1        A     All right.

 2        Q     You've got five boxes checked there.  Do you

 3   see?

 4        A     Yeah.

 5        Q     So there's race, color, national origin,

 6   retaliation and disability checked?

 7        A     Correct.

 8        Q     Do you see that?

 9              Your allegations of discrimination based on

10   color and national origin, are there any instances

11   during your employment with UPS that you believe are

12   different instances of discrimination based on either

13   color or national origin other than the instances we've

14   already talked about involving the race?

15        A     In the grievances, yes.  Many instances in my

16   grievances.

17        Q     My question to you is, do you believe that

18   there were different instances --

19        A     Like what do you mean different?

20        Q     For example, we've talked pretty extensively

21   about what you believe the discrimination based on

22   racial reasons was.

23        A     All right.

24        Q     Right?  My question to you is if there are any

25   other instances based on either color or national origin
```

 1   that were in addition to or different than your

 2   allegations of racial discrimination, or are they all

 3   the same and you believe that those instances of

 4   discrimination were race, color and national origin?

 5          Do you understand my question?

 6      A    I believe it was because of race, color,

 7   national origin, disability, everything that I checked.

 8      Q    Okay.  Prior to your injury in November of

 9   2019, were there any instances of disability

10   discrimination that you believe you faced?

11      A    I was never injured, so no.

12      Q    Okay.  Your allegation of retaliation, can you

13   explain to me what the basis for that claim is.

14      A    Yes.  Pretty much they would push my buttons

15   until I would retaliate.  Then I would get in trouble

16   for it, retaliating.  They would do whatever they

17   possibly could to get me to have a reaction or to

18   retaliate, so then as soon as I retaliated or I gave

19   them the reaction that they wanted, I would be able to

20   be disciplined.

21      Q    And those --

22          MR. USMAN:  And objection.  It's legal --

23      that's -- you're asking him to make legal

24      conclusions.

25

 1   BY MR. LILES:

 2        Q     Those are -- just so I'm clear, those are

 3   going back to --

 4        A     The first day that I worked there.

 5        Q     -- paragraph 28 where it says, "Due to race,

 6   UPS provoked Massa and then would discipline him when he

 7   objected to the mistreatment"?

 8        A     Correct.

 9        Q     Your testimony is that that provoking and then

10   discipline when you objected, that was the retaliation

11   you're claiming in your charge of discrimination filed

12   with the EEOC?

13        A     That's not the only retaliation.  They would

14   retaliate other ways, but yes, that is a way that they

15   would retaliate.

16        Q     What are the other ways that you believe that

17   they retaliated?

18        A     If I would do -- I wouldn't come to work, they

19   would retaliate to that.  I wouldn't do something that

20   they told me to do, they would retaliate.  I wouldn't do

21   exactly what they did, they would retaliate.

22              I don't know how else you want me to explain

23   it.  I didn't do exactly what they would tell me to do,

24   they would retaliate.  I didn't jump -- they didn't tell

25   me to jump and I asked them how high they wanted me to

```
 1   jump, they would retaliate.

 2       Q    Okay.  My understanding of what you're saying

 3   is that there were several instances where you believe

 4   you were retaliated against.

 5       A    More than several.  This was --

 6       Q    Those --

 7       A    I can't even -- a lot.

 8       Q    Those include times when you believed you were

 9   provoked and then disciplined based on your reaction --

10       A    Not just --

11       Q    -- times when you didn't come to work and you

12   believe you were retaliated for not coming to work, and

13   then times when you didn't perform the work requested or

14   you reacted to work assigned, and you believe you were

15   retaliated for those reactions?

16       A    True, yes.

17       Q    Is there any other instances where you believe

18   you were retaliated against?

19       A    No.  That pretty much sums it up.

20       Q    Following your injury in November of 2019,

21   were there any other instances like that where you

22   believe you were retaliated against?

23       A    Constantly, in my grievances.

24       Q    You agree with me that you did not file any

25   grievances after November of 2019?
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                  Page 94

 1      A    Oh, the November -- I wasn't at work.  So what

 2  does that even -- why are you even asking that?  So yes,

 3  of course.

 4      Q    So my question is, after November of 2019,

 5  when you were no longer at work, none of these instances

 6  of retaliation occurred?

 7      A    How would they -- no.  But how would they

 8  possibly occur?  If I'm not at work, UPS and union are

 9  not helping me, I'm not in contact with them, how would

10  they possibly occur?

11          MR. LILES:  I'm going to mark 11 and 12.

12      Eleven is going to be Bates number D-JM-000789, and

13      D-JM-000791.

14          (Defendant's Exhibits 11 and 12 marked for

15  identification.)

16  BY MR. LILES:

17      Q    Mr. Massa, I'm going to ask you to review the

18  documents there.

19      A    Okay.

20      Q    And I just want to confirm based on your prior

21  testimony that it's your testimony that you never

22  received either one of these letters.

23      A    Correct, because I would have --

24      Q    Is that correct?

25      A    Correct.  I would have for sure made a big

```
 1   deal on 1/13/2020, a hundred percent.  I never received

 2   either of these.

 3       Q    Okay.  And then at some time after these

 4   letters but before you talked to Alan in February of

 5   2020, you became aware that your insurance had been

 6   canceled?

 7       A    From going to the doctor and them telling me

 8   that I had to figure out a way to pay them because I owe

 9   them a substantial amount of money and my insurance is

10   now canceled.  Yes, that was a surprise by now.

11       Q    And so at some point between these letters and

12   your conversation with Alan --

13       A    Alan essentially just listened.  There really

14   wasn't a conversation with Alan.  Alan called me -- he

15   realized I was fired.  He called me.  I'm sitting there

16   for 30 minutes telling him exactly what happened.  There

17   was no detail left that he did not know about.  He

18   didn't really speak at all.  He was just sitting there

19   listening.

20            He then tells me after I told him everything,

21   I'm going to figure this out.  I'm going to talk to

22   Thor.  I'm going to talk to the head guys and I'm going

23   to call you back with -- with details.

24            I never, ever, ever received another contact

25   of -- I never received anything from him again, an
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 96

1   email, a text message, a phone call, a fax, nothing.

2        Q    Okay.  And so in February of 2020 you talked

3   to Alan.  He knew that you were fired.  He talked to you

4   about it.  You let him know that your insurance had been

5   canceled.

6        A    And still I'm not sure that I'm fired yet.

7   I'm not -- he didn't tell me.  I'm still not a hundred

8   percent sure.  He never once told me on the phone.  And

9   when I'm talking on the phone, he goes I'm going to call

10  you back once I figure out everything that's happening,

11  and he never told me anything after that.

12       Q    And you understand from the exhibits that I've

13  provided you earlier that, according to UPS, you were

14  terminated on January 14th of 2020?

15       A    Yes, and I never got this.

16       Q    Okay.  And then I'm going to hand you what I'm

17  marking as Exhibit 13.

18            (Defendant's Exhibit 13 marked for

19  identification.)

20  BY MR. LILES:

21       Q    Do you recognize this document?

22       A    Yes.  This is what took them -- this is

23  what -- this is what I was trying to get signed and it

24  took them 97 days for them to return it back to me.

25       Q    This document that you signed?

1        A    This was --

2             I believe -- I believe this was what it was

3   and it took them -- it was either this or something

4   else, and it had to do with -- all I needed was their

5   signature and a date, and it took them 97 days to return

6   it.

7        Q    Okay.  And you'll see in the middle of that

8   document that you're electing to continue your insurance

9   coverage on your own through COBRA.

10       A    Yeah.

11       Q    And that document is signed March 31, 2020 --

12       A    Yeah.

13       Q    -- right?

14       A    Correct.

15       Q    Okay.  You said that Alan never reached back

16  out to you after that February 2020 conversation --

17       A    Correct.

18       Q    -- and so he never communicated to you that

19  any grievance was filed relating to your discharge?

20       A    Correct.

21       Q    Did anybody at any time in the conversations

22  either in February 2020, some of the text messages we've

23  seen from October 2020 or later, did any of those

24  conversations contain any discussion that your discharge

25  was either blocked or postponed, anything like that?

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                    Page 98

```
 1      A    I didn't -- I never got anything saying I was

 2   discharged.  I never knew I was fired.  I never got

 3   anything like that at all, ever.

 4      Q    And you're referring specifically to the

 5   discharge letter?

 6      A    Yes.

 7      Q    Okay.  Nobody at UPS ever said anything

 8   negative about your knee injury or about your work

 9   restrictions or your inability to come back to work --

10      A    I never had any -- I never had any

11   communication where that would have happened, so it

12   was -- I talked to Liz and Alan.  They told me to get on

13   FMLA.  I told them FMLA is -- I don't -- I don't

14   qualify.  They told me to get on short-term.  That's it.

15   It's no, you're fired.  No nothing else.  Get on

16   short-term.  That is the only communication that I had

17   with them.

18      Q    And similarly nobody at HR ever said anything

19   negative about your knee injury --

20      A    HR never --

21      Q    -- your work restrictions --

22      A    HR never --

23      Q    -- or your inability to return to work?

24      A    HR never contacted me.  What is -- what is the

25   point of her job?  She never contacted me once.  It took
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                                      Page 99

```
 1   her 97 days to fill out a form that all she had to do

 2   was put a date and a signature on it.

 3        Q    During your time at UPS, did you ever see

 4   anybody that was injured, could no longer work in the

 5   loading or pre-loading, and was moved to a different

 6   position?

 7        A    Yes, all the time.

 8        Q    Who would --

 9        A    I don't know names --

10        Q    -- those people have been?

11        A    -- but all the time.  That happened all the

12   time, all the time.

13        Q    Can you identify any employees --

14        A    No, I cannot.  I cannot identify --

15        Q    -- who you believe --

16        A    It happened --

17             (Interruption by the stenographer due to

18   cross-talking.)

19   BY MR. LILES:

20        Q    Can you identify any employee who you believe

21   suffered some sort of an injury and was transitioned

22   from a job in loading or pre-loading to somewhere else

23   in the facility?

24        A    Yes.  It happened all the time.  I can't think

25   of the name.  It happened all the time though.
```

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 101 of 149 PageID 1315

USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 150 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                          Page 100

```
 1        Q    My question is a little bit different.  Can
 2   you identify --
 3        A    If I were to see --
 4        Q    -- any employee --
 5             Please let me finish my question.
 6             Can you identify any employee specifically who
 7   suffered an injury and was moved to a less strenuous job
 8   position within the Bayside facility?
 9        A    Yes, I can identify an employee if I see
10   pictures of them.  I cannot identify their names.  If
11   you show me pictures of them, yes, I would be able to
12   identify multiple employees.
13        Q    As we sit here today, you are unable to tell
14   me --
15        A    I don't know their --
16        Q    -- the names of any of those employees; is
17   that correct?
18        A    I do not -- I did not know their names,
19   correct.
20        Q    Other than filing grievances, did you ever
21   take advantage of UPS's help line or hotline, 1-800
22   number, to report any instances of racial or other
23   discrimination?
24        A    I did.
25        Q    When did that occur?
```

 1        A     Sometime after they happened.  I'm not sure of

 2    the exact date, but yes, I did use the hotline, and it

 3    did no good at all.

 4        **Q     Do you remember any specific instances when**

 5    **you called the hotline or help line?**

 6        A     Nope, but I definitely did.

 7        **Q     Other than the grievances you filed, are there**

 8    **any other instances where you would have sent complaints**

 9    **about discrimination or other bad treatment to anybody**

10    **at UPS?**

11        A     Where else would I have done that at?  Where

12    else would I do that besides a grievance?  So no.  But

13    like how else would I possibly do that without --

14    besides a grievance?  These questions are --

15        **Q     Mr. Massa, the answer is no?**

16        A     I'm not -- yes.

17        **Q     Following November 2019, have you seen any**

18    **doctors or counselors for any mental conditions, stress,**

19    **anxiety or depression?**

20        A     No, but I'm probably going to need to after

21    this.

22        **Q     Following --**

23        A     This is -- this is --

24        **Q     -- November 2019, have you been prescribed any**

25    **medication for any mental condition, stress, anxiety or**

 1   depression?

 2       A    No, I have not, but I probably could have

 3   after what you guys did to be completely honest.  I

 4   probably would have.  I'm sure I could have gotten

 5   diagnosed for depression I'm sure if I went.

 6       **Q    Following November of 2019, have you taken any**

 7   **statements or discussed with any current or former**

 8   **employees of UPS the claims that you are bringing in**

 9   **this case?**

10       A    No, because they don't -- they don't talk to

11   me.  The union doesn't talk to me.  UPS doesn't talk to

12   me.  Who would I possibly talk to -- with that about?

13       **Q    Have you reached out to any witnesses and**

14   **they've not responded about the claims that you're**

15   **bringing in this case?**

16       A    What witnesses would that be?

17       **Q    Mr. Massa --**

18       A    No, I just -- I'm just -- I'm just -- I don't

19   know what --

20       **Q    I'm asking the questions.**

21       A    I don't know what witnesses you're even

22   talking about.  What witness are you talking about?

23       **Q    If it's a no, that's an acceptable answer.**

24       A    So no.  So no.

25                MR. LILES:  Can I see your exhibit for the

```
 1        October timeframe?  I think it should be exhibit --
 2             MR. PILACEK:  Are you talking about the texts?
 3             MR. LILES:  Yeah, the texts.  I think it's
 4        Exhibit 7.
 5   BY MR. PILACEK:
 6        Q    Mr. Massa, could you turn to Exhibit 7.  It's
 7   the October 13, 2020 texts with Marc Howard.
 8        A    What date?
 9        Q    October 13, 2020.
10        A    What page are we on?
11        Q    The third page.
12        A    All right.
13        Q    Begins with the text "Labor manager."
14        A    Yeah.
15        Q    About halfway down that, it says, "Didn't even
16   know I was fired until I went to the doctor's office."
17   Do you see that?
18        A    Yeah.
19        Q    Which doctor or which doctors --
20        A    My surgeon.  So whatever -- whoever cut open
21   my knee.
22        Q    Okay.  And when was that appointment when
23   you --
24        A    I -- some -- before I called -- either January
25   to February.  Right before I called Alan.
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 104

```
 1        Q      January to February of 2020?

 2        A      Yeah.

 3        Q      As part of your Amended Complaint you're

 4   asking for damages as a result of the allegations that

 5   you're making; is that right?

 6        A      Correct.

 7        Q      Can you tell me what it is that you're seeking

 8   from UPS and the union in the form of damages.

 9        A      I'm not sure.  Whatever is fair.  But it's

10   definitely ruined my life.  It took four years, put me

11   in a big hole that's going to be very hard to dig out

12   of.

13        Q      Can you explain to me why you believe that

14   this put you in a big hole as you say.

15        A      Essentially I have no money.  I was -- I just

16   graduated college and this happened and then my life was

17   ruined.

18              So my life was essentially just about to start

19   and then it ended up being completely ruined to the

20   point where I have to live at my parent's house and have

21   her provide for me literally everything or I would have

22   been homeless.  Does that sound like a big hole to dig

23   yourself out of when you're almost 32 and I'm having to

24   deal with this now and this took four years of my life,

25   it is going to take?
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                    Page 105

```
 1      Q    I think we've covered it.  Apologize if we

 2   haven't.  We talked about your different allegations of

 3   discrimination.  After November 2019, did you complain

 4   to anyone at UPS or at the union that you felt like you

 5   were being discriminated against due to your disability?

 6      A    Yes, in the text messages.  You can go read

 7   them.  To Joey, yes.

 8      Q    Other than the text messages that have been

 9   admitted as exhibits in this case --

10      A    That is the only form of communication that I

11   had with anybody else, so no.

12      Q    Mr. Massa, again, please just let me finish my

13   question.  It will go faster if I can ask my question

14   and we can get a response.

15      A    These questions are ridiculous.

16      Q    Other than the text messages that have been

17   included as exhibits to this deposition, are there any

18   other instances or times when you complained about what

19   you believe is discrimination due to your disability to

20   anyone at UPS or the union?

21      A    Not after November 2019 when I was hurt, no.

22           It's obvious.  It's...

23      Q    Do you have any evidence or any reason to

24   believe that your complaints of racial discrimination in

25   any way played a role in UPS's decision to ultimately
```

 1   terminate you?

 2       A    No.  How would I possibly have any -- how

 3   would I -- no.

 4       Q    Similarly, do you have any reason to believe

 5   or any evidence that your disability played any role in

 6   the decision by UPS to ultimately terminate you?

 7       A    Yeah.

 8            MR. USMAN:  Objection.  Legal contention.

 9       A    Yes.

10   BY MR. LILES:

11       Q    And what is that evidence or reason you

12   believe that?

13       A    Ask the question again.

14       Q    Do you have any evidence or reason to believe

15   that any discrimination due to your disability played

16   any role in the ultimate decision by UPS to eventually

17   terminate you?

18       A    Yes, because I sent text messages to Alan,

19   Joey, Liz telling them exactly what happened and a

20   picture of my knee.  I was not expecting to have to deal

21   with any of this.  I was not expecting to get a

22   termination letter.  I was not expecting to get anything

23   at all after I sent it to them and they told me to get

24   on FMLA.  They did not tell me, All right, you're going

25   to get a -- you're going to get a 48-hour termination

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                              Page 107

1   letter; oh, we're going to keep sending you -- we're

2   going to keep sending you these letters every single day

3   until we get you fired finally.  They didn't tell me any

4   of that.

5        **Q     Do you have the texts that you sent to Liz,**

6   **Joey and Alan --**

7        A    That's what we have to get.  I will have them,

8   but we have to get -- I have to get it court-ordered.

9            THE WITNESS:  You have to get T-Mobile to send

10           them my phone.  I went to T-Mobile.  I have -- it

11           has to be court-ordered.  I don't have it on my old

12           phone.

13           MR. USMAN:  We need to subpoena those --

14       A    But I can for sure get the text messages that

15   I sent them, yes.

16   BY MR. LILES:

17       **Q     And so as we sit here today, your attorney has**

18   **represented that we will need to subpoena your phone**

19   **records to get any texts that you sent to Liz, Joey and**

20   **Alan --**

21       A    Yeah.

22       **Q     -- and as we sit here today you are not posed**

23   **to sending that subpoena to T-Mobile or otherwise**

24   **execute an authorization for that information to be sent**

25   **or released?**

1        A      Correct.

2               Yeah, I went there and they told me we can't

3     do this.  We need something from the lawyer or the

4     courts.

5        **Q     At what point in this process did you hire**

6     **your current attorney?**

7        A      It was right after they sent me -- right after

8     they sent me one of these text messages.  So it was --

9     it was -- it was -- he messaged me sometime and I

10    realized they were trying to trick me and I immediately

11    hired him.  So it was one of their text messages where

12    they were pretty much giving me an ultimatum and I knew

13    they were trying to work together and trick me, so I --

14    that's when I knew that I couldn't trust them and that's

15    when I got a lawyer, attorney.

16       **Q     Okay.  And so the text messages that have been**

17    **marked as exhibits in this case, there's text messages**

18    **from October 2020 and then a series of texts messages**

19    **from March 2021.**

20       A      Correct.

21       **Q     And so you believe that sometime --**

22              Well, is it your belief that you hired your

23    attorney sometime --

24       A      After -- after I got this text message.

25       **Q     And the text message you're pointing to is**

```
 1    from October 13 --

 2        A    October 13th.

 3        Q    -- 2020?

 4        A    Yes.

 5             MR. LILES:  Okay.  If we could take another

 6        short five or ten-minute break, I think I'm close

 7        to done, but I would just like to review my notes

 8        and then close out.

 9             (Recess taken.)

10    BY MR. LILES:

11        Q    Mr. Massa, we took a quick break.  Are you

12    ready to continue?

13        A    I am.

14        Q    Have you understood all of my questions today?

15        A    For the most part.

16        Q    As we sit here, are there any responses to any

17    of my questions that you feel like you need to change or

18    clarify?

19        A    Not now.

20             MR. LILES:  I'll pass the witness.

21             THE WITNESS:  Huh?

22             MR. LILES:  I'll pass the witness.

23    CROSS-EXAMINATION

24    BY MR. USMAN:

25        Q    Trent, I'm going to ask you some questions
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                    Page 110

```
 1   also.

 2           Okay.  Did you talk to Team Care about your

 3   insurance?

 4           MR. LILES:  Objection.  Leading.

 5      A    Yes.

 6   BY MR. USMAN:

 7      Q    Who did you talk to at Team Care?

 8      A    Just Team Care.

 9      Q    Just some --

10      A    Yeah, some person at Team -- I'm not sure who

11   it was.

12      Q    Okay.  Also, have you ever gone back to

13   Bayside after your injury?

14      A    No.

15      Q    Have you ever met any union representative in

16   person after your injury?

17      A    No.

18      Q    Okay.  After your injury, who did you talk to

19   from UPS?

20      A    Liz, Joey, Alan.

21      Q    Did you talk to them on the phone?

22      A    Alan on the phone; Joey and Liz text message.

23      Q    Okay.  Did they --

24           Who text?

25      A    I text messaged Joey and Liz and I talked to
```

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                                    Page 111

```
 1   Alan on the phone.
 2        Q    Joey and Liz, did they respond?
 3        A    They did.
 4        Q    And you informed Liz and Joey and Alan about
 5   your injury?
 6        A    Yes, I did.
 7             MR. LILES:  Leading.
 8   BY MR. USMAN:
 9        Q    What did you tell them about your injury?
10        A    I told them that my kneecap was in my thigh
11   and I sent them a picture of it.
12        Q    Let's go backwards a bit.
13             After you failed your driving test, who did
14   you discuss that with?
15        A    Alan and Joey.
16        Q    What did Alan and Joey --
17        A    They both just told me to take it again the
18   next time.
19        Q    What did you tell them about the driving test?
20        A    That I had -- I -- that they failed me on
21   purpose and I -- I studied for that like it was a final
22   for the last class that I was ever going to take in
23   college and I needed to get an A.  I couldn't have done
24   any more work to prepare for that.
25        Q    Okay.  Great.  Great.
```

```
 1                    Were you aware that UPS automatically

 2    initiates the termination process when you miss one day

 3    of work?

 4        A    No.

 5             MR. LILES:  Objection.  Leading.

 6        A    Nope.  Was not aware of that.

 7    BY MR. USMAN:

 8        Q    All right.  And before your injury, can you

 9    describe the stress from your race discrimination.

10        A    It was every day.  It's given me gray hairs

11    and I'm not even -- was not even 30.  It was every -- it

12    was every day, constant stress.

13        Q    Did you ever incur headaches?

14        A    Every day.

15             MR. LILES:  Objection.  Leading.

16        A    Every single day.  Every -- that's -- every

17    single day.  Having to deal with them, every single day

18    I would get a headache.

19    BY MR. USMAN:

20        Q    What about the disability discrimination?  Did

21    you have stress from them --

22             MR. LILES:  Objection.  Leading.

23    BY MR. USMAN:

24        Q    -- discriminating against you?

25        A    Yeah, constantly, every day.
```

```
 1       Q    What kind of stress?

 2       A    Mental, physical, emotional.  Every kind of

 3   stress possible from work.

 4       Q    What about your girlfriend?

 5       A    I didn't have a girlfriend at the time.

 6       Q    Okay.  When were you ready to come back

 7   after --

 8       A    Pretty -- as soon as the doctor told me that I

 9   was able to work, I was ready to come back and deal with

10   the -- the mail.  I was ready to do that as soon as -- I

11   saw people, that they would come back to work; they

12   would get a signature and have the easiest job ever.  I

13   was ready to do that immediately.

14       Q    Did you --

15            Oh, okay.  Yeah.  Did you ever tell UPS that

16   you were resigning after the $250 offer?

17       A    I most certainly did not.

18       Q    Did you ever tell the union you were resigning

19   after --

20       A    I most certainly did not.

21       Q    Oh, yeah.  Let me finish that so we have it on

22   the record.  Did you tell the union you were resigning

23   after the 250?

24       A    I did not.

25       Q    Did you ever submit a letter of resignation to
```

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                                    Page 114

```
 1   UPS?

 2       A    I did not.

 3            MR. LILES:  Objection.  Leading.

 4   BY MR. USMAN:

 5       Q    Did you ever submit a letter of resignation to

 6   the union?

 7            MR. LILES:  Objection.  Leading.

 8       A    I did not, but I was offered an ultimatum.  I

 9   could have had both of those from an ultimatum.

10            MR. USMAN:  All right.  That's all I have.

11   REDIRECT EXAMINATION

12   BY PILACEK:

13       Q    I just want to clarify something.

14            In response to some of the questions, you

15   indicated that you spoke with Alan on the phone --

16       A    Yes.

17       Q    -- as opposed to communicating via text,

18   correct?

19       A    It was -- the only time I spoke to Alan was on

20   the phone.

21       Q    And that was in February --

22       A    February.

23       Q    -- of 2020, correct?

24       A    Yes.

25       Q    And you never tried to call him back to find
```

 1   out what was happening?

 2       A    Why would I do that when he specifically told

 3   me he was going to reach back to me?

 4       Q    So the answer is you never attempted to reach

 5   out to him to say what's going on?

 6       A    Because I figured -- I pretty much knew what

 7   was going on by that point.  So no.

 8       Q    The answer to the question is no, correct?

 9       A    Yes.

10           MR. PILACEK:  Thank you, sir.  I have nothing

11       further.

12           MR. LILES:  Nothing further on my end.

13           THE STENOGRAPHER:  Reading or waiving?

14           MR. USMAN:  We'll read.

15           THE STENOGRAPHER:  Mr. Pilacek, are you

16       ordering?

17           MR. PILACEK:  Yeah, we're ordering jointly.

18       It's cross-noticed, so UPS and the union will split

19       the cost of the original and a copy for each of us.

20       Mr. Usman will have to pay for his own.

21           THE STENOGRAPHER:  Okay.  Mr. Usman, are you

22       ordering a copy?

23           MR. USMAN:  I will discuss that with

24       Mr. Massa.

25           (Deposition concluded at 12:27 p.m.)

```
 1              ERRATA-SIGNATURE PAGE
        MASSA VS. TEAMSTERS LOCAL UNION 79 AND UPS
 2           CASE NO.: 8:22-cv-796-KKM-JSS
          DEPOSITION TAKEN JANUARY 30, 2023
 3

 4   Page _____ Line _____:
     Now Reads: _____
 5   Should Read: _____
     Reason for Change: _____
 6
     Page _____ Line _____:
 7   Now Reads: _____
     Should Read: _____
 8   Reason for Change: _____

 9   Page _____ Line _____:
     Now Reads: _____
10   Should Read: _____
     Reason for Change: _____
11
     Page _____ Line _____:
12   Now Reads: _____
     Should Read: _____
13   Reason for Change: _____

14   Page _____ Line _____:
     Now Reads: _____
15   Should Read: _____
     Reason for Change: _____
16
     Page _____ Line _____:
17   Now Reads: _____
     Should Read: _____
18   Reason for Change: _____

19   Page _____ Line _____:
     Now Reads: _____
20   Should Read: _____
     Reason for Change: _____
21

22       Under penalties of perjury, I declare that I have
     read the foregoing transcript and that the facts stated
23   in it are true.

24   _____         _____
         Date                       JONATHAN TRENT MASSA
25
```

```
 1

 2                    CERTIFICATE OF OATH

 3

 4

 5   STATE OF FLORIDA         )
                             )
 6   COUNTY OF HILLSBOROUGH )

 7

 8        I, Lisa Gropper, Registered Professional Reporter,

 9   Certified Florida Professional Reporter, Notary Public,

10   State of Florida, certify that JONATHAN TRENT MASSA

11   appeared before me on the 30th day of January, 2023,

12   produced a Florida Driver's License as photo

13   identification, and was duly sworn.

14        WITNESS MY HAND AND OFFICIAL SEAL this 9th day of

15   February, 2023.

16

17        _____
          LISA GROPPER, RPR, FPR-C
18        Notary Public, State of Florida
          My Commission No.: GG 927462
19        My Commission Expires: 11/18/2023

20

21

22

23

24

25
```

```
 1
 2                    CERTIFICATE OF REPORTER

 3
    STATE OF FLORIDA         )
 4                          )
    COUNTY OF HILLSBOROUGH )
 5

 6        I, LISA GROPPER, Registered Professional Reporter,

 7   Certified Florida Professional Reporter, do hereby

 8   certify that I was authorized to and did

 9   stenographically report the deposition of JONATHAN TRENT

10   MASSA; that a review of the transcript was requested;

11   and that the foregoing transcript is a true record of my

12   stenographic notes.

13        I FURTHER CERTIFY that I am not a relative,

14   employee, or counsel of any of the parties, nor am I a

15   relative or employee of any of the parties' attorneys or

16   counsel connected with the action, nor am I financially

17   interested in the action.

18        Dated this 9th day of February, 2023.

19

20        _____
          Lisa Gropper, RPR, FPR-C
21

22

23

24

25
```

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 120 of 149 PageID 1334

USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 169 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                    Index: $250..2019

**Exhibits**

**MassaJ 1**
  3:11  9:1,2

**MassaJ 2**
  3:12  17:5,
  6  73:7
  89:13

**MassaJ 3**
  3:14  39:24
  40:2

**MassaJ 4**
  3:15  42:7

**MassaJ 5**
  46:21
  48:13,14
  51:10

**MassaJ 6**
  3:19  47:19

**MassaJ 7**
  3:20  51:20
  54:19  60:8
  103:4,6

**MassaJ 8**
  3:22  52:9

**MassaJ 9**  4:3
  52:22

**MassaJ 10**
  4:6  53:4,
  11

**MassaJ 11**
  4:8

**MassaJ 12**
  4:10

**MassaJ 13**
  4:12
  96:17,18

**$**

**$250**  18:25
  19:2  54:14
  56:8,9
  58:1,8,23
  59:5,7,17,
  24,25
  60:5,15
  61:6  72:23
  113:16

**0**

**004**  9:10

**005**  10:2

**006**  13:8

**012**  15:3

**1**

**1**  9:1,2
  47:9  48:11
  50:25

**1-800**  100:21

**1/13/2020**
  95:1

**10**  16:9
  40:21
  53:4,11
  75:10

**100**  51:16

**11**  9:11
  94:11,14

**11/1/19**  48:9

**11/7/19**  48:8

**12**  6:22
  28:3
  94:11,14

**12:27**  115:25

**13**  20:15,
  17,20  21:7
  52:6  54:15
  60:11
  96:17,18
  103:7,9
  109:1

**13th**  109:2

**144**  40:7

**14th**  96:14

**15**  6:22
  9:14  11:16
  75:10

**150**  35:7,11
  56:24
  60:1,4
  61:6  81:19
  82:2,5,12,
  15  83:6
  84:24
  85:20  87:8

**19**  24:9
  48:11  51:3

**1991**  6:14

**2**

**2**  17:5,6
  42:13  73:7
  89:13

**20**  42:25
  57:12
  73:18
  75:10

**2008**  11:15,
  18

**2015**  8:10,
  11  10:20
  12:3,5
  77:20  78:7
  80:17

**2016**  9:11,
  21  16:11
  78:19

**2017**  8:1

**2018**  8:1
  73:19
  74:16  85:5

**2019**  22:16
  24:5,9
  32:21
  42:16,25
  47:9  50:25
  57:12
  62:10
  69:5,7
  70:10,15
  72:25
  73:18
  74:16

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023 Index: 2020..accident

80:17 85:5
88:23 91:9
93:20,25
94:4
101:17,24
102:6
105:3,21

**2020** 20:15,
17,20 21:7
30:25
32:5,18
33:7,8
42:16
44:22 52:6
60:11
62:17 65:5
66:15
70:16,21
82:3 95:5
96:2,14
97:11,16,
22,23
103:7,9
104:1
108:18
109:3
114:23

**2021** 17:17,
24 18:5
42:16
52:20
53:2,9
54:17
62:19
108:19

**2022** 42:18
62:21

**22** 52:20

**23** 53:2

**25** 53:9

**250** 113:23

**27** 73:10
89:19

**28** 17:12,
17,24 18:5
80:2 89:21
92:5

**29** 75:12

—————————
**3**
—————————

**3** 16:2
39:24 40:2
42:23 44:6

**30** 6:14
33:12,18
44:17
65:13 74:8
75:10
95:16
112:11

**31** 73:12
97:11

**32** 104:23

**33647** 5:19

—————————
**4**
—————————

**4** 15:22
16:2 42:7
43:13,18,
19 44:7

**45** 28:17
75:20
76:6,14
77:23
81:12
84:14

**450** 28:3

**470** 47:1

**48-hour**
38:10,18,
21 39:11
55:1,13,
17,20
106:25

**495** 47:1

—————————
**5**
—————————

**5** 46:21
48:14
51:10

**50** 35:14

—————————
**6**
—————————

**6** 47:18,19
73:10

—————————
**7**
—————————

**7** 37:12
51:3,20
54:19 60:8
103:4,6

**79** 17:23

—————————
**8**
—————————

**8** 52:8,9

**8/30/1991**
6:14

**8205** 5:19

—————————
**9**
—————————

**9** 16:2
52:22

**97** 40:17,
20,24 41:2
96:24 97:5
99:1

—————————
**A**
—————————

**AA** 10:17,
18,21

**absence** 40:6

**absenteeism**
29:10

**absolutely**
60:1 72:16

**accept** 58:5,
11,17
59:12,14,
15 61:6

**acceptable**
102:23

**accepted**
58:15 59:5

**accident**

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 122 of 149 PageID 1336
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 171 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023   Index: accommodation..April

70:10

accommodation
72:12

accurate
11:9 20:17
52:17
53:1,8

action   37:1

actively
22:7,8

actual   62:15

addition
91:1

address
5:18,20
6:1

administration
10:7 21:20

admitted
105:9

advance   67:4

advantage
100:21

adversely
75:13
78:14

affirm   5:4

afford   45:22

African
28:13
75:17

afternoon

15:24

agent   53:20

agree   35:5
69:24
93:24

agreement
34:12

Alan   26:12,
23,24,25
27:4 32:16
33:1,10
34:4
44:17,20,
22,24
49:25
55:14
58:15 65:4
66:14
74:1,7
76:19 77:4
95:4,12,
13,14 96:3
97:15
98:12
103:25
106:18
107:6,20
110:20,22
111:1,4,
15,16
114:15,19

Alan's   76:20

allegation
91:12

allegations
78:6 88:23

90:9 91:2
104:4
105:2

allege   20:16
74:15
75:23
81:16

alleged   63:1
75:7 86:17

allegedly
55:2

alleging
63:8

allowed   14:2

Amended
17:2,22
73:8 80:2
104:3

American
14:25
28:13
75:17

American/
pacific
13:24
15:12

amount   42:15
78:2,8
95:9

and/or   53:22

angry   23:10,
11

answering
61:22,24

86:15,18

answers   69:2

anxiety
101:19,25

anymore   27:7
41:11

apartment
5:23

apologize
67:4 105:1

appears   9:5
17:16,24

application
9:17,21
15:4,8

applications
8:15 9:6
11:5

applied
11:19
69:4,8
72:25

apply   8:8
27:18
43:19

appointment
103:22

approximately
6:6 10:19
16:6 17:12
30:25 32:4
65:5

April   70:16,

21

argument
  23:16
  28:25 29:1
Article
  37:12
Asian  13:24
  14:5 15:11
asks  42:13
  43:1
assigned
  93:14
assistance
  24:17
assistant
  7:23
assume  34:20
  35:12
  63:25 64:1
assumed
  33:25
assuming
  22:6 32:3
  56:10
assumption
  34:2
Attached
  17:11
attempt
  34:3,8
  37:22
  38:2,7
attempted

115:4

attempting
  65:20
attend
  53:14,17,
  25
attendance
  29:22,25
attorney
  8:25 17:3
  67:1 87:22
  107:17
  108:6,15,
  23

August  6:14
authorization
  32:4,8
  107:24
automatically
  112:1
aware  7:7
  19:14,15
  34:12,22
  35:16
  36:12,14,
  15,24
  37:3,9,17,
  20 44:24
  95:5
  112:1,6

        ───────
              B
        ───────
bachelor's
  8:2 10:5

21:19

back  18:2
  25:17
  30:21
  31:3,5,7
  32:17
  33:15,19
  40:21,25
  41:1 42:2,
  4 44:4,9,
  18 45:3
  48:20 50:4
  51:10
  54:19
  55:25
  58:24
  63:17,18,
  22 64:12,
  21 65:6,7,
  20 66:8,10
  67:23 69:1
  71:21
  72:21
  78:21 83:6
  92:3 95:23
  96:10,24
  97:15 98:9
  110:12
  113:6,9,11
  114:25
  115:3
background
  7:24
backwards
  111:12
bad  29:22,
  25 101:9

bargaining
  34:12
based  11:4
  82:10,22
  83:15
  89:15
  90:9,12,
  21,25 93:9
  94:20
basically
  7:11,22
  37:12
basis  91:13
basketball
  24:15,22
Bates  9:9
  10:2 13:7
  15:2 46:25
  48:1 51:22
  94:12
Bayside
  100:8
  110:13
begin  9:10
  21:12
Begins
  103:13
belief  79:17
  81:4
  108:22
believed
  64:11 82:9
  85:5 93:8
benefit  43:1

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 124 of 149 PageID 1338

USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 173 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023           Index: benefits..claiming

benefits
  40:12
  41:23
  43:15,20

big  34:15
  38:4,5,6,
  17 48:18
  60:18
  81:12
  94:25
  104:11,14,
  22

bigger
  38:11,16

birth  6:13

bit  100:1
  111:12

BJ's  11:24
  12:2,12,23
  13:4

black  28:16
  81:8,9
  84:13,21

blocked
  97:25

blue  19:17

book  34:15
  55:8

bottom  9:10
  15:3 48:3,
  6

box  18:3

boxes  89:15
  90:2

break  66:19,
  23 109:6,
  11

bring  49:12

bringing
  102:8,15

brother  6:2

brought  5:15

browse  46:24

browsed
  52:12

Bruce  14:17

building
  26:16
  28:11

bull  76:24
  77:1

bunch  74:20
  89:15

business
  6:25 7:9
  8:2 10:6
  21:19
  53:20

businesses
  7:5

buttons
  91:14

——————
       C
——————

calendar
  42:16

call  33:15,
  19,20
  37:11
  44:18 49:3
  95:23
  96:1,9
  114:25

called  7:1
  32:16,17
  33:10
  34:23
  36:4,13
  40:21
  95:14,15
  101:5
  103:24,25

canceled
  33:24 34:1
  38:15
  44:16,25
  95:6,10
  96:5

capable
  30:22

car  45:16
  46:5

care  6:25
  24:19
  110:2,7,8

case  86:17
  102:9,15
  105:9
  108:17

cases  37:13

caused  85:9

cell  46:3

Centra  24:19

certified
  49:10
  50:17

chair  45:7
  71:8

change  77:15
  109:17

characteristic
s  18:8

charge
  17:13,22
  18:17
  26:15
  89:11
  92:11

check  21:13

checked
  15:10
  89:15
  90:2,6
  91:7

choices  19:1

chose  46:14

circles
  61:23

claim  40:12
  41:20
  67:21
  91:13

claiming
  92:11

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                    Index: claims..convinced

claims   86:17
  87:15
  102:8,14

clarify
  71:24
  72:10  75:6
  109:18
  114:13

class   111:22

clean   69:1

clear   59:17
  60:17  92:2

clinic   24:21

clock   78:3

close   109:6,
  8

Club   11:25

clue   21:3

coach   87:12

coaching
  84:19

COBRA   97:9

coincidence
  27:9

collective
  34:12

college
  10:5,12,22
  104:16
  111:23

color   90:5,
  10,13,25

91:4,6

commenced
  43:4

Commission
  17:14

communicate
  72:1

communicated
  97:18

communicating
  114:17

communication
  98:11,16
  105:10

community
  10:5,11,21

company   7:17
  26:3  34:13
  35:1,17
  36:5,25
  37:5,21
  41:14
  51:15
  60:14  64:6

company's
  58:5,12,17

compensated
  46:2

Compensation
  43:14,20
  44:3

complain
  105:3

complained
  105:18

Complaint
  17:2,22
  73:8  80:2
  104:3

complaints
  101:8
  105:24

completely
  23:2  45:9
  49:10  66:4
  68:5  102:3
  104:19

complies   5:3

concluded
  115:25

conclusions
  91:24

condition
  101:25

conditions
  101:18

confirm
  94:20

confused
  44:5

constant
  28:10
  112:12

constantly
  93:23
  112:25

constructive
  20:21

constructively
  18:4,6
  19:11  21:6

contact
  65:10  94:9
  95:24

contacted
  65:11
  98:24,25

contacting
  40:17

contained
  9:21

contention
  18:15
  79:22  89:4
  106:8

continue
  66:24
  81:11  97:8
  109:12

contract
  34:23
  35:16  36:1
  37:4,10

conversation
  95:12,14
  97:16

conversations
  97:21,24

convinced
  56:12

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**

Jonathan Trent Massa on 01/30/2023                Index: copy..day

copy 17:2,
 12 34:17
 115:19,22

correct 6:11
 9:22 11:3,
 10 12:18,
 19,25
 13:3,6,16,
 21 14:1,
 17,21
 15:8,12,13
 17:14,18,
 19,25
 18:1,20
 20:22
 22:20
 23:11 24:5
 26:19,21
 29:16,18,
 20 32:11,
 21 34:13,
 15,20,23
 35:4,5,18,
 19 36:2,5,
 19 37:7,8,
 16 39:12,
 20,21 40:8
 41:10,14,
 17,18
 42:20
 44:20,25
 45:1,12
 46:15
 47:12 49:5
 53:23,24,
 25 54:1,17
 55:3,4
 58:4,20

59:3,8
 60:18,19,
 24 65:9
 69:6 70:5,
 7,12,17,19
 74:10,14
 77:5
 78:11,20
 89:2 90:7
 92:8
 94:23,24,
 25 97:14,
 17,20
 100:17,19
 104:6
 108:1,20
 114:18,23
 115:8

cost 115:19

counsel
 86:10

counselors
 101:18

counting
 54:21

couple
 77:18,22
 78:7,10,17

court 19:20
 24:22
 67:16 78:5

court-ordered
 107:8,11

courts 108:4

Cove 5:19

cover 54:22

coverage
 97:9

covered
 105:1

Covid 82:1,
 4,6

coworkers
 74:11,17
 75:7,14
 77:17
 78:9,15
 79:19

CROSS-
EXAMINATION
 66:21
 109:23

cross-noticed
 115:18

cross-talking
 12:21
 36:22
 38:24 39:5
 49:20
 71:16 74:3
 76:9 84:11
 88:3,13
 99:18

current
 68:22
 102:7
 108:6

cut 103:20

D

D-JM-000789
 94:12

D-JM-000791
 94:13

damages
 104:4,8

dark 71:19

date 6:13
 11:19
 20:7,10,
 11,14 24:7
 31:14 43:4
 44:23
 57:16
 70:10 97:5
 99:2 101:2
 103:8

dated 41:3
 47:9 48:11
 60:11

dates 50:2

Dave 69:16,
 17,20

Dave's
 69:18,19

day 15:22,
 23 16:6,8
 28:7,10,
 12,14,18,
 22 29:8,9,
 14 30:13
 40:6,19

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 127 of 149 PageID 1341
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 176 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023          Index: days..discharged

50:3 57:3,
5,8 58:22
75:1,16,21
76:2 77:3
78:2,7
79:12
80:14,15,
16,22,24,
25 81:1,7
83:5,16
84:12
85:2,18
92:4 107:2
112:2,10,
12,14,16,
17,25

**days** 15:20
16:15,17
25:13,16
28:7
29:13,18
30:4 32:20
40:17,20,
24 41:2
46:13
96:24 97:5
99:1

**deal** 38:4,
5,6,11,16,
17 39:15
57:2
77:12,13
81:12 95:1
104:24
106:20
112:17
113:9

**dealing** 22:4
56:15

**dealt** 81:23

**decided**
37:14
81:24

**decision**
59:9
105:25
106:6,16

**defendant's**
9:2 17:6
40:2 42:7
46:21
47:18,19
48:13
51:10,20
52:9,22
53:4 60:7
94:14
96:18

**degree** 10:6
21:19

**degrees**
10:14

**delivery**
73:14
74:13

**denied**
27:21,22,
24 39:20
40:16 44:2

**deposition**
19:8
68:20,23

105:17
115:25

**depression**
101:19
102:1,5

**Derek** 84:5
87:12

**describe**
112:9

**Desiree**
40:17 41:8

**desk** 57:22

**detail** 19:6
33:12
82:16
95:17

**detailed**
81:21
82:12,13,
14 83:20
84:25
85:17
86:4,8
87:20,21

**details**
95:23

**detector**
39:13,14

**diagnosed**
102:5

**difference**
48:18
59:15

**dig** 104:11,
22

**direct** 5:8
69:11,12
83:11

**directly**
12:12 69:2

**disability**
18:7
40:12,14
41:19,22
42:24
43:7,11
63:1,8
69:8 90:6
91:7,9
105:5,19
106:5,15
112:20

**disagree**
40:9

**discharge**
36:5,13
37:7,10,
20,23
38:3,7
47:12 48:9
50:23 51:3
53:22
97:19,24
98:5

**discharged**
18:5,6
19:11 21:7
98:2

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 128 of 149 PageID 1342
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 177 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023       Index: disciplinary..effort

**disciplinary**
  36:25

**discipline**
  29:2,22
  48:25 49:5
  51:13 57:6
  80:4 85:13
  92:6,10

**disciplined**
  29:7 49:13
  57:2
  80:12,14,
  20,22
  82:10,22
  83:14 85:7
  91:20 93:9

**disciplines**
  29:24

**discovery**
  8:22 39:23
  47:24

**discriminate**
  30:12

**discriminated**
  30:18
  88:25
  105:5

**discriminating**
  112:24

**discrimination**
  17:23
  28:10
  63:1,10
  79:21
  89:14

90:9,12,21
91:2,4,10
92:11
100:23
101:9
105:3,19,
24 106:15
112:9,20

**discriminatory**
  73:12

**discuss**
  111:14
  115:23

**discussed**
  102:7

**discussion**
  97:24

**doctor**   25:24
  31:7 45:3,
  11 63:17
  72:2 95:7
  103:19
  113:8

**doctor's**
  33:3,5
  38:14
  44:15,19
  103:16

**doctors**
  101:18
  103:19

**document**
  13:9 15:16
  17:11,16
  31:17,22

42:11
52:15
89:20
96:21,25
97:8,11

**documentation**
  53:21

**documents**
  8:21 25:12
  39:22
  46:25
  47:23
  51:11,14
  94:18

**Dog**   7:10

**dollars**
  16:22

**Dore**   53:17

**driver**
  73:14,17
  74:13
  78:21

**drivers**
  75:10

**driving**
  73:13,21
  75:1,4
  79:20
  111:13,19

**dropped**
  18:24

**due**   12:20
  18:7 36:21
  38:23 39:4

40:7 49:19
71:15 74:2
76:8 78:24
80:3 81:4
82:9,21
83:15
84:10 85:6
88:2,12
92:5 99:17
105:5,19
106:15

**duty**   71:13

_____

E

**earlier**   31:2
  32:5 67:5
  69:23
  70:11
  96:13

**early**   71:9
  73:18
  74:16
  78:19

**easier**   56:7
  60:5 84:22

**easiest**
  113:12

**easy**   55:18
  62:7

**educational**
  7:24

**EEOC**   89:11
  92:12

**effort**   20:25

21:1,22
33:8

**efforts**   21:7

**electing**
97:8

**elements**
69:25

**Eleven**   94:12

**eligible**
43:23,25

**email**   33:20
96:1

**emailed**
40:23   41:1

**emails**   40:24

**emotional**
113:2

**employed**
9:13   11:14
46:11
56:22
57:16

**employee**
26:17   41:8
99:20
100:4,6,9

**employees**
68:23
99:13
100:12,16
102:8

**employment**
8:4,8,15

9:6,17,21
11:5,21,24
12:9   13:4
15:4   17:13
18:5   20:21
21:25
34:11
41:16
90:11

**end**   115:12

**ended**   20:21
104:19

**entire**   22:4
29:5   35:7
70:1   71:22
75:1   81:22

**Equal**   17:13

**essentially**
6:8,17
7:16,20
18:20
19:1,16,
22,25   20:3
28:15,19,
23,24
32:16,20
41:1
45:15,22
58:21   59:8
71:14,17,
19   72:20
87:3   95:13
104:15,18

**ethnic**   18:8

**ethnicity**

13:11,15,
18,23
15:11

**eventually**
77:8
106:16

**evidence**
79:20
105:23
106:5,11,
14

**exact**   16:23
24:7   83:19
84:20
101:2

**EXAMINATION**
5:8   114:11

**examples**
82:8,20
85:5

**excluding**
85:2,3

**excuse**   53:16
82:3

**excuses**
53:22

**execute**
107:24

**exhibit**   9:1,
2   17:5,6,
11,22   18:2
39:24   40:2
42:7   46:21
47:19

48:13
51:10,20
52:9,22
53:4,11
54:19   60:8
73:7
89:10,13,
14,18
96:17,18
102:25
103:1,4,6

**exhibits**
89:12
94:14
96:12
105:9,17
108:17

**expecting**
106:20,21,
22

**explain**
37:23
91:13
92:22
104:13

**explained**
21:9   29:12
30:6   49:18
51:5   57:17

**explaining**
83:7

**explains**
61:16

**extensively**
90:20

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                Index: faced..FMLA

**F**

faced  91:10

facility
  99:23
  100:8

fact  29:13
  59:25
  78:22

fail  78:25
  79:1,18

failed  73:13
  75:3,5
  79:2
  111:13,20

failure
  73:21
  78:23
  79:21

fair  104:9

familiar
  27:4 69:20

fashion
  73:13

faster
  105:13

father  6:2
  14:15

fax  96:1

February
  32:18
  33:7,8
  44:22 65:5

66:15 95:4
96:2
97:16,22
103:25
104:1
114:21,22

feel  109:17

feet  80:8

felt  72:12
  105:4

fend  71:19

fictitious
  7:14

fifty  35:20

figure  33:14
  55:3 95:8,
  21 96:10

figured
  115:6

file  28:21
  34:3,8
  35:18
  36:2,19,24
  40:11
  48:21,23
  49:17 51:8
  62:10,17
  63:7 73:20
  93:24

filed  17:3,
  13 18:17
  35:6,10
  62:25
  81:20

82:16
83:12,17
92:11
97:19
101:7

filing  35:13
  37:19
  100:20

fill  41:19
  99:1

final  74:22
  111:21

finally
  107:3

find  18:16
  20:25
  21:8,11,
  15,23 33:6
  45:11
  114:25

fine  15:1
  24:1 37:25
  45:13 49:8
  55:19,23

finish  15:22
  67:9,18
  76:11 78:4
  100:5
  105:12
  113:21

finishing
  33:3

fire  36:9
  37:13

fired  6:17
  18:23
  19:2,14,
  15,17
  21:2,4,12
  22:4,11
  31:4,25
  32:1,9,10,
  14,15,18,
  20,23
  33:2,16,
  22,23,25
  34:2 38:4,
  5,6 44:13,
  24 54:14
  56:8,9
  57:19,21
  58:2,8,14,
  15,16,22
  59:14,19
  60:16
  61:4,6,14
  63:3,19,23
  64:1,2,8,
  11 71:4
  72:14,18,
  20,22,24
  95:15
  96:3,6
  98:2,15
  103:16
  107:3

firing  37:21

flip  13:7

Florida  5:19

FMLA  26:10
  27:14,15,

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023          Index: follow-up..guys'

18 39:19
40:16 44:2
98:13
106:24

follow-up
67:2

food  45:17
46:3

forced  18:6,
13 19:13,
23 20:17

Fore  60:17

form  15:10
74:12 99:1
104:8
105:10

forms  41:20

forum  68:10

forward
70:16

found  6:17
32:19,20,
22,24 33:2
34:1 44:13

Fred  53:17
60:17 66:5

fresher
85:23

Friday  15:21
16:19

front  83:6

full-time
8:13 11:1,

6,9

_____

G
_____

games  61:23

gap  12:9

gaps  13:4

gave  9:20
19:1 87:17
91:18

George
69:12,16,
17

George's
69:14

get all
18:24 61:6
72:23

girlfriend
113:4,5

girls  71:6

give  5:5
7:24 59:17
61:5 65:3
67:10,18
80:24
82:8,19,24
85:4 88:18

giving
108:12

good  5:10,
11 20:16
67:6,8
74:23

79:7,18
101:3

gotcha
67:11,13

GPA  74:23

grade  79:7

graduate  8:3
10:11

graduated
8:1 104:16

gray  112:10

great  19:5
111:25

Green  7:2,
11,13,16,
18 11:14

grievance
34:3,9,23,
25 35:13,
18 36:2,
19,25
37:14,19
48:22,23
51:2,9
57:3 62:25
63:7 73:20
77:5
81:23,25
83:20
85:11
86:5,8
87:5 97:19
101:12,14

grievances

18:24
28:21 30:2
35:7,20
56:24
59:1,18
60:1,4,15
61:7 72:23
81:20
82:2,4,5,
12,15,18,
23 83:3,6,
12,17
84:24
85:16,20,
24 86:19,
21 87:8
90:15,16
93:23,25
100:20
101:7

grieved
51:13

ground  23:9

guess  9:19
60:17
89:21

guilty  37:11

guy  84:13

guys  27:4
60:5 82:5
95:22
102:3

guys'  82:3

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                    Index: hairs..hurt

**H**

hairs   112:10

half   75:20

halfway
  89:13
  103:15

hand   5:2
  49:11,13,
  15 50:16,
  17 96:16

handed   47:22
  49:5,6,7

handle   54:2
  60:22

handler
  15:19
  16:12

happen   57:4
  81:11

happened
  19:22
  24:10
  27:20
  28:15 29:8
  48:21
  78:22
  80:15
  81:7,11
  82:13,14
  83:7,18,
  21,24
  84:23
  85:10,18,
  21 86:5

95:16
98:11
99:11,16,
24,25
101:1
104:16
106:19

happening
  67:8 77:2
  81:10,21
  82:17
  96:10
  115:1

harass
  30:10,12

harassed
  30:18

harassment
  28:11 30:3

hard   104:11

harder   84:23

Harrill
  26:14

HCC   10:17

head   18:20
  26:15 86:7
  95:22

headache
  112:18

headaches
  112:13

hear   30:11
  83:25

heard   7:9
  30:8

heart   52:13,
  14

helping   94:9

hey   25:2

high   92:25

Hillsborough
  10:5,11

hire   108:5

hired   22:6
  28:13,15
  56:6 75:17
  108:11,22

hold   16:23

hole
  104:11,14,
  22

homeless
  45:21,24
  104:22

honest   102:3

hotline
  100:21
  101:2,5

hour   28:18
  75:21
  76:14
  81:12
  84:14

hours   15:20
  16:6,15
  27:23,25

28:3,7,9
29:14
40:5,7
44:1
75:14,20
78:14

house   104:20

Howard
  27:11,12
  52:5,20
  53:2,9
  54:24
  60:11,14,
  20 61:10
  62:2 103:7

HR   40:18
  41:11,12
  98:18,20,
  22,24

humongous
  39:15

hundred
  20:18
  35:6,10,
  14,20
  39:12
  56:23,24
  70:1 80:5
  81:19
  82:5,12,15
  83:5 84:24
  86:2 87:8
  95:1 96:7

hurt   22:7
  24:16
  26:2,9

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 133 of 149 PageID 1347

USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 182 of 208

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023       Index: identification..issue

105:21

---

**I**

---

**identification**
9:3 13:11
17:7 40:3
42:8 46:22
47:20
51:21
52:10,23
53:5 94:15
96:19

**identify**
42:14
83:13
99:13,14,
20 100:2,
6,9,10,12

**identity**
75:6

**ignores**  66:4

**immediately**
24:20
26:5,9
37:5,13
108:10
113:13

**implement**
37:5

**inability**
98:9,23

**include**  93:8

**included**
105:17

**includes**
54:21

**including**
43:4 76:7

**income**
42:14,15

**incorporated**
7:3

**incur**  112:13

**information**
9:20 11:4
15:7 43:2
107:24

**informed**
111:4

**initial**
25:9,13

**initially**
24:11,19

**initiates**
112:2

**injured**  24:4
32:21
38:2,13
70:2 71:3,
7 89:1
91:11 99:4

**injury**  22:13
24:12,14
28:4 30:22
40:7
42:19,21,
25 71:17
73:18

88:22 91:8
93:20
98:8,19
99:21
100:7
110:13,16,
18 111:5,9
112:8

**innocent**
37:11

**insane**  60:1

**insist**  23:20

**insisting**
23:18

**instances**
78:13
81:21
82:13,16,
25 88:24
90:10,12,
13,15,18,
25 91:3,9
93:3,17,21
94:5
100:22
101:4,8
105:18

**insurance**
33:4,24
34:1 38:15
42:18,21
43:17
44:16,25
45:17,23
95:5,9
96:4 97:8

110:3

**intend**  36:9

**Intent**  36:4,
13 37:6,
10,20
47:12

**Intents**
53:21

**interrogatory**
42:13,23
43:19
44:6,7

**interruption**
12:20
36:21
38:23 39:4
49:19
71:15 74:2
76:8 84:10
88:2,12
99:17

**invited**
53:12

**involved**
68:16

**involving**
90:14

**Islander**
13:24 14:5
15:12

**Islander/asian**
14:25

**issue**  25:2
37:6 78:9,

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 134 of 149 PageID 1348
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 183 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023          Index: issued..lengthy

12 85:4

**issued**  48:25
  51:15

**issues**  77:5

―――――――――――
          **J**
―――――――――――

**January**  9:11
  96:14
  103:24
  104:1

**job**  11:7
  12:7 15:17
  20:25
  21:2,3,8,
  11,15
  22:7,8
  28:12 29:5
  30:19
  69:24
  72:11
  75:17
  80:24
  84:12,22,
  23 85:3
  98:25
  99:22
  100:7
  113:12

**jobs**  28:20
  71:7 73:1
  81:1

**Joey**  18:21,
  22 26:12,
  24 27:4,
  10,12 34:4

49:25
52:5,19
53:2,8
58:15
60:11,14
61:10 62:2
66:1 74:1,
7 76:19,20
77:4 105:7
106:19
107:6,19
110:20,22,
25 111:2,
4,15,16

**Johnson**
  53:18

**jointly**
  115:17

**Jonathan**
  5:13

**jump**  17:1
  92:24,25
  93:1

**jumping**
  39:17 62:9

**June**  30:25
  32:5

―――――――――――
          **K**
―――――――――――

**kid**  28:16

**kind**  48:20
  67:7,20
  69:1 81:9
  82:6,7
  113:1,2

**knee**  18:7
  22:12
  24:4,16
  26:2,6,8
  38:12
  42:19,21,
  25 43:18
  70:3 88:22
  98:8,19
  103:21
  106:20

**kneecap**  25:4
  111:10

**knew**  20:20
  21:6
  33:22,23,
  25 55:18
  58:15
  64:10 71:1
  74:22,23
  79:6,8
  85:8 96:3
  98:2
  108:12,14
  115:6

**knowledge**
  86:16
  87:15

―――――――――――
          **L**
―――――――――――

**labels**  51:22

**labor**  45:6,8
  53:18
  54:24
  56:11
  60:17

103:13

**landscape/lawn**
  6:25

**landscaping**
  69:4

**late**  28:18
  73:19
  74:16
  75:21

**lawsuit**  5:14
  31:19
  67:22

**lawsuits**
  68:16

**lawyer**  54:2
  55:3 68:19
  108:3,15

**lazy**  56:21

**Leading**
  110:4
  111:7
  112:5,15,
  22 114:3,7

**leave**  39:19

**left**  11:23
  24:22 44:4
  59:9 71:18
  95:17

**legal**  18:15
  79:22 89:4
  91:22,23
  106:8

**lengthy**
  17:12

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 135 of 149 PageID 1349
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 184 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023      Index: letter..Management

letter
  38:10,18
  48:11
  49:15
  50:23
  55:1,21
  98:5
  106:22
  107:1
  113:25
  114:5

letters
  55:17
  94:22
  95:4,11
  107:2

lie  39:13,
  14

life
  104:10,16,
  18,24

light  71:8,
  13

Liles  39:25
  42:2 51:22
  66:18,22
  67:1 71:23
  74:4 76:10
  80:1 83:8,
  10 84:4,18
  85:1 86:9,
  12 87:10,
  13 88:6,14
  89:9,24
  92:1
  94:11,16

96:20
99:19
102:25
103:3
106:10
107:16
109:5,10,
  20,22
110:4
111:7
112:5,15,
  22 114:3,7
115:12

limit  36:1,
  16

listed  43:8

listen  35:24
  54:10

listened
  33:18
  95:13

listening
  95:19

literally
  86:7 87:20
  104:21

live  6:9
  14:19
  45:16
  104:20

lived  5:20

lives  5:25

living  67:14

Liz  26:12,

13,14
55:14
69:13 85:8
98:12
106:19
107:5,19
110:20,22,
  25 111:2,4

loading
  99:5,22

Local  17:23

location
  73:5

log  60:17

long  5:20
  6:16,22
  10:23 25:6
  83:3

longer  33:4
  77:16 94:5
  99:4

looked  53:12

lose  29:6

lost  29:3
  86:1

lot  78:23
  93:7

Lucciola
  26:25

_____

M

_____

made  20:24
  21:22

25:12 34:2
38:11,16,
  17 39:15
56:11
63:15
75:20
81:12
84:13
94:25

mail  48:15,
  19,24
49:9,10
50:5,9,15,
  17 51:7
55:1 71:6,
  8 113:10

maintain
  45:20

make  21:2,
  8,10,17
28:20 33:9
38:3,5,6
56:13
59:19,21
60:15
62:24 69:1
80:6,25
84:21 87:1
89:7 91:23

making  21:1
  54:25
67:22
87:15
104:5

Management
  7:20

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023       Index: manager..minutes

| | | | |
|---|---|---|---|
| manager | married  6:11 | mattered | 108:9 |
| 53:18 | | 71:25 | 110:25 |
| 54:24 | Massa  5:13 | | |
| 56:11 | 14:17 19:5 | meant  18:17 | messages |
| 60:17 | 22:12,24 | 60:3 | 19:3 20:12 |
| 103:13 | 23:12,15 | | 52:3,19 |
| | 24:2 29:10 | medical  18:7 | 53:1 57:24 |
| Marc  27:10 | 32:3 39:8 | 24:17,24, | 60:10 |
| 52:5,19 | 46:24,25 | 25 25:7,9, | 64:20 |
| 53:2,8 | 47:22 | 18,19 | 66:1,3,8 |
| 60:11,14 | 50:18 | | 97:22 |
| 62:2 103:7 | 52:25 57:9 | medication | 105:6,8,16 |
| | 58:10 | 101:25 | 106:18 |
| March  52:20 | 59:1,9 | | 107:14 |
| 53:2,9 | 61:9,19 | meeting | 108:8,11, |
| 97:11 | 64:2,9 | 53:14,17, | 16,17,18 |
| 108:19 | 66:23 | 25 | |
| | 73:13 74:9 | | met  18:22 |
| mark  17:5 | 75:13 80:3 | memory  9:16, | 68:12 |
| 42:5 46:19 | 82:18 | 24 12:11, | 110:15 |
| 47:17 | 83:11,23 | 23 44:23 | |
| 51:18 | 85:2 | 85:24 | middle  70:16 |
| 94:11 | 86:13,22 | | 97:7 |
| | 87:14 | mental | |
| marked  9:2 | 88:9,16,22 | 101:18,25 | mind  29:4,6 |
| 17:6 40:2 | 92:6 94:17 | 113:2 | 46:17 |
| 42:7 46:21 | 101:15 | | |
| 47:19 | 102:17 | mentioned | minimum |
| 51:20 | 103:6 | 27:10 | 78:18 |
| 52:9,22 | 105:12 | | |
| 53:4 94:14 | 109:11 | mess  64:17 | minutes |
| 96:18 | 115:24 | | 28:17 |
| 108:17 | | message | 33:12,18 |
| | Massa's | 18:14,19 | 44:17 |
| market  21:22 | 74:11 | 19:16,24 | 46:16 |
| | | 20:8 33:20 | 65:13 |
| marketing | match  80:11 | 60:13,20 | 75:21 |
| 8:2 | | 61:15 | 76:6,14 |
| | matter  8:22 | 65:25 96:1 | 77:23 |
| marking  9:1 | 17:3 71:21 | 108:24,25 | 81:12 |
| 39:23 | 72:21 | 110:22 | 95:16 |
| 96:17 | | | |
| | | messaged | |
| | | 18:23 | |

missing  48:9
  50:23 51:3

mistreatment
  80:4 92:7

mixed  14:4

mom  69:4

moment  20:19
  32:3 56:10

Monday  15:21
  16:19

monetary
  59:2

money  21:13
  28:18
  45:15,22
  46:1 59:25
  62:24 95:9
  104:15

month  6:6

months  12:19
  25:8,10,11
  28:4 30:24
  31:6 38:5,
  13 41:4,5
  58:23
  70:11,15
  77:18,22
  78:7,10,17
  85:3

morning
  5:10,11
  15:25 16:1

mother  6:2,
  9,16,19,23

11:18,24
  14:9,12,13
  21:9 39:13
  44:10
  45:4,5,14
  46:3,10

moved  99:5
  100:7

multi-family
  5:23

multiple
  64:21
  100:12

——————
N
——————

named  7:9

names  69:11,
  22 74:19
  75:9 99:9
  100:10,16,
  18

national
  90:5,10,
  13,25
  91:4,7

Nature  5:19

Necessities
  46:6

needed  33:13
  41:3 51:8
  97:4
  111:23

negative
  98:8,19

nonresponsive
  83:9 86:10
  87:11

notes  109:7

notice  36:9
  39:11

notify  26:2

November
  22:16
  24:5,9
  32:21
  42:25 47:9
  48:11
  50:25 51:3
  57:12
  69:5,7
  70:10,15
  72:25
  80:17
  88:23 91:8
  93:20,25
  94:1,4
  101:17,24
  102:6
  105:3,21

number  16:24
  94:12
  100:22

numbers
  40:22,23
  48:1

——————
O
——————

object  83:8
  84:18 86:9

87:10

objected
  80:4 92:7,
  10

objecting
  84:5

objection
  18:15
  79:22 84:1
  89:4 91:22
  106:8
  110:4
  112:5,15,
  22 114:3,7

obtain
  10:14,16,
  18

obtained
  10:24 11:6
  12:6 13:1
  15:17
  16:10

obvious
  55:15
  57:20,23
  105:22

occur  24:14
  73:17
  94:8,10
  100:25

occurred
  20:7 74:15
  94:6

October  9:14
  20:15,17,

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**                    Index: offer..period

20 21:7
52:6 54:15
60:11
97:23
103:1,7,9
108:18
109:1,2

offer  54:25
56:11
58:5,12,18
60:15
113:16

offered
59:2,25
114:8

office  33:3,
5 38:14
44:15,19
49:4 57:1,
5,10
103:16

one-up  69:13

one-up's
69:11

open  60:15
103:20

operation
16:4

Opportunities
17:14

opportunity
23:15,25
67:20
86:13,22,
25

opposed
15:11
114:17

ordeal  61:16

order  36:17
40:18 42:6
79:7

ordering
115:16,17,
22

origin  90:5,
10,13,25
91:4,7

original
115:19

overboard
79:8

owe  95:8

owner  6:3

owns  6:25

───────────

            P

P-O-I  7:9

p.m.  115:25

Pacific
14:5,25

package
15:19
16:12
46:25

pages  17:21
52:2,15,25

53:7

paid  42:21
43:5 54:14

panel  37:15

paper  40:25

paragraph
18:4 73:12
74:8 75:12
80:2 92:5

Parcel  8:9
11:7

Pardon  14:11

parent's
104:20

parents  14:7

part  34:20
61:15 69:4
78:24
104:3
109:15

part-time
8:14,16,
17,20 9:18
11:7,8,19,
22 12:6,16
13:2 16:10

Particulars
18:3

pass  79:7,8
109:20,22

pay  6:7
16:21
45:14 95:8

115:20

paying  21:12
22:1

payment  59:2

payments
42:18,24
43:4,7,11,
17 45:23

pays  46:7

pending  59:1

people  14:19
71:7 79:5,
15,16 80:7
99:10
113:11

people's
81:1

percent
20:18 35:6
39:12
51:16
56:23,25
70:1 80:5
86:2 95:1
96:8

perform  6:24
70:3,6
93:13

performing
71:11

period  11:8,
23 43:5
70:2,8
75:11

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
**Jonathan Trent Massa on 01/30/2023**          Index: person..preparing

81:16

**person** 28:13
  67:21
  75:18 81:8
  84:21
  110:10,16

**personal**
  86:16
  87:14

**phone** 33:10,
  11,16,20
  40:22,23
  45:16 46:3
  96:1,8,9
  107:10,12,
  18 110:21,
  22 111:1
  114:15,20

**physical**
  22:5,9
  45:6,8
  69:25
  113:2

**physically**
  70:4,22
  72:3,13

**physician**
  31:10 32:8

**pick** 28:20
  84:17

**pics** 55:14

**picture** 26:8
  106:20
  111:11

**pictures**
  26:5,7
  38:12
  100:10,11

**piece** 40:25

**Pilacek** 5:9
  9:1,4
  12:22
  17:5,8
  18:16 19:4
  22:19,23
  36:23
  39:1,6
  40:1,4
  42:5,9
  46:16,19,
  23 47:17,
  21 51:18,
  24 52:1,8,
  11,24 53:6
  62:16
  66:17
  103:2,5
  114:12
  115:10,15,
  17

**place** 45:16
  70:9

**plaintiff**
  5:14

**play** 61:23

**played**
  105:25
  106:5,15

**Playing**
  24:15

**Poi** 7:9

**point** 20:24
  28:24
  40:11 45:2
  53:23
  54:11 55:5
  56:14,16,
  19 61:2,17
  85:16
  88:24
  95:11
  98:25
  104:20
  108:5
  115:7

**pointing**
  108:25

**pointless**
  72:17
  73:23 74:6

**portion** 83:9
  86:10
  87:11

**posed** 107:22

**position**
  8:12,14,16
  9:18
  12:12,17,
  24 13:1,2
  15:5
  16:10,11
  41:17
  57:25
  72:11 99:6
  100:8

**positions**
  74:13

**possibly**
  33:13
  80:13
  91:17
  94:8,10
  101:13
  102:12
  106:2

**postponed**
  97:25

**Pre** 16:12

**pre-load**
  16:4,13

**pre-loading**
  99:5,22

**preceding**
  28:4 75:12

**prefer** 60:22

**preferential**
  74:12,18
  75:8

**preparation**
  79:14

**prepare**
  68:20
  74:24 75:4
  79:9
  111:24

**preparing**
  74:21
  79:16

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023          Index: prerogative..quote

prerogative
  87:22

prescribed
  101:24

present
  53:20

pretty  8:17
  14:3  17:12
  27:6
  28:20,25
  29:3,4
  33:17
  48:19
  54:13,16
  55:15,18
  56:4,25
  57:4  60:3
  61:15
  71:18
  73:22
  74:23
  75:19
  76:24,25
  77:13
  80:10  85:9
  90:20
  91:14
  93:19
  108:12
  113:8
  115:6

previously
  9:13  68:17

prior  35:7,
  20  41:5
  56:24  91:8

94:20

problem
  29:11

procedure
  34:23,25

process
  22:25  57:3
  67:15,25
  77:5  88:15
  108:5
  112:2

progress
  10:6

promoted
  8:18,20

promotion
  73:14

promotions
  74:12

protect
  21:14  22:2
  35:9

proven  37:11

provide
  13:12,23
  32:7  45:19
  53:22
  104:21

provided
  13:15,18
  15:7  47:23
  96:13

provider
  24:24

25:1,7,9,
  19  43:1

providing
  11:4

provision
  37:12

provoke
  80:13,23

provoked
  80:3,18,23
  81:17
  82:9,21
  83:5,14
  85:6  92:6
  93:9

provoking
  92:9

purpose  75:5
  111:21

push  91:14

put  20:19
  78:22
  81:21  99:2
  104:10,14

_____

Q

_____

qualify
  98:14

question
  19:10
  22:17
  23:23  30:8
  34:8
  35:24,25

39:7  42:3
  44:5,6
  45:10  55:7
  58:11  61:9
  65:2,14
  67:9,16,19
  71:24,25
  76:11  78:4
  82:19
  84:3,4
  87:4,11
  88:19
  90:17,24
  91:5  94:4
  100:1,5
  105:13
  106:13
  115:8

questions
  22:25
  23:3,6,20,
  25  59:22
  61:21
  66:4,17
  67:2,21,23
  68:2  86:3,
  14,23
  87:2,25
  88:16
  101:14
  102:20
  105:15
  109:14,17,
  25  114:14

quick  66:23
  109:11

quote  13:18,

Case 8:22-cv-00796-KKM-JSS   Document 34-2   Filed 04/24/23   Page 141 of 149 PageID 1355
USCA11 Case: 23-13855   Document: 15   Date Filed: 02/19/2024   Page: 190 of 208
JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                          Index: race..rent

23

—————————
        R
—————————

race  18:8
  78:24 79:3
  80:3 81:5,
  18 82:10,
  21 83:15,
  22 85:6,12
  90:5,14
  91:4,6
  92:5 112:9

racial  79:21
  87:6 90:22
  91:2
  100:22
  105:24

racially
  88:25

raise  5:1

randomly
  58:24

rate  16:20

reach  115:3,
  4

reached
  97:15
  102:13

reacted
  93:14

reaction
  80:21
  82:10,22
  83:15 85:7

91:17,19
93:9

reactions
  93:15

read  11:15
  17:9 20:12
  34:19
  42:2,4
  64:20
  105:6
  115:14

Reading
  115:13

ready  31:3,5
  63:17,18,
  21,22,23
  64:13
  65:7,22
  66:24
  71:21
  72:8,21
  109:12
  113:6,9,
  10,13

realized
  95:15
  108:10

reason  6:9
  36:10 37:9
  56:3,20
  81:24
  105:23
  106:4,11,
  14

reasons
  90:22

recall  16:20
  47:3

receive
  29:22,24
  30:2 36:16
  38:19
  39:10
  42:24
  50:12,14,
  15,16,17
  53:21
  60:13

received
  31:19 32:4
  36:4 37:22
  38:9,10
  39:14,23
  42:15
  43:11
  47:14
  48:8,15
  50:5,9,11,
  21 51:3,6,
  11,12
  55:20
  94:22
  95:1,24,25

receiving
  41:22 47:3

recent  16:20

recess  46:18
  66:20
  109:9

recite  52:14

recognize
  15:3 52:2,

15,25 53:7
96:21

record  82:18
  113:22

records
  107:19

REDIRECT
  114:11

referring
  79:13 98:4

refresh  9:16

refuse  23:13

regard  53:11

regular  77:8

reject
  59:12,14

related
  81:17

relating
  73:20
  97:19

release
  31:9,14

released
  63:16
  66:10
  70:21 72:2
  107:25

remember
  83:19 84:9
  101:4

rent  6:4,5,
  7

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                    Index: report..scheduled

report
    100:22

reporter
    67:16 78:5

representative
    110:15

represented
    107:18

representing
    87:23

request
    39:20
    63:15
    72:11

requested
    31:17
    93:13

required
    69:24

residence
    5:17,22
    6:3 14:20

resign  18:7,
    13,24
    19:2,13,
    18,23
    20:17
    54:14 56:9
    58:2,8
    59:7

resignation
    18:9 58:23
    59:15
    60:16

113:25
114:5

resigning
    20:4
    113:16,18,
    22

resolution
    60:21
    61:1,12
    62:3

resolved
    59:3 78:9,
    12

respond  55:2
    60:18
    111:2

responded
    55:2
    102:14

responding
    66:2

response
    25:14
    43:22
    105:14
    114:14

responses
    76:20
    109:16

restricted
    25:9

restriction
    25:6,13,18

restrictions

70:9,22
72:3 98:9,
21

result  42:24
    104:4

retaliate
    91:15,18
    92:14,15,
    19,20,21,
    24 93:1

retaliated
    91:18
    92:17
    93:4,12,
    15,18,22

retaliating
    91:16

retaliation
    90:6 91:12
    92:10,13
    94:6

return  31:9
    32:4,7
    33:9 39:11
    62:10,15,
    17 63:16
    64:13
    65:24
    66:10
    70:22
    72:3,8
    96:24 97:5
    98:23

returning
    30:22

review  94:17
    109:7

ridiculous
    22:21,24
    59:22,23
    77:1
    105:15

rights  35:4,
    17

role  105:25
    106:5,16

room  67:15

rotate  69:17

roughly
    70:9,16

rug  60:5

ruined
    104:10,17,
    19

_____

**S**

_____

salary  45:14

Saturdays
    74:25

save  28:18

Scape  7:16

Scapes  7:2,
    12,13
    11:14

scheduled
    16:17 28:6
    46:14

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023 Index: screenshots..specifically

screenshots
   52:2,17
   53:1,8

seasonal
   8:12,16,
   19,20
   12:12,24
   13:1 15:4,
   17 16:8

section
   89:16

Security
   69:8

seek   24:16

seeking   10:5
   104:7

send   38:2
   107:9

sending
   36:11
   107:1,2,23

sense   21:17
   59:19 89:7

Senyak   69:20

separate
   9:6,17
   10:14

September
   12:3,5

series
   108:18

Service   8:9
   11:7

set   51:14

settlement
   58:18

share   17:4

shelter   46:3

shifts   76:16

shop   65:4

short   109:6

short-term
   40:13
   98:14,16

shortly   11:6
   44:23

show   8:21
   17:2 30:4,
   14 39:22
   53:23
   100:11

showing
   53:21

sic   87:11

sidebar
   84:18
   86:10

sign   40:18,
   20 49:9,10

signature
   48:6 97:5
   99:2
   113:12

signed
   17:16,24
   51:7

96:23,25
   97:11

similarly
   67:20
   98:18
   106:4

simple   23:6

single   22:3
   28:10,18,
   22 29:8
   30:13
   33:12
   47:4,7,8
   54:5,7
   55:4,7
   57:3,5
   61:2
   80:14,15,
   16,24,25
   81:1,23
   83:3,4,5,
   20,24 86:4
   107:2
   112:16,17

single-family
   5:22,24

singled
   78:14

singled-out
   75:13

sir   5:1,10
   20:14
   50:13,15
   52:13
   115:10

sit   20:5
   45:7 71:8
   82:20
   83:12
   100:13
   107:17,22
   109:16

sitting   58:3
   67:14
   95:15,18

situation
   39:16

skip   35:13

small   11:16

Social   69:8

sort   99:21

sought   24:18

sound   27:4
   69:20
   104:22

source   42:15

sources
   42:14

spat   85:9

speak   82:18
   95:18

specific
   84:7,9,16
   101:4

specifically
   81:17 98:4
   100:6
   115:2

specifics
  83:19

spend   75:1

split   115:18

spoke   65:4
  114:15,19

spoken   68:14

stamped   9:9
  10:2 13:8
  15:3 46:25

stand   55:19
  80:8

stands   18:21

start   15:23
  23:16
  28:17
  41:22
  75:19,22,
  23,25
  77:6,8,25
  78:1,2,3
  85:4
  104:18

started   12:1
  28:12,14,
  19 29:8
  34:6
  75:15,24
  77:19
  81:8,10

state   43:1
  54:25
  56:11

statements

102:7

states   18:4

stay   11:11
  72:24

stenographer
  5:1,4
  12:20
  36:21
  38:23 39:4
  42:4 49:19
  71:15 74:2
  76:8 84:10
  88:2,12
  99:17
  115:13,15,
  21

steward
  26:21 49:4
  65:4

stewards
  26:24
  76:19

stop   54:12

stops   37:20

strange   82:7

strenuous
  100:7

stress
  101:18,25
  112:9,12,
  21 113:1,3

student
  11:1,6,9

studied
  74:21
  111:21

study   10:23
  74:23

studying
  78:23

stuff   68:25
  71:8 80:6

stupid   59:22

submit   18:9
  113:25
  114:5

submitted
  8:15 9:17

subpoena
  107:13,18,
  23

subsequent
  25:18

substantial
  95:9

sudden   61:5

suddenly
  55:25

suffered
  24:11
  99:21
  100:7

sums   93:19

supervisor
  49:16
  69:11,12

supervisor's
  49:3

supplied
  8:22

supposed
  25:16
  35:12

supposedly
  38:3

surgeon
  103:20

surgery   18:7
  22:5 45:24

surprise
  95:10

swear   5:4

sweep   57:22
  60:5

switch   17:1

---

**T**

---

T-MOBILE
  107:9,10,
  23

taking   21:13
  41:2
  79:10,15

talk   7:21
  20:6 57:6
  68:22
  71:10
  95:21,22
  102:10,11,

JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.
Jonathan Trent Massa on 01/30/2023                    Index: talked..til

12 110:2,
7,18,21

**talked**  32:25
33:10,11,
19 34:4
44:16,20,
22,24 45:3
65:13
66:14
69:23
73:23
90:14,20
95:4 96:2,
3 98:12
105:2
110:25

**talking**  8:6
43:12,16,
18 49:14
58:9 68:19
96:9
102:22
103:2

**Tampa**  5:19

**tax**  62:10,
17

**Team**  7:2,
11,13,16,
19 11:14
110:2,7,8,
10

**Teamsters**
17:23

**telling**
18:23

19:17 22:3
35:9,12
48:19 55:5
56:8 64:21
71:20
72:20,22
79:4 85:8
95:7,16
106:19

**tells**  33:14
54:24 55:9
85:21
95:20

**ten-minute**
66:18
109:6

**terminate**
106:1,6,17

**terminated**
19:16 21:4
32:1 96:14

**termination**
20:22 37:5
38:10,18
49:15
55:1,17,20
106:22,25
112:2

**terminations**
55:14

**terms**  46:2

**test**  39:13,
14 73:13,
17,21
74:21 75:4

78:21
79:1,5,9,
11,15,16,
20,21
111:13,19

**testimony**
5:5 55:20
70:8 80:16
82:24 92:9
94:21

**tests**  79:8

**text**  18:14,
19,21,22
19:3,16,24
20:8,12
33:20
52:3,19
53:1 57:23
60:10
61:15
64:14,20
65:25
66:1,3,8
96:1 97:22
103:13
105:6,8,16
106:18
107:14
108:8,11,
16,17,24,
25 110:22,
24,25
114:17

**text-messaged**
40:22

**texts**  53:8

56:10
103:2,3,7
107:5,19
108:18

**Thanksgiving**
24:8,10

**therapy**
22:5,9

**thick**  34:15

**thigh**  25:5
111:10

**thing**  7:15
16:12 22:3
29:5 35:14
36:13 45:9
54:7 61:13
84:20

**things**  66:2
67:7 85:12

**thinking**
43:12

**Thirteen**
16:22

**Thor**  18:19
53:18 55:8
60:22 66:5
95:22

**thought**
43:16,18
82:6

**three-page**
85:11

**til**  38:4

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                    Index: time..typically

| | | | |
|---|---|---|---|
| time  6:19, | 50:20 | 60:25 | trouble |
| 22 11:8,23 | 64:21 | 63:18,23 | 91:15 |
| 12:6 15:23 | 81:20 | 64:22 66:5 | truck  75:2 |
| 20:24 22:4 | 82:8,20 | 71:2 72:17 | true  9:22 |
| 25:21 | 83:13,17, | 73:22,25 | 15:8 25:15 |
| 28:15,17 | 18,19,21 | 74:5 77:1 | 52:17 |
| 29:5 32:1 | 93:8,11,13 | 83:25 | 53:1,7 |
| 34:19 35:7 | 105:18 | 92:20 | 93:16 |
| 36:1,16 | tired  56:25 | 95:20 | trust  19:25 |
| 40:11 43:5 | 57:1,15 | 96:8,11 | 20:1 34:6 |
| 46:10 | today  5:15 | 98:12,13, | 54:4,5,7 |
| 48:22 | 11:5 | 14 106:23 | 55:4 |
| 49:22 | 68:12,14, | 108:2 | 56:15,18 |
| 55:25 57:7 | 20,23 | 111:10,17 | 61:2,16,17 |
| 62:4 64:25 | 82:20 | 113:8 | 64:22 |
| 67:23 | 83:13 | 115:2 | 70:23 72:5 |
| 70:1,2,8 | 100:13 | top  86:7 | 108:14 |
| 71:22 72:5 | 107:17,22 | topics  17:1 | trusting |
| 75:11,19, | 109:14 | total  40:5 | 54:12 |
| 23,25 76:1 | told  14:3, | 42:14 | truth  5:5,6 |
| 77:6,8,25 | 5,6 18:22 | tracks  17:1 | truthfully |
| 78:1,2,3, | 26:8,9 | 39:17 62:9 | 23:2 |
| 8,23 | 27:13,15 | transitioned | turn  55:10 |
| 81:16,22 | 31:6,7 | 99:21 | 89:10,20 |
| 83:3,4,24 | 32:9,13,15 | treatment | 103:6 |
| 84:16,23 | 33:11,12, | 74:12,18 | turned  8:13 |
| 85:4 86:4 | 16,17,19 | 75:8 101:9 | 55:25 |
| 95:3 97:21 | 34:4,5 | Trent  5:13 | 56:21 |
| 99:3,7,11, | 38:13,14 | 59:20 | twenty  5:21 |
| 12,24,25 | 39:16 | 109:25 | 8:10 11:15 |
| 111:18 | 40:13 | trick  20:4 | type  7:18 |
| 113:5 | 44:16 | 54:6 | 24:21 |
| 114:19 | 48:16,21 | 57:23,24 | typically |
| timeframe | 49:21 50:2 | 61:25 | 15:24 |
| 103:1 | 51:5,6,7, | 108:10,13 | |
| timely  37:14 | 14 54:13 | | |
| times  22:9 | 58:14 | | |

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023        Index: ultimate..voluntary

**U**

ultimate
  106:16

ultimately
  41:22
  105:25
  106:6

ultimatum
  61:5
  108:12
  114:8,9

unable  70:3
  100:13

understand
  11:3
  22:12,15
  24:4 30:20
  57:21
  60:21
  85:22 86:6
  87:19
  88:4,11
  91:5 96:12

understanding
  93:2

understood
  53:12
  109:14

unemployment
  43:14,20
  44:3,6

union  18:20
  20:1 21:12
  22:1

26:21,24
27:5 34:6,
13 37:3
41:16,17,
19 45:25
47:23
48:16,20
49:4 51:15
53:20 54:7
55:24
56:12,20
58:5,11,17
61:25
65:6,18
66:9 71:18
72:6
73:23,25
74:5 76:19
77:4,9
89:8 94:8
102:11
104:8
105:4,20
110:15
113:18,22
114:6
115:18

United  8:9
  11:7

unquote
  13:21

UPS  6:18
  8:4,22
  9:13 11:8,
  21 12:7,
  13,14,24
  13:2,5

15:5,18
16:11
18:5,9
20:1,21
22:3 26:17
32:8 34:6,
11 39:23
41:8 45:7,
21,25
46:11
48:25
56:7,12
61:25
63:1,12,
15,22
64:13 67:2
68:23
69:10,24
70:20
71:10,18
72:2,5
73:3,13
75:16,22
80:3 81:14
87:25
88:25 89:8
90:11 92:6
94:8 96:13
98:7 99:3
101:10
102:8,11
104:8
105:4,20
106:6,16
110:19
112:1
113:15
114:1

115:18

UPS's  78:24
  100:21
  105:25

USF  8:1
  10:12,20,
  21,23 11:6
  12:1 74:22

Usman  17:4
  18:15,18
  22:17
  59:20
  62:14
  79:22
  84:1,6,9,
  15 86:1
  87:9 89:4,
  23 91:22
  106:8
  107:13
  109:24
  110:6
  111:8
  112:7,19,
  23 114:4,
  10 115:14,
  20,21,23

**V**

violated
  35:1,17

voluntarily
  13:15
  30:17

voluntary

13:12

—————————————

**W**
—————————————

**W-2**  62:14

**wait**  19:7,9
  37:14 38:4
  40:17 55:3
  67:9,18
  76:11

**waiting**
  65:10

**waiving**
  115:13

**walk**  28:11

**wanted**  30:23
  54:2 56:6
  60:25
  61:12,13
  62:3 64:12
  72:9 91:19
  92:25

**ways**  92:14,
  16

**week**  16:18
  21:13
  22:10
  24:8,10
  28:7 29:14
  38:1,12,
  17,18
  39:16

**weeks**  29:17,
  19

**whichever**

60:22

**white**  13:19
  14:4,6,8,
  13,22
  15:11
  28:13,16
  74:11
  75:14,18
  81:8,9
  84:13,21

**Wholesale**
  11:24

**William**  67:1

**withdrawn**
  39:18

**witnesses**
  102:13,16,
  21

**word**  54:5
  55:5 65:1,
  15

**work**  6:8,
  15,19,24
  7:18 9:10
  11:24 12:5
  15:20
  16:17 21:9
  24:12,13,
  23,25
  25:3,6,17
  26:4 27:6,
  7,23 28:6,
  9 29:13
  30:14,17,
  22 31:3,5,

8,9 32:4,
7,9,14
33:9 39:11
44:10
45:3,5,7,
18 46:10,
14 48:9
49:1,16
50:1,23
51:4 53:23
54:6 56:5,
7,21
57:12,18,
24 58:25
63:16,17,
18,22
64:3,7,10,
12,15,21
65:6,7,20,
24 66:8,
10,11
69:3,5
70:6,21,22
71:3,5,21,
22 72:2,4,
9,21 75:2,
4,13,16,
18,20
78:14
80:15,17
81:10,12
83:16
84:13,20
92:18
93:11,12,
13,14
94:1,5,8
98:8,9,21,

23 99:4
108:13
111:24
112:3
113:3,9,11

**worked**  6:16
  11:7,18
  12:2 28:1
  29:9,15,18
  40:6,19
  44:1 92:4

**workers**
  76:23
  85:13

**working**  6:10
  33:4 35:8,
  10 69:10
  75:22
  85:14

**works**  67:25
  88:9,15,21

**worst**  28:20

**write**  50:3

**wrong**  23:7,
  9,11 27:16
  51:4 79:1

**wrongfully**
  64:11

**wrote**  85:11,
  18

—————————————

**Y**
—————————————

**yard**  75:1

**JONATHAN TRENT MASSA vs TEAMSTERS LOCAL UNION 79, ET AL.**
Jonathan Trent Massa on 01/30/2023                    Index: year..Yup

**year**  40:6
   62:23

**years**  5:21
   6:22 10:25
   35:10
   42:16
   56:24 82:2
   85:19,24
   104:10,24

**yell**  59:20
   80:9

**yelling**
   80:11 85:9

**younger**  6:21
   14:4

**Yup**  10:8
   12:4 16:14
   28:8 40:1
   42:12 47:2
   48:10,12
   52:21
   54:20,23
   55:12
   66:25

# EXHIBIT G

## To Motion to Dismiss or For Summary Affirmance

Texts between Marc "Joey" Howard (blue) and Jonathan Trent Massa (black)

October 13, 2020





8:02

**New iMessage**                **Cancel**

To: **Trent  Massa**

iMessage
Tue, Oct 13, 11:51 AM

The company would like to make you a offer of $250 for your open grievances and also asking for a resignation instead of being fired per labor manager Fred fore

To clear the log

**That's a big no**

Understand what would you like your resolution to be ? Or I can let Thor handle it which ever you prefer



iMessage



8:02

**New iMessage**    **Cancel**

To: **Trent Massa**

> Labor manager is here just making the offer they state they sent you termination letter in mail and 48 hour and you didn't respond allegedly

I'll just wait for my lawyer to get this figured out

Getting fired for having surgery

Crazy

Didn't even know I was fired till i went to the doctors office

Talked to Alan in February on the phone.. tells me he's going to call me back and let me know what happens with





8:02

**New iMessage**    **Cancel**

To: **Trent Massa**

**Talked to Alan in February on the phone.. tells me he's going to call me back and let me know what happens with everything.. never hear from him again**

**Understood, I'll let Thor know**

**Desiree literally ignoring me for months and won't send me what I need.**

**Y'all telling me to sign up for FMLA even though you knew I wouldn't apply**

**Then I hear Dave telling people I won't get my job back because I didn't fill out paperwork right? Then laughing about it? Y'all told**





8:07

New iMessage          Cancel

To: Trent Massa

**Then I hear Dave telling people I won't get my job back because I didn't fill out paperwork right? Then laughing about it? Y'all told me to get on FMLA and I was denied. No one ever said to get on short term after I get denied from FMLA**

**Why did you or Alan not yell me I was fired, also?**

**Not tell***



iMessage



To: **Trent  Massa**



**Still spending <u>200$</u> a week at PT as well**



I spoke to Thor he said call and apply for teamcare and also file a grievance if any dicipline was sent to you and



8:07

**New iMessage**          **Cancel**

To: **Trent  Massa**

**Still spending <u>200$</u> a week at PT as well**

I spoke to Thor he said call and apply for teamcare and also file a grievance if any dicipline was sent to you and you can also call Sabrina at union hall to get form for teamcare and speak to him if needed

**Okay that didn't answer my question though**

**My teamcare has been in for months now.. only took me about 97 days to get Desiree to fill out the last day i worked**

Why was I getting 48 hr



iMessage



8:07

**New iMessage**    Cancel

To: Trent Massa

**Why was I getting 48 hr terminations when I sent pics to Liz, you and Alan also?**

**Was I just suppose to figure out how to use my leg right after I had surgery and drive to work?**

Tue, Oct 13, 5:11 PM



iMessage



8:07

**New iMessage**          Cancel

To: **Trent Massa**

**Here's another pic from today just so you all know 100%, that I had my leg cut open. Only a 6 inch incision though, nothing I shouldn't be able to walk off the next day.**